**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO
CASUALTY CO.,

        Plaintiffs,

vs.

MANUEL FEIJOO, M.D., MANUEL V. FEIJOO,
M.D. P.A., WE CARE MEDICAL SERVICES, INC,
MANUEL MARTINEZ VARELA, TONY
NGUYEN, D.O., NEW LIFE CLINICAL
SERVICES, INC, ALEAN MACHADO, JOSE
ESTEVEZ, YOANDRA RODRIGUEZ,
ACCIDENT REHAB ASSOCIATES INC, d/b/a
AMERICAN MEDICAL & REHAB CENTER,
ALEJANDRO VAZQUEZ, MARIA VAZQUEZ,
ERICK SALADO, M.D., MIAMI MEDICAL
GROUP, INC, JUAN JIMENEZ, GRACIELA
JIMENEZ, JOSE MARQUEZ, M.D., MARIA
NODARSE, D.C., YARA VAZQUEZ, and HAI
UZAN,

        Defendants.

_____/

**Jury Trial Demand**

## COMPLAINT

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue

Defendants and allege as follows:

1.    This action seeks to recover more than $3,100,000.00 that Defendants wrongfully

obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-

fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Manuel V. Feijoo, M.D. P.A. ("Feijoo P.A."), We Care Medical Services, Inc ("We Care"), New Life Clinical Services, Inc ("New Life"), Accident Rehab Associates Inc d/b/a American Medical & Rehab Center ("Accident Rehab"), and Miami Medical Group, Inc ("Miami Medical")(collectively the "Entity Defendants") relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including putative initial examinations, follow up examinations, range of motion testing, muscle strength testing, and physical therapy services (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2.       In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of pending, fraudulent no-fault insurance claims that Defendants have submitted or caused to be submitted through the Entity Defendants because:

(i)      at all relevant times (a) Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical operated in violation of the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), rendering them ineligible to collect no-fault insurance benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable; (b) Feijoo P.A., We Care, and New Life operated in violation of Florida's patient brokering act, Fla. Stat § 817.505 (the "Patient Brokering Act"); and (c) Feijoo P.A. operated in violation of Florida's Patient Self-Referral Act, Fla. Stat. § 456.053 (the "Self-Referral Act");

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by unsupervised massage therapists and/or chiropractic assistants and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists and chiropractic assistants;

(iv)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses necessary to perform the services without supervision;

(v)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

3.      Defendants fall into the following categories:

(i)     Defendant Feijoo P.A., through which the Fraudulent Services purportedly were performed and were billed to insurance companies, including GEICO, falsely purported to be a properly-exempted health care clinic under the Clinic Act, and operated in pervasive violation of Florida's Clinic Act, the Patient Brokering Act, and the Self-Referral Act.

(ii)    Defendants We Care, New Life, Accident Rehab, and  Miami Medical, through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO, falsely purported to be properly-licensed health care clinics that operated in compliance with the licensing and operating requirements set forth in the Clinic Act.

(iii)   Defendant Manuel Feijoo ("Feijoo") is a physician licensed to practice medicine in Florida, was the owner of Feijoo P.A., purported to perform virtually all the Fraudulent Services at Feijoo P.A., and also purported to perform a significant amount of the Fraudulent Services at We Care, New Life, Accident Rehab, and Miami Medical.

(iv)    Defendant Manuel Martinez Varela ("Martinez") purported to own and control We Care.

(v)     Defendant Tony Nguyen, D.O. ("Nguyen") is a physician licensed to practice medicine in Florida who falsely purported to serve as the medical director of We Care.

(vi)    Defendant Alean Machado ("Machado") purported to own and control New Life.

(vii)   Defendant Yoandra Rodriguez ("Rodriguez") is licensed as a massage therapist a in Florida, and purported to perform many of the Fraudulent Services on behalf of New Life.

(viii)   Defendant Jose Estevez ("Estevez") is licensed as a massage therapist a in Florida, and purported to perform many of the Fraudulent Services on behalf of New Life.

(ix)   Defendants Alejandro Vazquez ("A. Vazquez") and Maria Vazquez ("M. Vazquez") purported to own and control Accident Rehab.

(x)   Defendant Erick Salado, M.D. ("Salado") is a physician licensed to practice medicine in Florida who falsely purported to serve as the medical director of Accident Rehab, and falsely purported to perform or directly supervise many of the Fraudulent Services on behalf of Accident Rehab.

(xi)   Defendants Juan Jimenez ("J. Jimenez") and Graciela Jimenez ("G. Jimenez") purported to own and control Miami Medical. G. Jimenez was also licensed as a massage therapist and registered chiropractic assistant and purported to perform many of the fraudulent services on behalf of Miami Medical.

(xii)   Defendant Yara Vazquez ("Vazquez") is licensed as a massage therapist and registered chiropractic assistant in Florida, and purported to perform many of the Fraudulent Services on behalf of Miami Medical.

(xiii)   Defendant Hai Uzan ("Uzan") is licensed as a massage therapist in Florida, and purported to perform many of the Fraudulent Services on behalf of Miami Medical.

(xiv)   Defendant Jose Marquez, M.D. ("Marquez") is a physician licensed to practice medicine in Florida who falsely purported to serve as the medical director of Miami Medical, and falsely purported to perform or directly supervise many of the Fraudulent Services on behalf of Miami Medical.

(xv)   Defendant Maria Nodarse, D.C. ("Nodarse") is a chiropractor licensed to practice chiropractic in Florida, and purported to perform many of the Fraudulent Services on behalf of Miami Medical.

4.   As set forth herein, Defendants have known that:

(i)   at all relevant times (a) Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical operated in violation of  the Clinic Act; (b) Feijoo P.A., We Care, and New Life operated in violation of the Patient Brokering Act; and (c) Feijoo P.A. operated in violation of the Self-Referral Act;

(ii)   the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)   in many cases, the Fraudulent Services at We Care, New Life, Accident Rehab, and Miami Medical were not reimbursable as a matter of Florida law, because they were

4

performed – to the extent that they were performed at all – by unsupervised massage therapists and chiropractic assistants and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists and chiropractic assistants;

(iv)    in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses necessary to perform the services without supervision;

(v)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

5.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed through Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical to GEICO.

6.      The charts annexed hereto as Exhibits "1"–"5" set forth large and representative samples of the fraudulent claims that have been identified to date that Defendants have submitted, or caused to be submitted, to GEICO.

7.      Defendants' interrelated fraudulent schemes began no later than 2013 and have continued uninterrupted since that time.  As a result of Defendants' fraudulent schemes, GEICO has incurred damages of more than $3,100,000.00.

8.      Defendants' fraudulent schemes are the latest in a long line of insurance fraud scams aimed at Florida consumers and insurers.  They are part of an insurance fraud epidemic that – in 2014-2015 alone – led to almost 1,200 convictions in Florida.  See Florida Department of Financial Services, Division of Insurance Fraud Annual Report for Fiscal Year 2014-2015.

## THE PARTIES

### I.    Plaintiffs

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.    Defendants

10.      Defendant Feijoo P.A. is a Florida professional association with its principal place of business in Miami, Florida. At all relevant times, Feijoo P.A. falsely purported to be exempt from health care clinic licensure requirements pursuant to Fla. Stat. § 400.9905(4)(g). Feijoo P.A. was incorporated in Florida on or about April 2, 1993, had Feijoo as its owner and president, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

11.      Defendant Feijoo resides in and is a citizen of Florida. Feijoo was licensed to practice medicine in Florida on October 19, 1992, owned and operated Feijoo P.A., purported to perform virtually all of the Fraudulent Services on behalf of Feijoo P.A., and used Feijoo P.A. as a vehicle to submit fraudulent no-fault billing to GEICO and other insurers. In addition, Feijoo purported to perform a significant amount of the Fraudulent Services at We Care, New Life, Accident Rehab, and Miami Medical.

12.      Defendant We Care is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, We Care falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. We Care was incorporated in Florida on or about November 4, 2009, had Martinez as its owner,

falsely purported to have Nguyen as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

13.     Defendant Martinez resides in and is a citizen of Florida. Martinez purported to be the president and owner of We Care, and used We Care as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

14.     Defendant Nguyen resides in and is a citizen of Florida. Nguyen was licensed to practice medicine in Florida on July 18, 2017, and falsely purported to serve as medical director at We Care.

15.     Defendant New Life is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, New Life falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. New Life was incorporated in Florida on or about January 10, 2009, had Machado as its owner, falsely purported to have a physician named Carlos Arturo Almonte Gomez, M.D. ("Almonte") as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

16.     Defendant Machado resides in and is a citizen of Florida. Machado purported to be the owner of New Life, and used New Life as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

17.     Machado has a history of involvement in insurance fraud schemes.

18.     For example, on October 1, 2019, Machado was arrested in Miami and charged by the Miami-Dade State Attorney's Office with Insurance Fraud, Grand Theft, Patient Brokering, and Organized Scheme to Defraud in connection with his activities as the owner of Professional Medical Practice, a physical therapy clinic in Miami.

19.     The alleged crime involved Machado offering to pay motor vehicle accident victims $2,500.00 to lie to insurance companies about receiving physical therapy services that were never provided in the first instance.

20.     Defendant Rodriguez resides in and is a citizen of Florida. Rodriguez was licensed as a massage therapist in Florida on October 10, 2011. Rodriguez purported to perform many of the Fraudulent Services on behalf of New Life.

21.     Defendant Estevez resides in and is a citizen of Florida. Estevez was licensed as a massage therapist in Florida on March 17, 2011. Estevez purported to perform many of the Fraudulent Services on behalf of New Life.

22.     Defendant Accident Rehab is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Accident Rehab falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Accident Rehab was incorporated in Florida on or about September 26, 2003, had A. Vazquez and M. Vazquez as its owners, falsely purported to have Salado as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

23.     Defendant A. Vazquez resides in and is a citizen of Florida. A. Vazquez purported to be the president and owner of Accident Rehab, and together with M. Vazquez, used Accident Rehab as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

24.     Defendant M. Vazquez resides in and is a citizen of Florida. M. Vazquez purported to be the vice president and owner of Accident Rehab, and together with A. Vazquez, used Accident Rehab as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

25. Defendant Salado resides in and is a citizen of Florida. Salado was licensed to practice medicine in Florida on April 20, 1989, and falsely purported to serve as medical director at Accident Rehab.

26. Defendant Miami Medical is a Florida corporation with its principal place of business in Miami, Florida. At all relevant times, Miami Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act. Miami Medical was incorporated in Florida on or about January 12, 1982, had J. Jimenez and G. Jimenez as its owners, falsely purported to have Marquez as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

27. Defendant J. Jimenez resides in and is a citizen of Florida. J. Jimenez purported to be the president and owner of Miami Medical, and together with G. Jimenez, used Miami Medical as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

28. Defendant G. Jimenez resides in and is a citizen of Florida. G. Jimenez purported to be the vice president and owner of Miami Medical, and together with J. Jimenez, used Miami Medical as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers. G. Jimenez was licensed as a massage therapist in Florida on August 31, 2004, and was licensed as a registered chiropractic assistant in Florida on April 4, 2016. G. Jimenez purported to perform many of the Fraudulent Services on behalf of Miami Medical.

29. Defendant Marquez resides in and is a citizen of Florida. Marquez was licensed to practice medicine in Florida on October 30, 1986, and falsely purported to serve as medical director at Miami Medical.

30.     Defendant Nodarse resides in and is a citizen of Florida. Nodarse was licensed to practice chiropractic in Florida on January 13, 1995, and purported to perform many of the Fraudulent Services on behalf of Miami Medical.

31.     Nodarse has a history of alleged involvement in no-fault insurance fraud schemes.

32.     For example, on March 30, 2011, the State of Florida Department of Health ("Department of Health") filed an administrative complaint with the State of Florida Board of Chiropractic Medicine in a case entitled Department of Health vs. Maria Teresa Nodarse, D.C., (the "Nodarse Action").

33.     The Department of Health alleged, among other things, that:

(i)     Nodarse was a supervising physician of record of a certified chiropractic physician's assistant named Maria de las Mercedes Fuentes ("Fuentes") from December 2004 through May, 2006 at Santa Clara Medical Center, Inc. ("Santa Clara");

(ii)    The State Attorney for the Eleventh Judicial Circuit in Miami-Dade County, Florida charged Fuentes with one count of patient brokering and two counts of false/fraudulent insurance claims in connection with her work at Santa Clara. Fuentes pled guilty to all three counts;

(iii)   The crimes to which Fuentes pled guilty were directly related to her duties at Santa Clara while under the supervision of Nodarse.

34.     Based on these allegations, the Department of Health filed the Nodarse Action against Nodarse for failing to provide the necessary supervision to Fuentes.

35.     On August 2, 2011, the Nodarse Action settled, which required Nodarse, among other things, to practice under the indirect supervision of another chiropractic physician for one year.

36.     Upon information and belief, Nodarse's history of alleged involvement in an insurance fraud scheme – which can be located by prospective employers, referral sources, and patients through a simple internet search – has made it substantially more difficult for her to obtain

legitimate employment as a chiropractor, and contributed to her motive to participate in the fraudulent scheme described herein.

37.     Defendant Uzan resides in and is a citizen of Florida. Uzan was licensed as a massage therapist in Florida on February 16, 2015. Uzan purported to perform many of the Fraudulent Services on behalf of Miami Medical.

38.     Defendant Vazquez resides in and is a citizen of Florida. Vazquez was licensed as a massage therapist in Florida on June 25, 2003, and was licensed as a registered chiropractic assistant in Florida on April 4, 2016. Vazquez purported to perform many of the Fraudulent Services on behalf of Miami Medical.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

40.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") ACT).

41.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

42.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

**I.**     **An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.**     **The Florida No-Fault Law**

43.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

44.     Under the No Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health care Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

**B.**     **No-Fault Reimbursement and Compliance with Florida Law Governing Health care Practice**

45.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

46.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

47.     Thus, health care services providers, including clinics licensed or operating under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in

substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

48.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

C.     **No-Fault Reimbursement and the Clinic Act**

49.     Subject to certain limited exceptions, a license issued by the Florida Agency for Health Care Administration is required in order to operate a clinic in Florida. See Fla. Stat. § 400.991(1)(a). The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

50.     However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license … .

Fla. Stat. § 400.9905(4)(g)(emphasis added).

51.     In order to qualify for the "wholly owned" exemption under the Clinic Act, the licensed health care practitioner has a continuing obligation to supervise the business activities of the clinic and remain legally responsible for the entity's compliance with all federal and state laws.

52.     What is more, a clinic that does not qualify for the wholly owned exemption, and does not otherwise have a license, operates unlawfully under Florida law.

53.     Pursuant to the Clinic Act, clinics operating in Florida that do not qualify for the "wholly owned" exemption under the Clinic Act must – among other things – "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic." See Fla. Stat. § 400.9935(1).

54.     Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action." See Fla. Stat. § 400.9935(1).

55.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license", and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

56.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." See Fla. Stat. § 400.9935(3).

57.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's medical director or other operating requirements are not entitled to

collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

58. By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's medical director or other operating requirements, <u>whether or not the underlying health care services were medically necessary or actually provided.</u>

**D.     No-Fault Reimbursement and the Patient Brokering Act**

59. Florida's Patient Brokering Act, Fla. Stat. § 817.505, broadly prohibits any person from offering, paying soliciting, or receiving any commission, bonus, rebate, kickback, or bribe – directly or indirectly, in cash or in kind – or from engaging in any fee-splitting arrangement of any type whatsoever, to either induce a patient referral or in exchange for a patient referral.

60. What is more, the Patient Brokering Act makes it unlawful for any person to "aid, abet, advise, or otherwise participate" in such conduct.

61. Clinics and other health care providers that operate in violation of the Patient Brokering Act are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

62. By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Patient Brokering Act, whether or not the underlying health care services were medically necessary or actually provided.

E.      **No-Fault Reimbursement and the Self-Referral Act**

63.      Florida's Patient Self-Referral Act, Fla. Stat. § 456.053, prohibits health care providers from referring patients for certain designated health care services to any entity in which the health care provider is an investor or has an investment interest.

64.      In this context, licensed chiropractors are defined as "health care providers" under the Self-Referral Act, and "designated health services" include physical therapy and diagnostic imaging services.

65.      The Self-Referral Act also provides that:

> Any health care provider or other entity that enters into an arrangement or scheme, such as a cross-referral arrangement, which the physician or entity knows or should know has a principal purpose of assuring referrals by the physician to a particular entity which, if the physician directly made referrals to such entity, would be in violation of this section, shall be subject to a civil penalty of not more than $100,000 for each such circumvention arrangement or scheme to be imposed and collected by the appropriate board.

See Fla. Stat. § 456.053(5)(f).

66.      Pursuant to the Self-Referral Act, clinics and other health care providers may not submit any claim for payment to any insurer for services rendered pursuant to an unlawful self-referral. See Fla. Stat. § 456.053(5)(c).

67.      What is more, clinics and other health care providers that collect payments for services rendered pursuant to unlawful self-referrals must "refund such amount on a timely basis". See Fla. Stat. § 456.053(5)(d).

68.      More generally, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Self-Referral Act, whether or not the underlying health care services were medically necessary or actually provided.

**F.      No-Fault Reimbursement and Medical Necessity**

69.      Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP

Benefits for medically necessary services. <u>See</u> Fla. Stat. § 627.736. Concomitantly, a health care

services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP

Benefits for medically necessary services. <u>Id</u>.

70.      Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of
preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that
is:

(a) In accordance with generally accepted standards of medical practice;

(b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c) Not primarily for the convenience of the patient, physician, or other health care
     provider.

<u>See</u> Fla. Stat. § 627.732.

**G.      No-Fault Reimbursement, Massage Therapy, and Massage Therapists**

71.      Prior to January 1, 2013, the No-Fault Law permitted health care services providers,

including clinics organized under the Clinic Act, to collect PIP Benefits for massage therapy, so

long as – among other things – the massage therapy was "provided, supervised, ordered, or

prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed

or accredited institutional setting. <u>See</u> 2012 Fla. ALS 197.

72.      However, the No-Fault Law was amended, effective January 1, 2013, to prohibit

PIP reimbursement for massage or for services provided by massage therapists. <u>See</u> 2012 Fla. ALS

197; <u>see also</u> Fla. Stat. § 627.736(1)(a)(5)("Medical benefits [that are reimbursable under the No-

Fault Law] do not include massage …, regardless of the person, entity, or licensee providing

massage …, and a licensed massage therapist … may not be reimbursed for medical benefits under this section.").

73.     The No-Fault Law was amended to prohibit PIP reimbursement for massage or for services provided by massage therapists in response to widespread PIP fraud involving massage services and massage therapists. See, e.g., Florida House of Representatives Staff Analysis for House Bill 119 (amending the No-Fault Law), noting that "PIP fraud remains rampant", and citing dramatic increases in PIP claims for massage therapy as a significant part of the problem.

74.     Pursuant to Fla. Stat. § 486.028, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

**H.      No-Fault Reimbursement and Registered Chiropractic Assistants**

75.     Pursuant to Fla. Stat. § 460.4166(1), a registered chiropractic assistant "means a professional, multiskilled person dedicated to assisting in all aspects of chiropractic medicine practice under the direct supervision and responsibility of a chiropractic physician or certified chiropractic physician's assistant." See Fla. Stat. § 460.4166(1).

76.     Thus, a registered chiropractic assistant may – provided that they are working under the direct supervision and responsibility of a licensed chiropractor or certified chiropractic physician's assistant – assist with patient examinations or treatments other than manipulations or adjustments. See Fla. Stat. § 460.4166(2).

77.     Pursuant to Fla. Stat. § 460.403(7), "'direct supervision' means responsible supervision and control, with the licensed chiropractic physician assuming legal liability for the services rendered by a registered chiropractic assistant … [e]xcept in cases of emergency, direct supervision shall require the physical presence of the licensed chiropractic physician for

consultation and direction of the actions of the registered chiropractic assistant". See Fla. Stat. § 460.403(7).

78.     Similarly, the Florida Board of Chiropractic Medicine has promulgated various rules regarding the supervision of registered chiropractic assistants. Among other things, these rules state:

(i)     "'[d]irect supervision' means responsible supervision and requires, except in case of an emergency, the physical presence of the licensed chiropractic physician on the premises for consultation and direction. Registered chiropractic assistants shall only perform clinical procedures under direct supervision."

(ii)    "[t]he direct supervision of a registered chiropractic assistant shall mean that the assistant will be under the direction of a chiropractor or a licensed certified chiropractic physician's assistant who is physically located on the premises at all times while a registered chiropractic assistant is performing assigned duties that involve patient care management or treatment."

**I.     No-Fault Billing and No-Fault Reimbursement**

79.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)     For any service or treatment that was not lawful at the time rendered;

(ii)    For any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(iii)   To any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iv)    With respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

See Fla. Stat. § 627.736.

80.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the

guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes. See Fla. Stat. § 627.736.

**II.    Defendants' Fraudulent Schemes**

81.     As set forth herein, the Defendants masterminded and implemented interrelated fraudulent schemes in which they billed GEICO, or caused GEICO to be billed, more than $3,100,000.00 for medically unnecessary, illusory, and otherwise non-reimbursable services.

**A.    The Violations of the Clinic Act**

82.     As part of the Defendants' fraudulent schemes, Feijoo P.A., New Life, We Care, Accident Rehab, and Miami Medical operated in pervasive violation of the Clinic Act.

**1.    The Unlawful Operation of Feijoo P.A. Without Supervision by Feijoo**

83.     Although Feijoo P.A. purported to be exempt from the Clinic Act's health care clinic licensure requirements, Feijoo P.A. operated without a valid exemption and, as a result, operated as an unlicensed health care clinic in violation of the Clinic Act.

84.     In particular, Feijoo failed to supervise Feijoo P.A.'s business activities or ensure compliance with all applicable federal and state laws as required by the Clinic Act and, as a result, Feijoo P.A. did not qualify for any exemption from the Clinic Act's health care clinic licensure requirements.

85.     Feijoo never legitimately supervised the business activities of Feijoo P.A., inasmuch as Feijoo never conducted reviews of the billing or treatment records from Feijoo P.A. to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Feijoo P.A.

86.     Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across all of the billing submitted to GEICO through Feijoo P.A. – there is simply

no way that Feijoo could have legitimately supervised the business activities of Feijoo P.A. to ensure that the billing was not fraudulent or ensure compliance with all applicable federal and state laws as required by the Clinic Act.

87.     Had Feijoo legitimately supervised the business activities of Feijoo P.A., Feijoo would have noted, among other things, that:

(i)     Feijoo P.A. was operating in pervasive violation of the Clinic Act, Patient Brokering Act, and the Self-Referral Act;

(ii)    the Fraudulent Services purportedly provided by and billed through Feijoo P.A. were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol;

(iii)   in many cases, the Fraudulent Services purportedly provided by and billed through Feijoo P.A. never were provided in the first instance; and

(iv)    the billing codes used for the Fraudulent Services purportedly provided by and billed through Feijoo P.A. misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

88.     Accordingly, Feijoo P.A. never qualified for the exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did Feijoo P.A. have a medical director as required for a health care clinic without an exemption. As a result, Feijoo P.A. operated – at all relevant times – in violation of the Clinic Act.

**2.     The Unlawful Operations of We Care, New Life, Accident Rehab, and Miami Medical in Violation of the Clinic Act**

**a.     The Unlawful Operation of We Care Without a Legitimate Medical Director**

89.     We Care was first incorporated in November 2009.

90.     In or about October 2016, Martinez, who is not and never has been licensed as a physician, became sole owner of We Care and remained sole owner of We Care during the relevant time period.

91.     Thereafter, Martinez sought to use We Care as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

92.     However, because We Care was subject to the Clinic Act, Martinez could not lawfully operate We Care, or use We Care as a vehicle to submit PIP billing to GEICO and other insurers, unless Martinez recruited and retained a licensed physician to serve as We Care's medical director.

93.     However, if Martinez recruited and retained a legitimate physician to serve as a legitimate medical director at We Care, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. By extension, any such legitimate medical director would impede Martinez's ability to use We Care as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

94.     Accordingly, Martinez required a pliable physician willing to falsely pose as the "medical director" at We Care, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Martinez to use We Care as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

95.     Thereafter, in September 2017, Martinez recruited Nguyen, a licensed physician who was willing to falsely pose as the legitimate medical director of We Care.

96.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain We Care's licensure and to permit We Care to operate as a clinic, We Care and Martinez entered into a secret scheme with Nguyen. In exchange for a designated salary from We Care, Nguyen agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at We Care, and to the insurers including

GEICO that received PIP claims from We Care, that he was the true medical director at We Care, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at We Care.

97.     However, Nguyen never genuinely served as medical director at We Care. Instead, from the beginning of his association with We Care as its phony "medical director", Nguyen ceded all day-to-day decision-making and oversight regarding health care services at We Care, and the resulting billing, to Martinez.

98.     Nguyen never legitimately served as medical director at We Care, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of We Care's billing to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through We Care, much less take any immediate corrective action.

99.     Had Nguyen legitimately served as We Care's medical director, he would have noted that We Care was operating in pervasive violation of the Clinic Act and Patient Brokering Act.

100.     Had Nguyen legitimately served as We Care's medical director, he would have ensured that We Care's employees possessed the appropriate licenses to perform their jobs or were appropriately supervised.

101.     In fact, true authority over the provision of health care services through We Care, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Martinez.

102.    In keeping with the fact that Nguyen never legitimately served as medical director at We Care, Nguyen simultaneously purported to serve as medical director for numerous other clinics, including Prime Medical & Rehab Services Inc, Star Medical Center, Inc, and Gonzalez's Medical Center, Inc.

103.    Nguyen, who was only licensed to practice medicine in 2017 and therefore had limited experience as a licensed physician, could not legitimately have simultaneously served as medical director at three other clinics while also fulfilling his putative "medical director" role at We Care.

104.    Martinez used the façade of Nguyen's phony "appointment" as We Care's ersatz "medical director" to do indirectly what he was forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at We Care; (iii) to permit health care services to be provided at We Care by individuals who lacked the proper licensure to perform the services; and (iv) to use We Care as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

105.    Nguyen unlawfully permitted Martinez to dictate every aspect of the manner in which Insureds would be treated at We Care, and to dictate every aspect of the manner in which health care services at We Care would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through We Care.

**b.    The Unlawful Operation of New Life Without a Legitimate Medical Director**

106.    In or about January 2009, Machado, who is not and has never been licensed as a physician, incorporated New Life.

24

107.    Thereafter, Machado sought to use New Life as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

108.    However, because New Life was subject to the Clinic Act, Machado could not lawfully operate New Life, or use New Life as a vehicle to submit PIP billing to GEICO and other insurers, unless they recruited and retained a licensed physician to serve as New Life's medical director.

109.    However, if Machado recruited and retained a legitimate physician to serve as a legitimate medical director at New Life, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. By extension, any such legitimate medical director would impede Machado's, ability to use New Life as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

110.    Accordingly, Machado required a pliable physician willing to falsely pose as the "medical director" at New Life, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Machado to use New Life as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

111.    Thereafter, in February 2017, Machado recruited Almonte, a licensed physician who was willing to falsely pose as the legitimate medical director of New Life.

112.    In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain New Life's licensure and to permit New Life to operate as a clinic, New Life and Machado entered into a secret scheme with Almonte. In exchange for a designated salary from New Life, Almonte agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at New Life, and to the insurers including

GEICO that received PIP claims from New Life, that he was the true medical director at New Life, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at New Life.

113.    However, Almonte never genuinely served as medical director at New Life. Instead, from the beginning of his association with New Life as its phony "medical director", Almonte ceded all day-to-day decision-making and oversight regarding health care services at New Life, and the resulting billing, to Machado.

114.    Almonte never legitimately served as medical director at New Life, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of New Life's billing to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through New Life, much less take any immediate corrective action.

115.    Had Almonte legitimately served as New Life's medical director, he would have noted that New Life was operating in pervasive violation of the Clinic Act and the Patient Brokering Act.

116.    Had Almonte legitimately served as New Life's medical director, he would have ensured that New Life's employees possessed the appropriate licenses to perform their jobs or were appropriately supervised.

117.    In fact, true authority over the provision of health care services through New Life, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Machado.

118.     In keeping with the fact that Almonte never legitimately served as medical director at New Life, Almonte simultaneously purported to serve as medical director for at least three other clinics, namely Foot Treatment Center, Inc, Diagnostic & Radiology of Miami, Inc, and Ultra Care & Diagnostic Corp.

119.     It is highly improbable – to the point of impossibility – that Almonte could have simultaneously served as medical director at three other clinics while also fulfilling his putative "medical director" role at New Life.

120.     In keeping with the fact that Almonte never legitimately served as New Life's medical director, Almonte swore – in a May 2019 affidavit – that:

(i)      He only visited New Life one day each month, for a few hours, during his purported tenure as "medical director" there.

(ii)     He never even reviewed any of New Life's actual bills, and instead reviewed purported "billing summaries" that were provided to him by New Life.

(iii)    He did not know how many patients were treated each month at New Life, or whether the handful of patient charts he reviewed each month at New Life represented any significant percentage of the overall number of patients who treated each month at New Life.

(iv)     He did not know whether the healthcare services reflected in the patient records at New Life were medically necessary, or actually provided.

121.     Machado used the façade of Almonte's phony "appointment" as New Life's ersatz "medical director" to do indirectly what he was forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at New Life; (iii) to permit health care services to be provided at New Life by individuals who lacked the proper licensure to perform the services; and (iv) to use New Life as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

122. Almonte unlawfully permitted Machado to dictate every aspect of the manner in which Insureds would be treated at New Life, and to dictate every aspect of the manner in which health care services at New Life would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through New Life.

c. **The Unlawful Operation of Accident Rehab Without a Legitimate Medical Director**

123. In or about September 2003, A. Vazquez – who is not and never has been licensed as a physician – incorporated Accident Rehab.

124. In or about October 2003, M. Vazquez – who also is not and never has been licensed as a physician – became co-owner of Accident Rehab, together with A. Vazquez.

125. A. Vazquez and M. Vazquez sought to use Accident Rehab as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

126. However, because Accident Rehab was subject to the Clinic Act, A. Vazquez and M. Vazquez could not lawfully operate Accident Rehab, or use Accident Rehab as a vehicle to submit PIP billing to GEICO and other insurers, unless they recruited and retained a licensed physician to serve as Accident Rehab's medical director.

127. However, if A. Vazquez and M. Vazquez recruited and retained a legitimate physician to serve as a legitimate medical director at Accident Rehab, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. By extension, any such legitimate medical director would impede A. Vazquez and M. Vazquez's, ability to use Accident Rehab as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

128. Accordingly, A. Vazquez and M. Vazquez required a pliable physician willing to falsely pose as the "medical director" at Accident Rehab, but who – in actuality – would not even

attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit A. Vazquez and M. Vazquez to use Accident Rehab as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

129.     Thereafter, in June 2009, A. Vazquez, and M. Vazquez recruited Salado, a licensed physician who was willing to falsely pose as the legitimate medical director of Accident Rehab.

130.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Accident Rehab's licensure and to permit Accident Rehab to operate as a clinic, Accident Rehab, A. Vazquez, and M. Vazquez entered into a secret scheme with Salado. In exchange for a designated salary from Accident Rehab, Salado agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Accident Rehab, and to the insurers including GEICO that received PIP claims from Accident Rehab, that he was the true medical director at Accident Rehab, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at Accident Rehab.

131.     However, Salado never genuinely served as medical director at Accident Rehab. Instead, from the beginning of his association with Accident Rehab as its phony "medical director", Salado ceded all day-to-day decision-making and oversight regarding health care services at Accident Rehab, and the resulting billing, to A. Vazquez and M. Vazquez.

132.     Salado never legitimately served as medical director at Accident Rehab, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of Accident Rehab's billing to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Accident Rehab, much less take any immediate corrective action.

133.     Had Salado legitimately served as Accident Rehab's medical director, he would have ensured that Accident Rehab's employees possessed the appropriate licenses to perform their jobs or were appropriately supervised.

134.     Had Salado legitimately served as Accident Rehab's medical director, he would have noted that Accident Rehab routinely fraudulently represented in Accident Rehab's billing that the putative initial examinations at Accident Rehab were legitimately and lawfully performed and billed to GEICO.

135.     In fact, true authority over the provision of health care services through Accident Rehab, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by A. Vazquez and M. Vazquez.

136.     In keeping with the fact that Salado never legitimately served as medical director at Accident Rehab, Salado simultaneously purported to serve as medical director for at least two other clinics, namely Custer Medical Center and Medical Rehabilitative Center.

137.     A. Vazquez and M. Vazquez used the façade of Salado's phony "appointment" as Accident Rehab's ersatz "medical director" to do indirectly what they were forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at Accident Rehab; (iii) to permit health care services to be provided at Accident Rehab by individuals who lacked the proper licensure to perform the services; and (iv) to use Accident Rehab as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

138.     Salado unlawfully permitted A. Vazquez and M. Vazquez to dictate every aspect of the manner in which Insureds would be treated at Accident Rehab, and to dictate every aspect of the manner in which health care services at Accident Rehab would be billed to GEICO and other

insurers, because he sought to continue profiting from the fraudulent billing submitted through Accident Rehab.

**d.     The Unlawful Operation of Miami Medical Without a Legitimate Medical Director**

139.    Miami Medical was first incorporated in January 1982.

140.    In or about January 1995, J. Jimenez became sole owner of Miami Medical.

141.    In 2008, G. Jimenez became a co-owner of Miami Medical, together with J. Jimenez.

142.    Thereafter,  J. Jimenez and G. Jimenez sought to use Miami Medical as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

143.    However, because Miami Medical was subject to the Clinic Act, J. Jimenez and G. Jimenez could not lawfully operate Miami Medical, or use Miami Medical as a vehicle to submit PIP billing to GEICO and other insurers, unless they recruited and retained a licensed physician to serve as Miami Medical's medical director.

144.    However, if J. Jimenez and G. Jimenez recruited and retained a legitimate physician to serve as a legitimate medical director at Miami Medical, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. By extension, any such legitimate medical director would impede J. Jimenez and G. Jimenez's, ability to use Miami Medical as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

145.    Accordingly, J. Jimenez and G. Jimenez required a pliable physician willing to falsely pose as the "medical director" at Miami Medical, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby

would permit J. Jimenez and G. Jimenez to use Miami Medical as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

146.    Thereafter, in June 2010, J. Jimenez and G. Jimenez recruited Marquez, a licensed physician who was willing to falsely pose as the legitimate medical director of Miami Medical.

147.    In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Miami Medical's licensure and to permit Miami Medical to operate as a clinic, Miami Medical, J. Jimenez, and G. Jimenez entered into a secret scheme with Marquez. In exchange for a designated salary from Miami Medical, Marquez agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Miami Medical, and to the insurers including GEICO that received PIP claims from Miami Medical, that he was the true medical director at Miami Medical, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at Miami Medical.

148.    However, Marquez never genuinely served as medical director at Miami Medical. Instead, from the beginning of his association with Miami Medical as its phony "medical director", Marquez ceded all day-to-day decision-making and oversight regarding health care services at Miami Medical, and the resulting billing, to J. Jimenez and G. Jimenez.

149.    Marquez never legitimately served as medical director at Miami Medical, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of Miami Medical's billing to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Miami Medical, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

150.    Had Marquez legitimately served as Miami Medical's medical director, he would have ensured that Miami Medical's employees possessed the appropriate licenses to perform their jobs or were appropriately supervised.

151.    Had Marquez legitimately served as Miami Medical's medical director, he would have noted that Miami Medical routinely fraudulently represented in Miami Medical's billing that the putative initial and follow-up examinations were legitimately and lawfully performed and billed to GEICO.

152.    In fact, true authority over the provision of health care services through Miami Medical, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by J. Jimenez and G. Jimenez.

153.    In keeping with the fact that Marquez never legitimately served as medical director at Miami Medical, Marquez simultaneously purported to serve as medical director for at least four other clinics, namely Advance Health & Wellness Inc, East Coast Medical Rehab Inc, Ray Medical Center, Inc, and Professional Medical Building Group.

154.    Marquez could not legitimately have simultaneously served as medical director at four other clinics while also fulfilling his putative "medical director" role at Miami Medical.

155.    J. Jimenez and G. Jimenez used the façade of Marquez's phony "appointment" as Miami Medical's ersatz "medical director" to do indirectly what they were forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at Miami Medical; (iii) to permit health care services to be provided at Miami Medical by individuals who lacked the proper licensure to perform the services; and (iv) to use Miami Medical as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

156.     Marquez unlawfully permitted J. Jimenez and G. Jimenez to dictate every aspect of the manner in which Insureds would be treated at Miami Medical, and to dictate every aspect of the manner in which health care services at Miami Medical would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through Miami Medical.

**B.     The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at We Care, New Life, Accident Rehab, and Miami Medical**

157.     We Care, New Life, Accident Rehab, and Miami Medical routinely falsely represented the identities of the health care providers who rendered services at We Care, New Life, Accident Rehab, Miami Medical, in order to obtain payment for Fraudulent Services to which they otherwise would not be entitled.

**1.     The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at We Care**

158.     In keeping with the fact that Nguyen never truly served as medical director at We Care, and never fulfilled the statutory obligations of a clinic medical director at We Care, Nguyen permitted We Care, Martinez, and Feijoo to routinely falsely represent the identities of the health care providers who rendered services at We Care, in order to obtain payment for the Fraudulent Services to which they otherwise would not be entitled.

159.     As set forth in Exhibit "2",  the purported physical therapy services constituted the vast majority of the services We Care, Martinez, Nguyen, and Feijoo (collectively, the "We Care Defendants") billed through We Care to GEICO.

160.     Feijoo purported to perform or directly supervise a substantial amount of the physical therapy services in the claims identified in Exhibit "2".

161. However, Feijoo only occasionally was physically present at We Care, and did not personally perform – or even supervise – the physical therapy services that We Care purported to provide to Insureds.

162. In fact, the vast majority of the physical therapy services that were billed through We Care to GEICO were performed – to the extent that they were performed at all – by unsupervised massage therapists, not physical therapists or licensed physicians.

163. However, with respect to insurance policies issued after January 1, 2013, the No-Fault Law has prohibited We Care from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists.

164. The We Care Defendants were well-aware of the fact that We Care could not legally recover PIP Benefits for services provided by unsupervised massage therapists.

165. For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

166. Therefore, the We Care Defendants listed Feijoo as the treating provider for a substantial amount of the individual physical therapy services that were billed through We Care to GEICO from September 2017 until June 2018.

167. In fact, Feijoo was only occasionally physically present at We Care, and did not personally perform – or even supervise – the physical therapy services that We Care purported to provide to Insureds.

168. In keeping with the fact that Feijoo was physically present at We Care for only a few hours each week, simultaneous to his "employment" at We Care, Feijoo also purported to

personally perform a massive number of health care services at least ten health care clinics located in distinct facilities throughout south Florida.

169.    What is more, simultaneous to his "employment" at We Care, Feijoo also purported to own, control, and supervise the business activities of Feijoo P.A., as well as personally perform a massive number of health care services at Feijoo P.A.

170.    Between September 2017 and June 2018 – the same period when he was purporting to personally perform or directly supervise a massive number of health care services at We Care, and also supervise the business activities of Feijoo P.A., Feijoo purported to personally perform a massive amount of health care services that were billed to GEICO through other health care clinics.

171.    Altogether, between September 2017 and June 2018, GEICO received more than $1,000,000.00 in billing for services purportedly performed by Feijoo at a variety of health care clinics, all while he was simultaneously purporting to perform or directly supervise over 1,900 hours of physical therapy services that required direct, one-on-one patient contact at We Care.

172.    Even so, the We Care Defendants submitted thousands of physical therapy charges to GEICO which falsely contended that Feijoo had performed or at least directly supervised the underlying physical therapy services, despite the fact that Feijoo could not possibly have performed or even directly supervised the physical therapy.

173.    In fact, neither Feijoo, nor any other physician or licensed physical therapist purportedly associated with We Care, performed or even directly supervised the vast majority of the physical therapy services that were billed through We Care to GEICO and other insurers.

174.    Instead, the underlying physical therapy services were unlawfully provided by massage therapists, without any legitimate supervision by any licensed physician or physical therapist.

175.    In keeping with the fact that Feijoo could not have personally performed – or even supervised – the vast majority of the physical therapy services billed to GEICO through We Care, Feijoo would often purport to personally perform or directly supervise an impossible number of hours of physical therapy services in a given day.

176.    For instance:

(i)     On September 19, 2017, We Care, Martinez, Nguyen, and Feijoo purported to provide at least 86 individual physical therapy services to at least 8 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo also purported to personally perform, or at least directly supervise at least 39 additional physical therapy services purportedly provided to at least 10 additional GEICO Insureds at three different facilities, including at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20 hours of services that Feijoo purported to personally perform, or at least directly supervise, on September 19, 2017.

(ii)    On September 21, 2017, We Care, Martinez, Nguyen, and Feijoo purported to provide at least 44 individual physical therapy services to at least 8 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo also purported to personally perform, or at least directly supervise at least 37 additional physical therapy services purportedly provided to at least 8 additional GEICO Insureds at three different facilities, including at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20.25 hours of services that Feijoo purported to personally perform, or at least directly supervise, on September 21, 2017.

(iii)   On October 3, 2017, We Care, Martinez, Nguyen, and Feijoo purported to provide at least 73 individual physical therapy services to at least 7 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the

37

Insureds throughout the services. That same day, Feijoo <u>also</u> purported to personally perform, or at least directly supervise: (a) two 25 minute follow-up patient examinations; and (b) at least 37 <u>additional</u> physical therapy services purportedly provided to at least 9 additional GEICO Insureds at three different facilities, including at least 5.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 18.75 hours of services that Feijoo purported to personally perform, or at least directly supervise, on October 3, 2017.

(iv)   On January 2, 2018, We Care, Martinez, Nguyen, and Feijoo purported to provide at least 41 individual physical therapy services to at least 7 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo <u>also</u> purported to personally perform, or at least directly supervise: (a) two 45-minute initial patient examinations, two 25-minute follow-up patient examinations, and one 40 minute follow-up patient examination; and (b) at least 36 <u>additional</u> physical therapy services purportedly provided to at least 8 additional GEICO Insureds at four different facilities, including at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.5 of services that Feijoo purported to personally perform, or at least directly supervise, on January 2, 2018.

(v)   On April 11, 2018, We Care, Martinez, Nguyen, and Feijoo purported to provide at least 92 individual physical therapy services to at least 8 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo <u>also</u> purported to personally perform, or at least directly supervise: (a) three 45-minute initial patient examinations and one 25 minute follow-up patient examination; and (b) at least 46 <u>additional</u> physical therapy services purportedly provided to at least 10 additional GEICO Insureds at three different facilities, including at least 4.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20.5 of services that Feijoo purported to personally perform, or at least directly supervise, on April 11, 2018.

177.   These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "2", the We Care Defendants routinely falsely represented that Feijoo

had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at other health care clinics on those same dates.

178.    Upon information and belief, the fraudulent billing for physical therapy services that the We Care Defendants submitted or caused to be submitted through We Care to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that the We Care Defendants submitted through We Care to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

179.    Similarly, upon information and belief, the billing for physical therapy services submitted through the other health care clinics Feijoo purportedly provided services at constituted only a fraction of the total billing for physical therapy services submitted through those other health care clinics to all of the automobile insurers in the Florida automobile insurance market.

180.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

181.    It is extremely improbable, to the point of impossibility, that the We Care Defendants and the other health care clinics where Feijoo purported to provide health care services only submitted fraudulent billing to GEICO, and did not simultaneously bill other automobile insurers.

182.    Thus, upon information and belief, the massive, impossible number of physical therapy services that Feijoo purported to directly supervise or provide to GEICO Insureds on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of physical therapy services that Feijoo purported to directly supervise

or provide, including to individuals insured by companies other than GEICO, on those same dates of service.

183.    In fact, Feijoo did not perform or directly supervise the vast majority of the physical therapy services that were billed through We Care to GEICO.

184.    Rather: (i) the vast majority of the "physical therapy" services that the We Care Defendants purported to provide through We Care to Insureds were performed, to the extent that they were performed at all, by massage therapists rather than by Feijoo; (ii) Feijoo did not legitimately supervised the putative "physical therapy" services that were billed through We Care to GEICO; and (iii) virtually none of the putative "physical therapy" services that were billed through We Care to GEICO actually constituted physical therapy, because the massage therapists associated with We Care were not licensed as a physical therapist.

185.    As set forth herein, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

186.    All of the billing that the Defendants submitted through We Care to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

187.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the health care provider who actually rendered or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

188.    To "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the

performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

189.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

190.    The We Care Defendants were well-aware of the fact that – because the unsupervised massage therapists associated with We Care were not physical therapists – We Care could not recover PIP Benefits for any services that the massage therapists purported to provide.

191.    As a result, and in order to conceal the fact that the massage therapists provided – without any legitimate supervision by Feijoo– all of the "physical therapy" services that were unlawfully billed through We Care to GEICO, the Defendants deliberately omitted any reference to the massage therapists on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

192.    Instead, in the claims for physical therapy services identified in Exhibit "2", the We Care Defendants falsely listed Feijoo on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

193.    For example:

(i)     On or about October 16, 2017, We Care, Martinez, Nguyen, and Feijoo billed GEICO for physical therapy services that purportedly were provided through We Care to an Insured named MM on October 16, 2017. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent

physical therapy services, and We Care, Martinez, Nguyen, and Feijoo deliberately omitted any reference to the massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist, without any legitimate supervision by Feijoo.

(ii)     On or about December 28, 2017, We Care, Martinez, Nguyen, and Feijoo billed GEICO for physical therapy services that purportedly were provided through We Care to an Insured named FP on December 28, 2017. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and We Care, Martinez, Nguyen, and Feijoo deliberately omitted any reference to the massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist, without any legitimate supervision by Feijoo.

(iii)    On or about January 18, 2018, We Care, Martinez, Nguyen, and Feijoo billed GEICO for physical therapy services that purportedly were provided through We Care to an Insured named VD on January 18, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and We Care, Martinez, Nguyen, and Feijoo deliberately omitted any reference to the massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist, without any legitimate supervision by Feijoo.

(iv)    On or about March 21, 2018, We Care, Martinez, Nguyen, and Feijoo billed GEICO for physical therapy services that purportedly were provided through We Care to an Insured named AA on March 21, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and We Care, Martinez, Nguyen, and Feijoo deliberately omitted any reference to the massage therapist from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by a massage therapist, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist, without any legitimate supervision by Feijoo.

(v)     On or about May 7, 2018, We Care, Martinez, Nguyen, and Feijoo billed GEICO for physical therapy services that purportedly were provided through We Care to an Insured named OC on May 7, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and We Care, Martinez, Nguyen, and Feijoo deliberately omitted any reference to the massage therapist from the HCFA-1500 form. However, the

underlying physical therapy treatment notes were signed by a massage therapist, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist, without any legitimate supervision by Feijoo.

194.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "2", the We Care Defendants routinely falsely represented in the HCFA-1500 forms they submitted to GEICO that Feijoo had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by massage therapists, to the extent that they were performed at all, without any legitimate supervision by Feijoo.

195.    In the claims for physical therapy services identified in Exhibit "2", the We Care Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services were performed – to the extent they were performed at all – by massage therapists, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law;

(ii)    We Care could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed without supervision by massage therapists, in contravention of Florida law; and

(iii)   the We Care Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services in their billing for the putative "physical therapy" services.

196.    The We Care Defendants routinely fraudulently misrepresented to GEICO that Feijoo had performed or at least directly supervised the underlying physical therapy services because they knew that, were they to accurately represent that the underlying physical therapy services had been performed unsupervised by massage therapists, the charges would have been non-reimbursable and GEICO would not have remitted payment for these services.

43

197.    These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that We Care was operated without a legitimate medical director.

198.    For instance, Nguyen, who at all relevant times purported to serve as the "medical director" at We Care – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

199.    Nor, for that matter, did Nguyen "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

200.    Had Nguyen actually fulfilled his statutory role as medical director at We Care, he would have noted – among other things – that the We Care Defendants routinely fraudulently represented in We Care's billing that the physical therapy services were performed or at least directly supervised by Feijoo.

201.    Had Nguyen actually fulfilled his statutory role as medical director at We Care, he would have noted – among other things – that the We Care Defendants routinely fraudulently concealed the fact that the physical therapy services were provided – to the extent that they were provided at all – without any legitimate supervision by massage therapists, and therefore were non-reimbursable under the No-Fault Law.

202.    Nguyen did none of these things, because he never actually served as a legitimate medical director at We Care in the first instance, rendering We Care ineligible to collect PIP Benefits in the first instance.

2.     **The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at New Life**

203.     In keeping with the fact that Almonte  never truly served as medical director at New Life, and never fulfilled the statutory obligations of a clinic medical director at New Life, Almonte permitted New Life, Machado, Rodriguez, Estevez, and Feijoo to routinely falsely represent the identities of the health care providers who rendered services at New Life, in order to obtain payment for the Fraudulent Services to which they otherwise would not be entitled.

204.     As set forth in Exhibit "3", the purported physical therapy services constituted the vast majority of the services New Life, Machado, Rodriguez, Estevez, and Feijoo (collectively, the "New Life Defendants") billed through New Life to GEICO.

205.     Feijoo purported to perform or directly supervise a majority of the physical therapy services in the claims identified in Exhibit "3".

206.     However, Feijoo only occasionally was physically present at New Life, and did not personally perform – or even supervise – the physical therapy services that New Life purported to provide to Insureds.

207.     In fact, the vast majority of the physical therapy services that were billed through New Life to GEICO were performed – to the extent that they were performed at all – by Rodriguez, Estevez, and other unsupervised massage therapists associated with New Life, not physical therapists or licensed physicians.

208.     The New Life Defendants were well-aware of the fact that New Life could not legally recover PIP Benefits for services provided by unsupervised massage therapists.

209.     For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the

preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

210.     Therefore, the New Life Defendants listed Feijoo as the treating provider for a majority of the individual physical therapy services that were billed through New Life to GEICO from February 2017 until July 2018.

211.     In fact, Feijoo was only occasionally physically present at New Life, and did not personally perform – or even supervise – the physical therapy services that New Life purported to provide to Insureds.

212.     In keeping with the fact that Feijoo was physically present at New Life for only a few hours each week, simultaneous to his "employment" at New Life, Feijoo also purported to personally perform a massive number of health care services at least 10 health care clinics located in distinct facilities throughout the greater south Florida area.

213.     What is more, simultaneous to his "employment" at New Life, Feijoo also purported to own, control, and supervise the business activities of Feijoo P.A.

214.     Between February 2017 and July 2018 – the same period when he was purporting to personally perform or directly supervise a massive number of health care services at New Life, Feijoo purported to personally perform hundreds of thousands of dollars worth of health care services that were billed to GEICO through other health care clinics.

215.     Altogether, between February 2017 and July 2018, GEICO received more than $1,860,000.00 in billing for services purportedly performed by Feijoo at a variety of health care clinics, all while he was simultaneously purporting to perform or directly supervise over 890 hours of physical therapy services that required direct, one-on-one patient contact at New Life.

216.     Even so, the New Life Defendants submitted physical therapy charges to GEICO which falsely contended that Feijoo had performed or at least directly supervised the underlying physical therapy services, despite the fact that Feijoo could not possibly have performed or even directly supervised the physical therapy.

217.     In fact, neither Feijoo, nor any other physician or licensed physical therapist purportedly associated with New Life performed or even directly supervised the vast majority of the physical therapy services that were billed through New Life to GEICO and other insurers.

218.     Instead, the underlying physical therapy services were unlawfully provided by Rodriguez, Estevez, and other massage therapists associated with New Life, without any legitimate supervision by any licensed physician or physical therapist.

219.     In keeping with the fact that Feijoo could not have personally performed – or at least directly supervised – the vast majority of the physical therapy services billed to GEICO through New Life, Feijoo would often purport to personally perform – or at least directly supervise – an impossible number of hours of physical therapy services in a given day.

220.     For instance:

(i)      On November 30, 2017, New Life, Machado, and Feijoo purported to provide at least 32 individual physical therapy services to at least 3 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 6.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo also purported to personally perform, or at least directly supervise: (a) four 45 minute initial patient examinations; (b) three 25 minute follow-up patient examinations and (c) at least 73 additional physical therapy services purportedly provided to at least 8 additional GEICO Insureds at five different facilities, including at least 11.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21 hours of services that Feijoo purported to personally perform, or at least directly supervise, on November 30, 2017.

(ii)     On December 18, 2017, New Life, Machado, and Feijoo purported to provide at least 26 individual physical therapy services to at least 3 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo <u>also</u> purported to personally perform, or at least directly supervise: (a) three 45 minute initial patient examinations; (b) two 40 minute follow-up patient examinations; and (c) at least 87 <u>additional</u> physical therapy services purportedly provided to at least 11 additional GEICO Insureds at six different facilities, including at least 13 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20.5 hours of services that Feijoo purported to personally perform, or at least directly supervise, on December 18, 2017.

(iii)    On April 27, 2018, New Life, Machado, and Feijoo purported to provide at least 24 individual physical therapy services to at least 3 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo <u>also</u> purported to personally perform, or at least directly supervise: (a) one 25 minute follow up patient examination; and (b) at least 87 <u>additional</u> physical therapy services purportedly provided to at least 10 additional GEICO Insureds at six different facilities, including at least 13 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 17 hours of services that Feijoo purported to personally perform, or at least directly supervise, on April 27, 2018.

(iv)     On May 30, 2018, New Life, Machado, and Feijoo purported to provide at least 76 individual physical therapy services to at least 9 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(v)      On June 6, 2018, New Life, Machado, and Feijoo purported to provide at least 75 individual physical therapy services to at least 9 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 14.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

221.     These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "3", the New Life Defendants routinely falsely represented that Feijoo had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at other health care clinics on those same dates.

222.     Upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted or caused to be submitted through New Life to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that the New Life Defendants submitted through New Life to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

223.     Similarly, upon information and belief, the billing for physical therapy services submitted through the other health care clinics Feijoo purportedly provided services at constituted only a fraction of the total billing for physical therapy services submitted through those other health care clinics to all of the automobile insurers in the Florida automobile insurance market.

224.     GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

225.     It is extremely improbable, to the point of impossibility, that the New Life Defendants and the other health care clinics Feijoo purportedly provided health care services only submitted fraudulent billing to GEICO, and did not simultaneously bill other automobile insurers.

226.     Thus, upon information and belief, the massive, impossible number of physical therapy services that Feijoo purported to directly supervise or provide to GEICO Insureds on individual dates of service, including the dates of service identified above, constituted only a

fraction of the <u>total</u> number of physical therapy services that Feijoo purported to directly supervise or provide, including to individuals insured by companies other than GEICO, on those same dates of service.

227.    In fact, Feijoo did not perform or directly supervise the vast majority of the physical therapy services that were billed through New Life to GEICO.

228.    Rather: (i) the vast majority of the putative "physical therapy" services that the New Life Defendants purported to provide through New Life to Insureds were performed, to the extent that they were performed at all, by Rodriguez, Estevez, and the other massage therapists associated with New Life rather than by Feijoo; (ii) Feijoo did not legitimately supervise the putative "physical therapy" services that were billed through New Life to GEICO; and (iii) virtually none of the putative "physical therapy" services that were billed through New Life to GEICO actually constituted physical therapy, because Rodriguez, Estevez, and the other massage therapists associated with New Life were not licensed as physical therapists.

229.    As set forth herein, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. <u>See</u> Fla. Stat. § 627.736.

230.    All the billing that the Defendants submitted through New Life to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

231.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the health care provider who actually rendered or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. <u>See</u>, <u>e.g.</u>, Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

232.     To "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

233.     Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

234.     The New Life Defendants were well-aware of the fact that – because Rodriguez and the other unsupervised massage therapist associated with New Life were not physical therapists – New Life could not recover PIP Benefits for any services that the massage therapists purported to provide.

235.     As a result, and in order to conceal the fact that Rodriguez, Estevez, and the other massage therapists associated with New Life provided –without any legitimate supervision by Feijoo– the vast majority of the "physical therapy" services that were unlawfully billed through New Life to GEICO, the New Life Defendants deliberately omitted any reference to Rodriguez, Estevez, and the other massage therapists associated with New Life on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

236.     Instead, in the claims for physical therapy services identified in Exhibit "3", the New Life Defendants falsely listed Feijoo on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

237.     For example:

(i)      On or about March 24, 2017, New Life, Machado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through New Life to an Insured named AA on March 24, 2017. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and New Life, Machado, and Feijoo deliberately omitted any reference to Estevez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Estevez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Estevez, without any legitimate supervision by Feijoo.

(ii)     On or about August 31, 2017, New Life, Machado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through New Life to an Insured named MC on August 31, 2017. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and New Life, Machado, and Feijoo deliberately omitted any reference to Estevez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Estevez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Estevez, without any legitimate supervision by Feijoo.

(iii)    On or about May 3, 2017, New Life, Machado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through New Life to an Insured named YG on May 3, 2017. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and New Life, Machado, and Feijoo deliberately omitted any reference to Estevez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Estevez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Estevez, without any legitimate supervision by Feijoo.

(iv)     On or about October 26, 2017, New Life, Machado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through New Life to an Insured named DM on October 26, 2017. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and New Life, Machado, and Feijoo deliberately omitted any reference to Estevez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Estevez, in keeping with the fact that the pertinent

services were performed – to the extent that they were performed at all – by Estevez, without any legitimate supervision by Feijoo.

(v)     On or about February 2, 2018, New Life, Machado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through New Life to an Insured named JC on February 2, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and New Life, Machado, and Feijoo deliberately omitted any reference to Rodriguez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Rodriguez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Rodriguez, without any legitimate supervision by Feijoo.

(vi)    On or about March 10, 2018, New Life, Machado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through New Life to an Insured named MC on March 10, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and New Life, Machado, and Feijoo deliberately omitted any reference to Rodriguez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Rodriguez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Rodriguez, without any legitimate supervision by Feijoo.

(vii)   On or about May 10, 2018, New Life, Machado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through New Life to an Insured named YA on May 10, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and New Life, Machado, and Feijoo deliberately omitted any reference to Rodriguez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Rodriguez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Rodriguez, without any legitimate supervision by Feijoo.

(viii)  On or about May 17, 2018, New Life, Machado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through New Life to an Insured named GC on May 17, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and New Life, Machado, and Feijoo deliberately omitted any reference to Rodriguez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Rodriguez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Rodriguez, without any legitimate supervision by Feijoo.

(ix)    On or about June 6, 2018, New Life, Machado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through New Life to an Insured named SS on June 6, 2018. The HCFA-1500 form falsely represented that

Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and New Life, Machado, and Feijoo deliberately omitted any reference to Rodriguez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Rodriguez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist, without any legitimate supervision by Feijoo.

(x)     On or about July 5, 2018, New Life, Machado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through New Life to an Insured named RR on July 5, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and New Life, Machado, and Feijoo deliberately omitted any reference to Rodriguez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Rodriguez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by a massage therapist, without any legitimate supervision by Feijoo.

238.     These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "3", the New Life Defendants routinely falsely represented in the HCFA-1500 forms they submitted to GEICO that Feijoo had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by Rodriguez, Estevez, and other massage therapists associated with New Life, to the extent that they were performed at all, without any legitimate supervision by Feijoo.

239.     In the claims for physical therapy services identified in Exhibit "3", the New Life Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services were performed – to the extent they were performed at all by Rodriguez, Estevez, and other massage therapists associated with New Life, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law;

(ii)     New Life could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed without supervision by Rodriguez, Estevez, and other massage therapists associated with New Life, in contravention of Florida law;

(iii)   the New Life Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services in their billing for the putative "physical therapy" services.

240.   The New Life Defendants routinely fraudulently misrepresented to GEICO that Feijoo had performed or at least directly supervised the underlying physical therapy services because they knew that, were they to accurately represent that the underlying physical therapy services had been performed unsupervised by Rodriguez, Estevez, and other massage therapists associated with New Life, the charges would have been non-reimbursable and GEICO would not have remitted payment for these services.

241.   These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that New Life was operated without a legitimate medical director.

242.   For instance, Almonte, who at all relevant times purported to serve as the "medical director" at New Life – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

243.   Nor, for that matter, did Almonte "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

244.   Had Almonte actually fulfilled his statutory role as medical director at New Life, he would have noted – among other things – that the Defendants routinely fraudulently represented in New Life's billing that the physical therapy services were performed or at least directly supervised by Feijoo.

245.   Had Almonte actually fulfilled his statutory role as medical director at New Life, he would have noted – among other things – that the New Life Defendants routinely fraudulently

concealed the fact that the physical therapy services were provided – to the extent that they were provided at all – without any legitimate supervision by Rodriguez, Estevez, and other massage therapists and not a physical therapists, and therefore were non-reimbursable under the No-Fault Law.

246.    Almonte did none of these things, because he never actually served as a legitimate medical director at New Life in the first instance, rendering New Life ineligible to collect PIP Benefits in the first instance.

### 3.    The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at Accident Rehab

247.    In keeping with the fact that Salado ever truly served as medical director at Accident Rehab, and never fulfilled the statutory obligations of a clinic medical director at Accident Rehab, Salado permitted Accident Rehab, A. Vazquez, M. Vazquez, and Feijoo to routinely falsely represent the identities of the health care providers who rendered services at Accident Rehab, in order to obtain payment for the Fraudulent Services to which they otherwise would not be entitled.

248.    As set forth in Exhibit "4", the purported physical therapy services constituted the majority of the services the Accident Rehab Defendants billed through Accident Rehab to GEICO.

249.    Feijoo purported to provide the majority of the physical therapy services at Accident Rehab.

250.    In fact, Feijoo was almost never present at Accident Rehab, and did not personally perform – or even supervise – the physical therapy services that Accident Rehab purported to provide to Insureds.

251.    Rather, the physical therapy services that were billed through Accident Rehab to GEICO were performed – to the extent that they were performed at all – by unsupervised chiropractic assistants.

252.    As set forth herein, a registered chiropractic assistant must work under the direct supervision and responsibility of a licensed chiropractor or certified chiropractic physician's assistant. See Fla. Stat. § 460.4166(2).

253.    The chiropractic assistants associated with Accident Rehab did not work under the direct supervision and responsibility of a licensed chiropractor or certified chiropractic physician's assistant.

254.    Therefore, the Accident Rehab Defendants falsely listed Feijoo as the treating provider for a majority of the individual physical therapy services that were billed through Accident Rehab to GEICO from January 2017 until the present date.

255.    In actuality, Feijoo billed GEICO for such a massive amount of hours of purported services, often in excess of 18 hours per day at numerous separate health care facilities, that it prevented Feijoo from being physically present at Accident Rehab for any significant amount of time and prevented Feijoo from being able to personally perform – or even supervise – the physical therapy services that Accident Rehab purported to provide to Insureds.

256.    For example, between January 2017 and January 2020, GEICO received more than $3,600,000.00 in billing for services purportedly performed or directly supervised by Feijoo at multiple health care clinics, all while he was simultaneously purporting to perform or directly supervise a massive amount of physical therapy services that required direct patient on patient contact at Accident Rehab.

257.    In keeping with the fact that Feijoo could not have personally performed or even directly supervised the vast majority of the physical therapy services billed to GEICO through Accident Rehab, Feijoo would often purport to personally perform – or at least directly supervise – an impossible number of hours of physical therapy services in a given day at other locations on the same day he was purporting to provide services at Accident Rehab.

258.    For instance:

(i)    On October 10, 2017, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo purported to provide at least 20 individual physical therapy services to at least 4 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo also purported to personally perform, or at least directly supervise: (a) four 45 minute initial patient examinations; (b) one 60 minute initial patient examination; and (c) at least 98 additional physical therapy services purportedly provided to at least 15 additional GEICO Insureds at six different facilities, including at least 15.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20.75 hours of services that Feijoo purported to personally perform, or at least directly supervise, on October 10, 2017.

(ii)    On December 12, 2017, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo purported to provide at least 20 individual physical therapy services to at least 6 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo also purported to personally perform, or at least directly supervise: (a) three 45 minute initial patient examinations; (b) two 25 minute follow-up patient examinations; (c) one 40 minute follow-up patient examination; and (d) at least 79 additional physical therapy services purportedly provided to at least 10 additional GEICO Insureds at six different facilities, including at least 15 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21 hours of services that Feijoo purported to personally perform, or at least directly supervise, on December 12, 2017.

(iii)   On January 17, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo purported to provide at least 14 individual physical therapy services to at least 3 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo <u>also</u> purported to personally perform, or at least directly supervise at least 11 additional GEICO Insureds at three different facilities, including at least 17 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 18.5 hours of services that Feijoo purported to personally perform, or at least directly supervise, on January 17, 2018.

(iv)   On February 20, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo purported to provide at least 49 individual physical therapy services to at least 10 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo <u>also</u> purported to personally perform, or at least directly supervise: (a) two 45 minute initial patient examinations; (b) one 25 minute follow-up patient examination; (c) one 40 minute follow-up patient examination; and (d) at least 75 <u>additional</u> physical therapy services purportedly provided to at least 8 additional GEICO Insureds at four different facilities, including at least 13.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20.75 hours of services that Feijoo purported to personally perform, or at least directly supervise, on February 20, 2018.

(v)   On April 10, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo purported to provide at least 25 individual physical therapy services to at least 5 individual Insureds, and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo <u>also</u> purported to personally perform, or at least directly supervise: (a) one 45 minute initial patient examination; (b) one 25 minute follow-up patient examination; and (c) at least 101 <u>additional</u> physical therapy services purportedly provided to at least 11 additional GEICO Insureds at four different facilities, including at least 18 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.25 hours of services that

Feijoo purported to personally perform, or at least directly supervise, on April 10, 2018.

259.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "4", the Accident Rehab Defendants routinely falsely represented that Feijoo had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at other health care clinics on those same dates.

260.    Upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted or caused to be submitted through Accident Rehab to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that the Accident Rehab Defendants submitted through Accident Rehab to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

261.    Similarly, upon information and belief, the billing for physical therapy services submitted to GEICO through the other health care clinics Feijoo purportedly provided services at constituted only a fraction of the total billing for physical therapy services submitted through those other health care clinics to all of the automobile insurers in the Florida automobile insurance market.

262.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

263.    It is extremely improbable, to the point of impossibility, that the Accident Rehab Defendants and the other health care clinics Feijoo purportedly provided health care services at only submitted fraudulent billing to GEICO, and did not simultaneously bill other automobile insurers.

264.    Thus, upon information and belief, the massive, impossible number of physical therapy services that Feijoo purported to directly supervise or provide to GEICO Insureds on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of physical therapy services that Feijoo purported to directly supervise or provide, including to individuals insured by companies other than GEICO, on those same dates of service.

265.    As set forth herein, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. <u>See</u> Fla. Stat. § 627.736.

266.    All of the billing that the Defendants submitted through Accident Rehab to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

267.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the health care provider who actually rendered or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. <u>See</u>, <u>e.g.</u>, Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

268.    To "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." <u>See</u>, <u>e.g.</u>, Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, <u>citing</u> 42 C.F.R. 410.32.

269.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually

"directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

270.    The Accident Rehab Defendants were well-aware of the fact that – because the unsupervised chiropractic assistants associated with Accident Rehab were not physical therapists, chiropractors, or licensed physicians – Accident Rehab could not recover PIP Benefits for any services that the massage therapists purported to provide.

271.    As a result, and in order to conceal the fact that the chiropractic assistants provided – without any legitimate supervision by Feijoo– all of the "physical therapy" services that were unlawfully billed through Accident Rehab to GEICO, the Accident Rehab Defendants deliberately omitted any reference to the chiropractic assistants on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

272.    Instead, in the claims for physical therapy services identified in Exhibit "4", the Accident Rehab Defendants routinely falsely listed Feijoo on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

273.    For example:

(i)     On or about January 28, 2017, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Accident Rehab to an Insured named AT on January 28, 2017. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo deliberately omitted any reference to the chiropractic assistant from the HCFA-1500 form. In keeping with the fact that Feijoo did not perform or directly supervise the pertinent physical therapy services, the "Daily Progress Notes" purportedly reflecting the physical therapy services provided to the Insureds were not signed by Feijoo, or any other provider.

(ii)     On or about July 18, 2017, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Accident Rehab to an Insured named WD on July 18, 2017. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo deliberately omitted any reference to the chiropractic assistant from the HCFA-1500 form. In keeping with the fact that Feijoo did not perform or directly supervise the pertinent physical therapy services, the "Daily Progress Notes" purportedly reflecting the physical therapy services provided to the Insureds were not signed by Feijoo, or any other provider.

(iii)    On or about April 3, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Accident Rehab to an Insured named MO on April 3, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo deliberately omitted any reference to the chiropractic assistant from the HCFA-1500 form. In keeping with the fact that Feijoo did not perform or directly supervise the pertinent physical therapy services, the "Daily Progress Notes" purportedly reflecting the physical therapy services provided to the Insureds were not signed by Feijoo, or any other provider.

(iv)     On or about September 27, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Accident Rehab to an Insured named TH on September 27, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo deliberately omitted any reference to the chiropractic assistant from the HCFA-1500 form. In keeping with the fact that Feijoo did not perform or directly supervise the pertinent physical therapy services, the "Daily Progress Notes" purportedly reflecting the physical therapy services provided to the Insureds were not signed by Feijoo, or any other provider.

(v)      On or about September 29, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Accident Rehab to an Insured named MV on September 29, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo deliberately omitted any reference to the chiropractic assistant from the HCFA-1500 form. In keeping with the fact that Feijoo did not perform or directly supervise the pertinent physical therapy services, the "Daily Progress Notes" purportedly reflecting the physical therapy services provided to the Insureds were not signed by Feijoo, or any other provider.

(vi)     On or about August 14, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for physical therapy services that purportedly were

provided through Accident Rehab to an Insured named JO on August 14, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo deliberately omitted any reference to the chiropractic assistant from the HCFA-1500 form. In keeping with the fact that Feijoo did not perform or directly supervise the pertinent physical therapy services, the "Daily Progress Notes" purportedly reflecting the physical therapy services provided to the Insureds were not signed by Feijoo, or any other provider.

(vii)    On or about October 30, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Accident Rehab to an Insured named MV on October 30, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo deliberately omitted any reference to the chiropractic assistant from the HCFA-1500 form. In keeping with the fact that Feijoo did not perform or directly supervise the pertinent physical therapy services, the "Daily Progress Notes" purportedly reflecting the physical therapy services provided to the Insureds were not signed by Feijoo, or any other provider.

(viii)    On or about February 26, 2019, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Accident Rehab to an Insured named SN on February 26, 2019. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo deliberately omitted any reference to the chiropractic assistant from the HCFA-1500 form. In keeping with the fact that Feijoo did not perform or directly supervise the pertinent physical therapy services, the "Daily Progress Notes" purportedly reflecting the physical therapy services provided to the Insureds were not signed by Feijoo, or any other provider.

(ix)    On or about March 27, 2019, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Accident Rehab to an Insured named DO on March 27, 2019. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo deliberately omitted any reference to the chiropractic assistant from the HCFA-1500 form. In keeping with the fact that Feijoo did not perform or directly supervise the pertinent physical therapy services, the "Daily Progress Notes" purportedly reflecting the physical therapy services provided to the Insureds were not signed by Feijoo, or any other provider.

(x)    On or about June 1, 2019, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Accident Rehab to an Insured named LF on June 1, 2019. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the

pertinent physical therapy services, and Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo deliberately omitted any reference to the chiropractic assistant from the HCFA-1500 form. In keeping with the fact that Feijoo did not perform or directly supervise the pertinent physical therapy services, the "Daily Progress Notes" purportedly reflecting the physical therapy services provided to the Insureds were not signed by Feijoo, or any other provider.

274.   These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "4", the Accident Rehab Defendants routinely falsely represented in the HCFA-1500 forms they submitted to GEICO that Feijoo had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by chiropractic assistants, to the extent that they were performed at all, without any legitimate supervision by Feijoo.

275.   It is improbable, to the point of impossibility, that Salado, who purportedly served as medical director at Accident Rehab, and therefore had the responsibility to ensure that the billing submitted from Accident Rehab was not fraudulent or unlawful was unaware of the fact that the pertinent services were performed by unlicensed chiropractic assistants, without any legitimate supervision by a medical doctor or licensed physical therapist or chiropractor.

276.   In the claims for physical therapy services identified in Exhibit "4", the Accident Rehab Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services were performed – to the extent they were performed at all by chiropractic assistants, without any supervision, in contravention of Florida law;

(ii)    Accident Rehab could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed without supervision by chiropractic assistants, in contravention of Florida law; and

(iii) the Accident Rehab Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services in their billing for the putative "physical therapy" services.

277. The Accident Rehab Defendants routinely fraudulently misrepresented to GEICO that Feijoo had performed or at least directly supervised the underlying physical therapy services because they knew that, were they to accurately represent that the underlying physical therapy services had been performed unsupervised by chiropractic assistants, the charges would have been non-reimbursable and GEICO would not have remitted payment for these services.

278. These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that Accident Rehab was operated without a legitimate medical director.

279. For instance, Salado, who at all relevant times purported to serve as the "medical director" at Accident Rehab – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

280. Nor, for that matter, did Salado "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

281. Had Salado actually fulfilled his statutory role as medical director at Accident Rehab, he would have noted – among other things – that the Defendants routinely fraudulently represented in Accident Rehab's billing that the physical therapy services were performed or at least directly supervised by Feijoo.

282. Had Salado actually fulfilled his statutory role as medical director at Accident Rehab, he would have noted – among other things – that the Accident Rehab Defendants routinely

fraudulently concealed the fact that the physical therapy services were provided without any legitimate supervision – to the extent that they were provided at all – by chiropractic assistants and not physical therapists or chiropractors, and therefore were non-reimbursable under the No-Fault Law.

283.   Had Salado actually fulfilled his statutory role as medical director at Accident Rehab, he would have noted – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services.

284.   Salado did none of these things, because he never actually served as a legitimate medical director at Accident Rehab in the first instance, rendering Accident Rehab ineligible to collect PIP Benefits in the first instance.

**4.    The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at Miami Medical**

285.   In keeping with the fact that Marquez never truly served as medical director at Miami Medical, and never fulfilled the statutory obligations of a clinic medical director at Miami Medical, Marquez permitted Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo to routinely falsely represent the identities of the health care providers who rendered services at Miami Medical, in order to obtain payment for the Fraudulent Services to which they otherwise would not be entitled.

286.   Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo (collectively, the "Miami Medical Defendants") billed for a limited range of health care services through Miami Medical, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; (iii) purported physical therapy services; and (iv) range of motion testing.

287.    As set forth in Exhibit "5", the purported physical therapy services constituted the vast majority of the services that the Miami Medical Defendants billed through Miami Medical to GEICO.

288.    Feijoo and Nodarse purported to perform or directly supervise a majority of the physical therapy services in the claims identified in Exhibit "5".

289.    However, Feijoo and Nodarse were only occasionally physically present at Miami Medical, and did not personally perform – or even supervise – the physical therapy services that Miami Medical purported to provide to Insureds.

290.    The vast majority of the physical therapy services that were billed through Miami Medical to GEICO were performed – to the extent that they were performed at all – by unsupervised massage therapists and/or registered chiropractic assistants, including G. Jimenez, Vazquez, and Uzan, without legitimate supervision or oversight by Nodarse, Feijoo, or any other licensed physician, chiropractor, or physical therapist.

291.    G. Jimenez, Vazquez, and Uzan were licensed as massage therapists and/or registered chiropractic assistants. G. Jimenez, Vazquez, and Uzan were never licensed as physical therapists or chiropractors.

292.    As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law prohibited Miami Medical from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as G. Jimenez, Vazquez, and Uzan.

293.    Nor could Miami Medical recover PIP Benefits for services performed by unsupervised registered chiropractic assistants.

294.    The Miami Medical Defendants were well-aware of the fact that Miami Medical could not legally recover PIP Benefits for services provided by massage therapists and/or registered chiropractic assistants such as G. Jimenez, Vazquez, and Uzan.

295.    For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

296.    Therefore, the Miami Medical Defendants listed Feijoo and Nodarse as the treating provider for virtually all the individual physical therapy services that were billed through Miami Medical to GEICO from October 2016 to the present.

297.    In fact, Feijoo and Nodarse were only occasionally physically present at Miami Medical, and did not personally perform – or even supervise – the physical therapy services that Miami Medical purported to provide to Insureds.

298.    In keeping with the fact that Feijoo was physically present at Miami Medical for only a few hours each week, simultaneous to his "employment" at Miami Medical, Feijoo also purported to personally perform a massive number of health care services at least 10 health care clinics located in distinct facilities throughout south Florida.

299.    What is more, simultaneous to his "employment" at Miami Medical, Feijoo also purported to own, control, and supervise the business activities at Feijoo P.A., as well as personally perform a massive number of health care services at Feijoo P.A.

300.    What is more, in keeping with the fact that Nodarse was only occasionally physically present at Miami Medical, simultaneous to her "employment" at Miami Medical,

Nodarse was simultaneously purporting to provide a massive amount of physical therapy services at another health care clinic in south Florida.

301. Even so, the Miami Medical Defendants submitted thousands of physical therapy charges to GEICO which falsely contended that Feijoo or Nodarse had performed or at least directly supervised the underlying physical therapy services, despite the fact that Feijoo and Nodarse could not possibly have performed or even directly supervised the physical therapy.

302. In keeping with the fact that Feijoo and Nodarse could not have personally performed – or at least directly supervised – the vast majority of the physical therapy services billed to GEICO through Miami Medical, Feijoo and Nodarse would often purport to personally perform – or at least directly supervise – an impossible number of hours of physical therapy services in a given day.

303. For instance:

(i)     On December 7, 2016, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse purported to provide at least 49 individual physical therapy services to six GEICO Insureds and falsely contended in the resulting bills to GEICO that Nodarse personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 12.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Nodarse also purported to personally perform, or at least directly supervise at least 56 additional physical therapy services purportedly provided to at least seven additional GEICO Insureds at a different facility, including at least 12.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 25 hours of services that Nodarse purported to personally perform, or at least directly supervise, on December 7, 2016.

(ii)    On January 5, 2017, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse purported to provide at least 34 individual physical therapy services to five GEICO Insureds and falsely contended in the resulting bills to GEICO that Nodarse personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 8.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Nodarse

also purported to personally perform, or at least directly supervise at least 64 additional physical therapy services purportedly provided to at least eight additional GEICO Insureds at a different facility, including at least 14.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 23 hours of services that Nodarse purported to personally perform, or at least directly supervise, on January 5, 2017.

(iii)    On June 20, 2017, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse purported to provide at least 16 individual physical therapy services to two GEICO Insureds and falsely contended in the resulting bills to GEICO that Nodarse personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Nodarse also purported to personally perform, or at least directly supervise at least 79 additional physical therapy services purportedly provided to at least nine additional GEICO Insureds at a different facility, including at least 17.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.25 hours of services that Nodarse purported to personally perform, or at least directly supervise, on June 20, 2017.

(iv)    On April 4, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo purported to provide at least 7 individual physical therapy services to a GEICO Insured and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo also purported to personally perform, or at least directly supervise: (a) one 60 minute initial patient examination; (b) two 25 minute follow-up patient examinations; (c) one 40 minute follow-up patient examination; and (d) at least 82 additional physical therapy services purportedly provided to at least twelve additional GEICO Insureds at six different facilities, including at least 13.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 19.75 hours of services that Feijoo purported to personally perform, or at least directly supervise, on April 4, 2018.

(v)    On April 12, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse purported to provide at least 44 individual physical therapy services to six GEICO Insureds and falsely contended in the resulting bills to GEICO that Nodarse personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11 hours of physical therapy services that required direct, one-on-one patient contact between the

treating provider and the Insureds throughout the services. That same day, Nodarse <u>also</u> purported to personally perform, or at least directly supervise at least 79 <u>additional</u> physical therapy services purportedly provided to at least three additional GEICO Insureds at a different facility, including at least 5.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 15.25 hours of services that Nodarse purported to personally perform, or at least directly supervise, on April 12, 2018.

(vi)     On May 29, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo purported to provide at least 16 individual physical therapy services to 2 GEICO Insureds and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo <u>also</u> purported to personally perform, or at least directly supervise at least 103 <u>additional</u> physical therapy services purportedly provided to at least six additional GEICO Insureds at three different facilities, including at least 15.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 19.5 hours of services that Feijoo purported to personally perform, or at least directly supervise, on May 29, 2018.

(vii)    On June 4, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo purported to provide at least 16 individual physical therapy services to two GEICO Insureds and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo <u>also</u> purported to personally perform, or at least directly supervise at least 122 <u>additional</u> physical therapy services purportedly provided to at least 15 additional GEICO Insureds at five different facilities, including at least 21.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 25.25 hours of services that Feijoo purported to personally perform, or at least directly supervise, on June 4, 2018.

(viii)   On July 2, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo purported to provide at least 24 individual physical therapy services to three GEICO Insureds and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo

<u>also</u> purported to personally perform, or at least directly supervise at least 60 <u>additional</u> physical therapy services purportedly provided to at least seven additional GEICO Insureds at two different facilities, including at least 11.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 16 hours of services that Feijoo purported to personally perform, or at least directly supervise, on July 2, 2018.

(ix)     On July 18, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo purported to provide at least 10 individual physical therapy services to a GEICO Insured and falsely contended in the resulting bills to GEICO that Feijoo personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Feijoo <u>also</u> purported to personally perform, or at least directly supervise: (a) one 60 minute initial patient examination; (b) one 45 minute patient examination; (c) two 25 minute follow-up patient examination; and (d) at least 45 <u>additional</u> physical therapy services purportedly provided to at least six additional GEICO Insureds at three different facilities, including at least 9.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 13.5 hours of services that Feijoo purported to personally perform, or at least directly supervise, on July 18, 2019.

(x)      On November 20, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse purported to provide at least 38 individual physical therapy services to five GEICO Insureds and falsely contended in the resulting bills to GEICO that Nodarse personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Nodarse <u>also</u> purported to personally perform, or at least directly supervise at least 8 <u>additional</u> physical therapy services purportedly provided to an additional GEICO Insureds at a different facility, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 11.25 hours of services that Nodarse purported to personally perform, or at least directly supervise, on November 20, 2019.

304.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "5", the Miami Medical Defendants routinely falsely represented that Feijoo and Nodarse had performed – or at least directly supervised – an improbable, and often

impossible, number of physical therapy services on individual dates, considering the amounts of services they were simultaneously purporting to perform or directly supervise at other health care clinics on those same dates.

305. Upon information and belief, the fraudulent billing for physical therapy services that the Miami Medical Defendants submitted or caused to be submitted through Miami Medical to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that the Miami Medical Defendants submitted through Miami Medical to all of the automobile insurers in the Florida automobile insurance market.

306. GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

307. It is extremely improbable, to the point of impossibility, that the Miami Medical Defendants and the other health care clinics where Feijoo and Nodarse purported to provide health care services only submitted fraudulent billing to GEICO, and did not simultaneously bill other automobile insurers.

308. Thus, upon information and belief, the massive, impossible number of physical therapy services that Feijoo and Nodarse purported to directly supervise or provide to GEICO Insureds on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of physical therapy services that Feijoo and Nodarse purported to directly supervise or provide, including to individuals insured by companies other than GEICO, on those same dates of service.

309. In fact, Feijoo and Nodarse did not perform or directly supervise the vast majority of the physical therapy services that were billed through Miami Medical to GEICO.

310.     What is more, Miami Medical did not actually provide any legitimate physical therapy services to GEICO Insureds.

311.     Rather: (i) the putative "physical therapy" services that the Miami Medical Defendants purported to provide through Miami Medical to Insureds were performed, to the extent that they were performed at all, by G. Jimenez, Vazquez, Uzan, and the other massage therapists and/or registered chiropractic assistants associated with Miami Medical rather than by Feijoo or Nodarse; (ii) Feijoo and Nodarse did not legitimately supervised the putative "physical therapy" services that were billed through Miami Medical to GEICO; and (iii)  the putative "physical therapy" services that were billed through Miami Medical to GEICO actually constituted physical therapy, because G. Jimenez, Vazquez, Uzan, and the other massage therapists and/or registered chiropractic assistants associated with Miami Medical were not licensed as physical therapists and/or chiropractors, and did not perform the pertinent services under the supervision of any licensed physical therapist, physician, chiropractor, or other health care provider.

312.     As set forth herein, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

313.     All of the billing that the Defendants submitted through Miami Medical to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

314.     Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the health care provider who actually rendered or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

315. To "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

316. Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

317. Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo were well-aware of the fact that – because G. Jimenez, Vazquez, Uzan, and the other massage therapists and/or registered chiropractic assistants associated with Miami Medical were unsupervised massage therapists and/or registered chiropractic assistants, rather than physical therapists and/or chiropractors – Miami Medical could not recover PIP Benefits for any services that G. Jimenez, Vazquez, and Uzan or the other unsupervised massage therapists and/or registered chiropractic assistants associated with Miami Medical purported to provide.

318. As a result, and in order to conceal the fact that G. Jimenez, Vazquez, Uzan, and the other massage therapists and/or registered chiropractic assistants associated with Miami Medical unlawfully provided –without any legitimate supervision by Feijoo or Nodarse – all of the "physical therapy" services that were unlawfully billed through Miami Medical to GEICO, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo deliberately omitted any

reference to G. Jimenez, Vazquez, Uzan, and the other massage therapists and/or registered chiropractic assistants associated with Miami Medical on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

319.    Instead, in the claims for physical therapy services identified in Exhibit "5", the Miami Medical Defendants falsely listed Feijoo and Nodarse on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

320.    For example:

(i)    On or about November 17, 2017, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for physical therapy services that purportedly were provided through Miami Medical to an Insured named OR on November 17, 2017. The HCFA-1500 form falsely represented that Nodarse performed, or at least directly supervised, the pertinent physical therapy services, and Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse deliberately omitted any reference to G. Jimenez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by G. Jimenez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by G. Jimenez, without any legitimate supervision by Nodarse.

(ii)    On or about September 22, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for physical therapy services that purportedly were provided through Miami Medical to an Insured named OS on September 13, 2018. The HCFA-1500 form falsely represented that Nodarse performed, or at least directly supervised, the pertinent physical therapy services, and Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse deliberately omitted any reference to Uzan from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Uzan, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Uzan, without any legitimate supervision by Nodarse.

(iii)    On or about September 29, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for physical therapy services that purportedly were provided through Miami Medical to an Insured named OS on September 13, 2018. The HCFA-1500 form falsely represented that Nodarse performed, or at least directly supervised, the pertinent physical therapy services, and Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse deliberately omitted any reference to Vazquez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Vazquez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vazquez, without any legitimate supervision by Nodarse.

(iv)    On or about October 3, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Miami Medical to an Insured named GL on October 3, 2018. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo deliberately omitted any reference to Vazquez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Vazquez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vazquez, without any legitimate supervision by Feijoo.

(v)    On or about December 8, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for physical therapy services that purportedly were provided through Miami Medical to an Insured named KT on December 8, 2018. The HCFA-1500 form falsely represented that Nodarse performed, or at least directly supervised, the pertinent physical therapy services, and Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse deliberately omitted any reference to Uzan from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Uzan, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Uzan, without any legitimate supervision by Nodarse.

(vi)    On or about December 10, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for physical therapy services that purportedly were provided through Miami Medical to an Insured named KT on December 8, 2018. The HCFA-1500 form falsely represented that Nodarse performed, or at least directly supervised, the pertinent physical therapy services, and Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse deliberately omitted any reference to Vazquez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Vazquez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vazquez, without any legitimate supervision by Nodarse.

(vii)    On or about April 13, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for physical therapy services that purportedly were provided through Miami Medical to an Insured named JF on April 13, 2019. The HCFA-1500 form falsely represented that Nodarse performed, or at least directly supervised, the pertinent physical therapy services, and Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse deliberately omitted any reference to Vazquez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Vazquez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vazquez, without any legitimate supervision by Nodarse.

(viii)   On or about July 18, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Miami Medical to an Insured named LT on July 18, 2019. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo deliberately omitted any reference to Vazquez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Vazquez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vazquez, without any legitimate supervision by Feijoo.

(ix)   On or about July 25, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for physical therapy services that purportedly were provided through Miami Medical to an Insured named LT on July 18, 2019. The HCFA-1500 form falsely represented that Feijoo performed, or at least directly supervised, the pertinent physical therapy services, and Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo deliberately omitted any reference to G. Jimenez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by G. Jimenez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by G. Jimenez, without any legitimate supervision by Feijoo.

(x)   On or about July 30, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for physical therapy services that purportedly were provided through Miami Medical to an Insured named JT on July 23, 2019. The HCFA-1500 form falsely represented that Nodarse performed, or at least directly supervised, the pertinent physical therapy services, and Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse deliberately omitted any reference to Vazquez from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Vazquez, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Vazquez, without any legitimate supervision by Nodarse.

321.   These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "5", the Miami Medical Defendants routinely falsely represented in the HCFA-1500 forms they submitted to GEICO that Feijoo and Nodarse had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by G. Jimenez, Vazquez, Uzan, and the other massage therapists and/or registered chiropractic assistants associated with Miami Medical, to the extent that they were performed at all, without any legitimate supervision by Feijoo and Nodarse.

322.     It is improbable, to the point of impossibility, that Marquez who purportedly served as medical director at Miami Medical, and therefore had the responsibility to ensure that the billing submitted from Miami Medical was not fraudulent or unlawful, was unaware of the fact that the pertinent services were performed by unlicensed massage therapists, without any legitimate supervision by a medical doctor or licensed physical therapist.

323.     In the claims for physical therapy services identified in Exhibit "5", the Miami Medical Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services were performed – to the extent they were performed at all  by massage therapists and/or registered chiropractic assistants, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law;

(ii)     Miami Medical could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed without supervision by massage therapists and/or registered chiropractic assistants, in contravention of Florida law; and

(iii)     the Miami Medical Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services in their billing for the putative "physical therapy" services.

324.     The Miami Medical Defendants routinely fraudulently misrepresented to GEICO that Feijoo and Nodarse had performed or at least directly supervised the underlying physical therapy services because they knew that, were they to accurately represent that the underlying physical therapy services had been performed unsupervised by G. Jimenez, Vazquez, Uzan, and the other massage therapists and/or registered chiropractic assistants associated with Miami Medical, the charges would have been non-reimbursable and GEICO would not have remitted payment for these services.

325.   These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that Miami Medical was operated without a legitimate medical director.

326.   For instance, Marquez, who at all relevant times purported to serve as the "medical director" at Miami Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

327.   Nor, for that matter, did Marquez "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

328.   Had Marquez actually fulfilled his statutory role as medical director at Miami Medical, he would have noted – among other things – that the Miami Medical Defendants routinely fraudulently represented in Miami Medical's billing that the physical therapy services were performed or at least directly supervised by Feijoo and Nodarse.

329.   Had Marquez actually fulfilled his statutory role as medical director at Miami Medical, he would have noted – among other things – that the Miami Medical Defendants routinely fraudulently concealed the fact that the physical therapy services were provided without any legitimate supervision – to the extent that they were provided at all – by massage therapists and/or registered chiropractic assistants and not physical therapists, and therefore were non-reimbursable under the No-Fault Law.

330.   Had Marquez actually fulfilled his statutory role as medical director at Miami Medical, he would have noted – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services.

331.    Marquez did none of these things, because he never actually served as a legitimate medical director at Miami Medical in the first instance, rendering Miami Medical ineligible to collect PIP Benefits in the first instance.

**C.    The Violations of the Patient Brokering Act**

**1.    The Unlawful Referrals from Feijoo P.A. to We Care in Violation of the Patient Brokering Act**

332.    In the claims identified in Exhibit "2", We Care, Martinez, Nguyen, and Feijoo routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because they were provided – to the extent that they were provided at all – pursuant an illegal patient brokering and kickback scheme.

333.    As set forth herein, health care providers that operate in violation of the Patient Brokering Act are not entitled to collect PIP Benefits.

334.    Even so, Feijoo – at Martinez's direction – routinely and unlawfully referred Insureds, or caused Insureds to be referred, to We Care in exchange for compensation from Martinez.

335.    Beginning in September 2017, in exchange for compensation from Martinez and We Care, Feijoo caused Insureds to be referred from Feijoo P.A. to We Care for medically unnecessary Fraudulent Services. In fact, a significant number of the patients purportedly treated at We Care presented there pursuant to referrals by Feijoo that were made at Martinez's direction, and in exchange for compensation from Martinez and We Care.

336.    Beginning in September 2017, each patient referral that Feijoo made or caused to be made to We Care violated the Patient Brokering Act, in that the referrals were made in exchange for compensation from Martinez and We Care.

337.    For example:

(i)     On or about December 28, 2017, Feijoo referred an Insured named LM from Feijoo
        P.A. to We Care for purported physical therapy services. The referral violated the
        Patient Brokering Act in that it was provided in exchange for compensation paid to
        Feijoo by Martinez and We Care.

(ii)    On or about January 29, 2018, Feijoo referred an Insured named MA from Feijoo
        P.A. to We Care for purported physical therapy services. The referral violated the
        Patient Brokering Act in that it was provided in exchange for compensation paid to
        Feijoo by Martinez and We Care.

(iii)   On or about January 29, 2018, Feijoo referred an Insured named GV from Feijoo
        P.A. to We Care for purported physical therapy services. The referral violated the
        Patient Brokering Act in that it was provided in exchange for compensation paid to
        Feijoo by Martinez and We Care.

(iv)    On or about March 21, 2018, Feijoo referred an Insured named AV from Feijoo
        P.A. to We Care for purported physical therapy services. The referral violated the
        Patient Brokering Act in that it was provided in exchange for compensation paid to
        Feijoo by Martinez and We Care.

(v)     On or about March 29, 2018, Feijoo referred an Insured named MH from Feijoo
        P.A. to We Care for purported physical therapy services. The referral violated the
        Patient Brokering Act in that it was provided in exchange for compensation paid to
        Feijoo by Martinez and We Care.

338.    These are only representative examples. In the claims identified in Exhibit "2",
Feijoo caused Insureds to be referred to We Care in violation of the Patient Brokering Act.

**2.    The Unlawful Referrals from Feijoo P.A. to New Life in Violation of the Patient
        Brokering Act**

339.    In the claims identified in Exhibit "3", New Life, Machado, Almonte, and Feijoo
routinely falsely represented that the underlying health care services were lawfully provided and
reimbursable, when in fact they were neither lawfully provided nor reimbursable because they
were provided – to the extent that they were provided at all – pursuant an illegal patient brokering
scheme.

340.     As set forth herein, health care providers that operate in violation of the Patient Brokering Act are not entitled to collect PIP Benefits.

341.     Even so, Feijoo – at Machado's direction – routinely and unlawfully referred Insureds, or caused Insureds to be referred, to New Life in exchange for compensation from Machado.

342.     Beginning in February 2017, in exchange for compensation from Machado and New Life, Feijoo caused Insureds to be referred from Feijoo P.A. to New Life for medically unnecessary Fraudulent Services. In fact, a significant number of the patients purportedly treated at New Life presented there pursuant to referrals by Feijoo that were made at Machado's direction, and in exchange for compensation from Machado and New Life.

343.     Beginning in February 2017, each patient referral that Feijoo made or caused to be made to New Life violated the Patient Brokering Act, in that the referrals were made in exchange for compensation from Machado and New Life.

344.     For example:

(i)      On or about May 20, 2017, Feijoo referred an Insured named YA from Feijoo P.A. to New Life for purported physical therapy services. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Feijoo by Machado and New Life.

(ii)     On or about September 19, 2017, Feijoo referred an Insured named YG from Feijoo P.A. to New Life for purported physical therapy services. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Feijoo by Machado and New Life.

(iii)    On or about October 12, 2017, Feijoo referred an Insured named DB from Feijoo P.A. to New Life for purported physical therapy services. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Feijoo by Machado and New Life.

(iv)     On or about October 26, 2017, Feijoo referred an Insured named DM from Feijoo P.A. to New Life for purported physical therapy services. The referral violated the

Patient Brokering Act in that it was provided in exchange for compensation paid to Feijoo by Machado and New Life.

(v)     On or about January 25, 2018, Feijoo referred an Insured named JC from Feijoo P.A. to New Life for purported physical therapy services. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Feijoo by Machado and New Life.

(vi)    On or about February 27, 2018, Feijoo referred an Insured named XA from Feijoo P.A. to New Life for purported physical therapy services. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Feijoo by Machado and New Life.

(vii)   On or about April 26, 2018, Feijoo referred an Insured named JV from Feijoo P.A. to New Life for purported physical therapy services. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Feijoo by Machado and New Life.

(viii)  On or about May 8, 2018, Feijoo referred an Insured named YB from Feijoo P.A. to New Life for purported physical therapy services. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Feijoo by Machado and New Life.

(ix)    On or about May 10, 2018, Feijoo referred an Insured named YR from Feijoo P.A. to New Life for purported physical therapy services. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Feijoo by Machado and New Life.

(x)     On or about May 30, 2018, Feijoo referred an Insured named SP from Feijoo P.A. to New Life for purported physical therapy services. The referral violated the Patient Brokering Act in that it was provided in exchange for compensation paid to Feijoo by Machado and New Life.

345.    These are only representative examples. In the claims identified in Exhibit "3", Feijoo routinely caused Insureds to be referred to New Life in violation of the Patient Brokering Act.

## D.     The Violations of the Self-Referral Act

346.    As set forth herein, the Self-Referral Act prohibits any health care provider from referring patients for certain designated health care services to any entity in which the health care provider is an investor or has an investment interest. See Fla. Stat. § 456.053.

347. In the context of the Self-Referral Act, Feijoo – as a licensed medical doctor – was a "health care provider".

348. In the context of the Self-Referral Act, the putative patient examinations that Feijoo P.A. purported to provide to Insureds were "designated health care services".

349. In the context of the Self-Referral Act, Feijoo – who purported to be an owner and member of Feijoo P.A. – was both an investor in and had an investment interest in Feijoo P.A.

350. Accordingly, Feijoo could not lawfully self-refer Insureds to Feijoo P.A. – directly or indirectly – for designated health care services such as the putative patient examinations that Feijoo P.A. purported to provide.

1. **The Unlawful Self-Referrals by Feijoo from We Care and New Life to Feijoo P.A.**

351. As set forth herein, in addition to his putative ownership of Feijoo P.A., Feijoo purported to perform many of the Fraudulent Services at We Care and New Life.

352. In many instances, Feijoo would cause an Insured to be referred from Feijoo P.A. to We Care and New Life for physical therapy services.

353. Then, Feijoo would purport to provide the putative physical therapy services at We Care and New Life.

354. Then, at the conclusion of the physical therapy services, Feijoo would unlawfully self-refer the Insured back to Feijoo P.A. for the continued provision of medically unnecessary follow-examinations and range of motion testing.

355. For example:

(i) On or about August 7, 2017, Feijoo referred an Insured named PG from Feijoo P.A. to We Care for purported physical therapy services. Between August 8, 2017 and August 30, 2017, Feijoo purported to perform the physical therapy services at We Care. During that same period, Feijoo unlawfully self-referred PG back to Feijoo P.A. for a medically unnecessary follow-up examination and range of motion test.

(ii)     On or about December 28, 2017, Feijoo referred an Insured named LM from Feijoo P.A. to We Care for purported physical therapy services. Between December 28, 2017 and January 28, 2018, Feijoo purported to perform the physical therapy services at We Care. During that same period, Feijoo unlawfully self-referred LM back to Feijoo P.A. for a medically unnecessary follow-up examination and range of motion test.

(iii)    On or about January 25, 2018, Feijoo referred an Insured named JC from Feijoo P.A. to New Life for purported physical therapy services. Between January 25, 2018 and April 5, 2018, Feijoo purported to perform the physical therapy services at New Life. During that same period, Feijoo unlawfully self-referred JC back to Feijoo P.A. for medically unnecessary follow-up examinations and range of motion tests.

(iv)    On or about January 29, 2018, Feijoo referred an Insured named MA from Feijoo P.A. to New Life for purported physical therapy services. Between January 30, 2018 and March 5, 2018, Feijoo purported to perform the physical therapy services at We Care. During that same period, Feijoo unlawfully self-referred MA back to Feijoo P.A. for a medically unnecessary follow-up examination and range of motion test.

(v)     On or about July 25, 2017, Feijoo referred an Insured named NA from Feijoo P.A. to New Life for purported physical therapy services. Between July 27, 2017 and February 26, 2018, Feijoo purported to perform the physical therapy services at We Care. Then, at the conclusion of the physical therapy services, Feijoo unlawfully self-referred NA back to Feijoo P.A. for a medically unnecessary follow-up examination and range of motion test.

(vi)    On or about February 27, 2018, Feijoo referred an Insured named XA from Feijoo P.A. to New Life for purported physical therapy services. Between February 27, 2018 and April 3, 2018, Feijoo purported to perform the physical therapy services at New Life. During that same period, Feijoo unlawfully self-referred XA back to Feijoo P.A. for medically unnecessary follow-up examinations and range of motion tests.

(vii)   On or about March 21, 2017, Feijoo referred an Insured named AV from Feijoo P.A. to We Care for purported physical therapy services. Between March 21, 2017 and May 5, 2018, Feijoo purported to perform the physical therapy services at We Care. During that same period, Feijoo unlawfully self-referred AV back to Feijoo P.A. for a medically unnecessary follow-up examination and range of motion test.

(viii)  On or about April 26, 2018, Feijoo referred an Insured named LV from Feijoo P.A. to New Life for purported physical therapy services. Between April 26, 2018 and October 29, 2018, Feijoo purported to perform the physical therapy services at New Life. During that same period, Feijoo unlawfully self-referred LV back to Feijoo P.A. for medically unnecessary follow-up examinations and range of motion tests.

(ix)     On or about May 8, 2018, Feijoo referred an Insured named YB from Feijoo P.A. to New Life for purported physical therapy services. Between May 8, 2018 and July 13, 2018, Feijoo purported to perform the physical therapy services at New Life. During that same period, Feijoo unlawfully self-referred YB back to Feijoo P.A. for medically unnecessary follow-up examinations and range of motion tests.

(x)      On or about May 10, 2018, Feijoo referred an Insured named GN from Feijoo P.A. to New Life for purported physical therapy services. Between May 10, 2018 and July 19, 2018, Feijoo purported to perform the physical therapy services at New Life. During that same period, Feijoo unlawfully self-referred GN back to Feijoo P.A. for medically unnecessary follow-up examinations and range of motion tests.

356.    These are only representative examples. In the claims identified in Exhibit "1", Feijoo routinely unlawfully self-referred Insureds from We Care and New Life to Feijoo P.A. for the Fraudulent Services.

357.    In the claims identified in Exhibit "1", Feijoo, and Feijoo P.A. routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because they were provided – to the extent that they were provided at all – in violation of the Self-Referral Act.

**E.     The Defendants' Fraudulent Treatment and Billing Protocols**

358.    In the claims identified in Exhibits "1"-"5" the vast majority of the Insureds whom Feijoo purported to treat at Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical, were involved in minor accidents, to the extent that they were involved in any actual accidents at all.

359.    Concomitantly, in the claims identified in Exhibits "1"-"5" almost none of the Insureds whom Feijoo purported to treat at Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

360.     Even so, in the claims identified in Exhibits "1"-"5", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

361.     The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1"-"5", without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problems arising from any actual automobile accidents.

362.     Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

363.     No legitimate physician, chiropractor, physical therapist, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described below to proceed under his, her, or its auspices.

**1.     Feijoo P.A.'s Fraudulent Treatment and Billing Protocol**

**(i)     The Fraudulent Charges for Initial Examinations at Feijoo P.A.**

364.     As an initial step in Feijoo P.A.'s fraudulent treatment and billing protocol, Feijoo P.A. and Feijoo (collectively the "Feijoo P.A. Defendants") purported to provide the Insureds in the claims identified in Exhibit "1" with a putative initial examination.

365.     Feijoo purported to personally perform or directly supervise virtually all of the initial examinations at Feijoo P.A. in the claims identified in Exhibit "1".

366.     As set forth in Exhibit "1", Feijoo P.A. and Feijoo then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99204, typically resulting in charges of $475.00 for each initial examination that they purported to provide.

367.     In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Feijoo P.A.'s eligibility to collect PIP Benefits in the first instance.

368.     In fact, and as set forth herein, Feijoo P.A. never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act.

369.     As set forth herein, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

370.     The No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

371.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

372.     Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the Insured presented with problems of moderate to high severity.

373.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

374. Specifically, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i) Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii) Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii) Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv) Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v) Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi) Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii) Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

375. Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

376. By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the problems were low severity soft tissue injuries such as sprains and strains.

377. For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their minor automobile

accidents, or else problems of low severity, in most of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

378. To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

379. Furthermore, to the extent that police reports existed with respect to the claims identified in Exhibit "1", the contemporaneous police reports virtually always indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

380. Even so, in the claims for initial examinations identified in Exhibit "1", Feijoo P.A. and Feijoo virtually always billed for their putative initial examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

381. For example:

(i)     On July 22, 2013, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JR's vehicle did not deploy, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured in the accident. In keeping with the fact that JR was not seriously injured in the accident, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JR by Feijoo on July 23, 2013, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JR presented with moderately to highly severe health problems as the result of the accident.

(ii)    On May 5, 2014, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CC's vehicle did not deploy, and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured in the accident. In keeping with the fact that CC was not seriously injured in the accident, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any

health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of CC by Feijoo on May 8, 2014, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that CC presented with moderately to highly severe health problems as the result of the accident.

(iii)    On September 9, 2014, an Insured named IG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to IG's vehicle, that there was minor damage to the other vehicle, that the airbags in IG's vehicle did not deploy, and that IG's vehicle was drivable following the accident. The police report further indicated that IG was not injured in the accident. In keeping with the fact that IG was not seriously injured in the accident, IG did not visit any hospital emergency room following the accident. To the extent that IG experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of IG by Feijoo on September 23, 2014, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that IG presented with moderately to highly severe health problems as the result of the accident.

(iv)    On September 25, 2014, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LS's vehicle did not deploy, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured in the accident. In keeping with the fact that LS was not seriously injured in the accident, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of LS by Feijoo on October 23, 2014, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that LS presented with moderately to highly severe health problems as the result of the accident.

(v)    On February 5, 2015, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's vehicle did not deploy, and that MC's vehicle was not towed.  The police report further indicated that MC was not injured in the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of MC by Feijoo on February 9, 2015, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MC presented with moderately to highly severe health problems as the result of the accident.

(vi)    On June 25, 2015, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CM's vehicle did

not deploy, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured in the accident. In keeping with the fact that CM was not seriously injured in the accident, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of CM by Feijoo on June 25, 2015, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that CM presented with moderately to highly severe health problems as the result of the accident.

(vii)    On October 1, 2015, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's vehicle did not deploy, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured in the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of MC by Feijoo on October 13, 2015, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MC presented with moderately to highly severe health problems as the result of the accident.

(viii)   On October 21, 2015, an Insured named FA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in FA's vehicle did not deploy, and that FA's vehicle was drivable following the accident. The police report further indicated that FA was not injured in the accident. In keeping with the fact that FA was not seriously injured in the accident, FA did not visit any hospital emergency room following the accident. To the extent that FA experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of FA by Feijoo on October 23, 2015, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that FA presented with moderately to highly severe health problems as the result of the accident.

(ix)    On November 12, 2016, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that JA was not injured in the accident. In keeping with the fact that JA was not seriously injured in the accident, JA did not visit any hospital emergency room following the accident. To the extent that JA experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JA by Feijoo on November 17, 2016, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JA presented with moderately to highly severe health problems as the result of the accident.

(x)     On November 30, 2016, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JM's vehicle, that the airbags in JM's vehicle did not deploy, and that JM's vehicle was drivable following the accident. The police report further indicated that JM was not injured in the accident. In keeping with the fact that JM was not seriously injured in the accident, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JM by Feijoo on December 12, 2016, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JM presented with moderately to highly severe health problems as the result of the accident.

(xi)    On December 19, 2016, an Insured named LC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LC's vehicle, that the airbags in LC's vehicle did not deploy, and that LC's vehicle was drivable following the accident. The police report further indicated that LC was not injured in the accident. In keeping with the fact that LC was not seriously injured in the accident, LC did not visit any hospital emergency room following the accident. To the extent that LC experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of LC by Feijoo on March 7, 2017, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that LC presented with moderately to highly severe health problems as the result of the accident.

(xii)   On February 18, 2017, an Insured named DP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in DP's vehicle did not deploy, and that DP's vehicle was drivable following the accident. The police report further indicated that DP was not injured in the accident. In keeping with the fact that DP was not seriously injured in the accident, DP did not visit any hospital emergency room following the accident. To the extent that DP experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of DP by Feijoo on March 2, 2017, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that DP presented with moderately to highly severe health problems as the result of the accident.

(xiii)  On March 2, 2018, an Insured named NA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in NA's vehicle did not deploy, and that NA's vehicle was drivable following the accident. The police report further indicated that NA was not injured in the accident. In keeping with the fact that NA was not seriously injured in the accident, NA did not visit any hospital emergency room following the accident. To the extent that NA experienced any health problems at all as the result of the accident, they were of low severity. Even

so, following a purported initial examination of NA by Feijoo on March 8, 2018, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that NA presented with moderately to highly severe health problems as the result of the accident.

(xiv)    On March 31, 2018, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that AM was not injured in the accident. In keeping with the fact that AM was not seriously injured in the accident, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of AM by Feijoo on April 4, 2018, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that AM presented with moderately to highly severe health problems as the result of the accident.

(xv)    On April 29, 2018, an Insured named BS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in BS's vehicle did not deploy, and that BS's vehicle was drivable following the accident. The police report further indicated that BS was not injured in the accident. In keeping with the fact that BS was not seriously injured in the accident, BS did not visit any hospital emergency room following the accident. To the extent that BS experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of BS by Feijoo on August 2, 2018, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that BS presented with moderately to highly severe health problems as the result of the accident.

(xvi)    On May 17, 2018, an Insured named JF was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JF's vehicle, that the airbags in JF's vehicle did not deploy, and that JF's vehicle was drivable following the accident. The police report further indicated that JF was not injured in the accident. In keeping with the fact that JF was not seriously injured in the accident, JF did not visit any hospital emergency room following the accident. To the extent that JF experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JF by Feijoo on June 15, 2018, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JF presented with moderately to highly severe health problems as the result of the accident.

(xvii)    On June 10, 2018, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LM's vehicle did not deploy, and that LM's vehicle was drivable following the accident. The police report further indicated that LM was not injured in the accident. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any

hospital emergency room following the accident. To the extent that LM experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of LM by Feijoo on June 19, 2018, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that LM presented with moderately to highly severe health problems as the result of the accident.

(xviii)   On October 31, 2018, an Insured named FP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in FP's vehicle did not deploy, and that FP's vehicle was drivable following the accident.  The police report further indicated that FP was not injured in the accident. In keeping with the fact that FP was not seriously injured in the accident, FP did not visit any hospital emergency room following the accident. To the extent that FP experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of FP by Feijoo on November 1, 2018, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that FP presented with moderately to highly severe health problems as the result of the accident.

(xix)   On October 31, 2018, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AC's vehicle did not deploy, and that AC's vehicle was drivable following the accident. The police report further indicated that AC was not injured in the accident. In keeping with the fact that AC was not seriously injured in the accident, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of AC by Feijoo on December 7, 2018, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that AC presented with moderately to highly severe health problems as the result of the accident.

(xx)   On April 12, 2019, an Insured named LF was involved in an automobile accident. The contemporaneous police report indicated that the damage to LF's vehicle was minor, that the airbags in LF's vehicle did not deploy, and that LF's vehicle was drivable following the accident.  The police report further indicated that LF was not injured in the accident. In keeping with the fact that LF was not seriously injured in the accident, LF did not visit any hospital emergency room following the accident. To the extent that LF experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of LF by Feijoo on June 11, 2019, Feijoo P.A. and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that LF presented with moderately to highly severe health problems as the result of the accident.

382.     These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibit "1", Feijoo P.A. and Feijoo falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

383.     In the claims for initial examinations identified in Exhibit "1", Feijoo P.A. and Feijoo routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

384.     In the claims for initial examinations identified in Exhibit "1", Feijoo P.A. and Feijoo also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Feijoo P.A. Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and range of motion testing.

**b.     Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

385.     What is more, in the claims identified in Exhibit "1" for initial examinations under CPT code 99204, Feijoo P.A. and Feijoo misrepresented and exaggerated the amount of face-to-face time that the examining physician – namely Feijoo – spent with the Insureds or the Insureds' families during the putative initial examination.

386.     Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination typically represents that the physician who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

387.     As set forth in Exhibit "1", Feijoo P.A. and Feijoo virtually always billed for their putative initial examinations using CPT code 99204, and thereby represented that the physician who purported to conduct the examinations – namely Feijoo – spent at least 45 minutes of face-to-face time with the Insureds or their families during the examinations.

388.     In fact, in the initial examinations identified in Exhibit "1", Feijoo never spent even 15 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 45 minutes, to the extent that the examinations actually were conducted at all.

389.     Rather, in the purported initial examinations identified in Exhibit "1", the examinations rarely entailed more than 10 minutes of face-to-face time between Feijoo and the Insureds, or the Insureds' families, to the extent that they were provided at all.

390.     In keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not involve more than 10 minutes of face-to-face time between Feijoo, the Insureds, or the Insureds' families – to the extent that they were provided at all – Feijoo used a template  in purporting to conduct the examinations at Feijoo P.A..

391.     The template that Feijoo P.A. and Feijoo used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

392.     The only face-to-face time between Feijoo and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

393.     These interviews and examinations did not require Feijoo to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

394.    Indeed, Feijoo could not legitimately have personally spent at least 45 minutes of face-to-face time with the Insureds or their families during the initial examinations at Feijoo P.A., or even directly supervised anyone else who was purporting to perform the examinations, considering the massive amount of health care services he simultaneously was purporting to personally perform or directly supervise at numerous health care clinics and medical practices throughout south Florida.

395.    For example:

(i)     On July 28, 2017, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo falsely purported to perform on an Insured named AL and falsely represented that Feijoo spent at least 45 minutes of face-to-face time with the Insured or the Insured's family during the examinations. On that same day, Feijoo also purported to personally provide or directly supervise at least 17.5 hours of physical therapy services to 10 individual Insureds, at five different facilities throughout south Florida, all of which were billed to GEICO.

(ii)    On December 26, 2017, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for seven initial examination that Feijoo falsely purported to perform on Insureds named JR, VL, YM, RT, RR, ER, and JL and falsely represented that Feijoo spent at least 45 minutes of face-to-face time with the Insured or the Insured's family during these examinations. On that same day, Feijoo also purported to personally provide or directly supervise at least 16.75 hours of physical therapy services to 11 individual Insureds, at five different facilities throughout south Florida, all of which were billed to GEICO.

(iii)   On February 13, 2018, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for three initial examination that Feijoo falsely purported to perform on Insureds named MR, EA, and AC and falsely represented that Feijoo spent at least 45 minutes of face-to-face time with the Insured or the Insured's family during these examinations. On that same day, Feijoo also purported to personally provide or directly supervise at least 17.25 hours of physical therapy services to 12 individual Insureds, at four different facilities throughout the south Florida Area, all of which were billed to GEICO.

396.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", Feijoo P.A. and Feijoo routinely falsely represented that Feijoo had spent at least 45 minutes of face-to-face time with the Insureds or their families during the

examinations, despite the fact that – on those same dates – Feijoo also purported to personally perform a massive amount of physical therapy and other services to large numbers of Insureds at multiple locations throughout south Florida.

397.    What is more, and as set forth herein, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

398.    It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

399.    Thus, upon information and belief, the massive, impossible number of examination and physical therapy services that Feijoo purported to directly supervise or provide to GEICO Insureds on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of examination and physical therapy services that Feijoo purported to directly supervise or provide, including to individuals insured by companies other than GEICO, on those same dates of service.

400.    In the claims for initial examinations identified in Exhibit "1", Feijoo P.A. and Feijoo routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99204 are reimbursable at higher rates than examinations that take less time to perform.

**c.    Misrepresentations Regarding "Comprehensive" Physical Examinations**

401.    Moreover, in the claims identified in Exhibit "1" for initial examinations under CPT code 99204, Feijoo P.A. and Feijoo falsely represented the extent of the underlying physical examinations.

402.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination

403.    As set forth in Exhibit "1", Feijoo P.A. and Feijoo virtually always billed for their putative initial examinations using CPT code 99204, and thereby represented that the physician who purported to conduct the examinations – namely Feijoo – conducted comprehensive physical examinations of the Insureds who purportedly received the examinations.

404.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

405.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

406.    The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)      neurological;

(xi)     psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)    allergic/immunologic.

407.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

408.     In the claims for initial examinations identified in Exhibit "1", when Feijoo P.A. and Feijoo billed for the initial examinations under CPT code 99204, they falsely represented that Feijoo performed a "comprehensive" patient examination on the Insureds he purported to treat during the initial examinations.

409.     In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibit "1", Feijoo virtually never conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

410.     For instance, in each of the claims under CPT code 99204 identified in Exhibit "1", Feijoo did not conduct any general examination of multiple patient organ systems, inasmuch as he did not document findings with respect to at least eight organ systems.

411.     Furthermore, although Feijoo often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during the initial examinations in the claims for initial examinations identified in Exhibit "1", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

412.    For example:

(i)    On August 12, 2013, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named SG, and thereby represented that they had provided a "comprehensive" physical examination to SG.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)    On October 14, 2013, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named JB, and thereby represented that they had provided a "comprehensive" physical examination to JB.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)    On May 8, 2014, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named CC, and thereby represented that they had provided a "comprehensive" physical examination to CC.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)    On September 23, 2014, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named IG, and thereby represented that they had provided a "comprehensive" physical examination to IG.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or

any of the Insured's other organ systems.

(v)     On October 23, 2014, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named LS, and thereby represented that they had provided a "comprehensive" physical examination to LS.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vi)    On February 9, 2015, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named MC, and thereby represented that they had provided a "comprehensive" physical examination to MC.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vii)   On June 25, 2015, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named CM, and thereby represented that they had provided a "comprehensive" physical examination to CM.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(viii)  On October 13, 2015, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named MC, and thereby represented that they had provided a "comprehensive" physical examination to MC.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ix)    On October 23, 2015, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named FA, and thereby represented that they had provided a "comprehensive" physical examination to FA.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(x)     On January 1, 2016, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named GC, and thereby represented that they had provided a "comprehensive" physical examination to GC.  However, Feijoo did not document

findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xi)     On December 12, 2016, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named JM, and thereby represented that they had provided a "comprehensive" physical examination to JM.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xii)    On March 2, 2017, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named DP, and thereby represented that they had provided a "comprehensive" physical examination to DP.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xiii)   On March 23, 2017, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named MN, and thereby represented that they had provided a "comprehensive" physical examination to MN.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xiv)    On June 6, 2017, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named YE, and thereby represented that they had provided a "comprehensive" physical examination to YE.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xv)     On June 19, 2018, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named LM, and thereby represented that they had provided a "comprehensive" physical examination to LM.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xvi)    On August 2, 2018, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an

Insured named BS, and thereby represented that they had provided a "comprehensive" physical examination to BS. However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xvii)  On November 1, 2018, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named FP, and thereby represented that they had provided a "comprehensive" physical examination to FP. However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xviii)  On December 7, 2018, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named AC, and thereby represented that they had provided a "comprehensive" physical examination to AC. However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xix)  On May 2, 2019, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named IP, and thereby represented that they had provided a "comprehensive" physical examination to IP. However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(xx)  On June 11, 2019, Feijoo P.A. and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named LF, and thereby represented that they had provided a "comprehensive" physical examination to LF. However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

413.    These are only representative examples. In the vast majority of the claims for initial examinations under CPT code 99204 that are identified in Exhibit "1", Feijoo P.A. and Feijoo falsely represented that they had provided "comprehensive" physical examinations. In fact, they had not provided comprehensive physical examinations because neither Feijoo nor anyone

working under his direct supervision had documented findings with respect to at least eight of the Insureds' organ systems, nor had they documented "complete" examinations of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

414. In the claims for initial examinations under CPT code 99204 that are identified in Exhibit "1", Feijoo P.A. and Feijoo routinely falsely represented that they had provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations that do not require the examining physician to provide "comprehensive" physical examinations.

**d.     Misrepresentations Regarding the Extent of Medical Decision-Making**

415. Furthermore, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in "moderate complexity" medical decision-making.

416. In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co–morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

417. Though Feijoo P.A. and Feijoo routinely billed for their putative initial examinations using CPT codes 99204 and thereby falsely represented that the initial examinations involved medical decision-making of "moderate" complexity, in actuality the initial examinations did not involve any medical decision-making at all.

418.    First, in the claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

419.    When the Insureds in the claims identified in Exhibit "1" presented to Feijoo P.A. for "treatment", they did not arrive with any significant amount of medical records.

420.    Furthermore, prior to the initial examinations, Feijoo P.A. and Feijoo typically did not request any medical records from other providers.

421.    Second, in the claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity– much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

422.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at Feijoo P.A., to the extent that Feijoo P.A. provided any such diagnostic procedures or treatment options in the first instance.

423.    In the claims identified in Exhibit "1", any diagnostic procedures and "treatments" that the Feijoo P.A. Defendants actually provided were limited to a series of medically unnecessary follow-up examination and range of motion testing, none of which was health-or life-threatening if properly administered.

424.    Third, in the claims for initial examinations identified in Exhibit "1", Feijoo P.A. and Feijoo did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

425.    Rather, to the extent that the initial examinations were conducted in the first instance, Feijoo P.A. and Feijoo provided a phony list of soft tissue injury "diagnoses" for virtually

every Insured, and prescribed a substantially similar course of treatment for virtually every Insured.

426.     Specifically, in most of the claims identified in Exhibit "1", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

427.     Even so, Feijoo P.A. and Feijoo prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every Insured.

428.     Then, based upon these phony "diagnoses", Feijoo P.A. and Feijoo directed the Insureds to return for medically unnecessary follow up examinations and range of motion testing.

429.     For example:

(i)      On May 5, 2014, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CC's vehicle did not deploy, and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured in the accident. In keeping with the fact that CC was not seriously injured in the accident, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as the result of the accident, they were of low severity. On May 8, 2014, Feijoo purported to conduct an initial examination of CC at Feijoo P.A.. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided CC with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CC's presenting problems, nor the treatment plan provided to CC by Feijoo and Feijoo P.A., presented any risk of significant complications, morbidity, or mortality. To the contrary, CC did not need any significant treatment at all as a result of the accident. Even so, Feijoo and Feijoo P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Feijoo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On September 9, 2014, an Insured named IG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to IG's vehicle, that there was minor damage to the other vehicle, that the airbags in IG's vehicle did not deploy, and that IG's vehicle was drivable following

the accident. The police report further indicated that IG was not injured in the accident. In keeping with the fact that IG was not seriously injured in the accident, IG did not visit any hospital emergency room following the accident. To the extent that IG experienced any health problems at all as the result of the accident, they were of low severity. On September 23, 2014, Feijoo purported to conduct an initial examination of IG at Feijoo P.A.. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided IG with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither IG's presenting problems, nor the treatment plan provided to IG by Feijoo and Feijoo P.A., presented any risk of significant complications, morbidity, or mortality. To the contrary, IG did not need any significant treatment at all as a result of the accident. Even so, Feijoo and Feijoo P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Feijoo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)    On February 5, 2015, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's vehicle did not deploy, and that MC's vehicle was not towed.  The police report further indicated that MC was not injured in the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low severity. On February 9, 2015, Feijoo purported to conduct an initial examination of MC at Feijoo P.A.. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided MC with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured.  Furthermore, neither MC's presenting problems, nor the treatment plan provided to MC by Feijoo and Feijoo P.A., presented any risk of significant complications, morbidity, or mortality. To the contrary, MC did not need any significant treatment at all as a result of the accident. Even so, Feijoo and Feijoo P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Feijoo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)    On October 21, 2015, an Insured named FA was involved in an automobile accident. The contemporaneous police report indicated that the airbags in FA's vehicle did not deploy, and that FA's vehicle was drivable following the accident.

The police report further indicated that FA was not injured in the accident. In keeping with the fact that FA was not seriously injured in the accident, FA did not visit any hospital emergency room following the accident. To the extent that FA experienced any health problems at all as the result of the accident, they were of low severity. On October 23, 2015, Feijoo purported to conduct an initial examination of FA at Feijoo P.A.. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided FA with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither FA's presenting problems, nor the treatment plan provided to FA by Feijoo and Feijoo P.A., presented any risk of significant complications, morbidity, or mortality. To the contrary, FA did not need any significant treatment at all as a result of the accident. Even so, Feijoo and Feijoo P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Feijoo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)     On November 30, 2016, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JM's vehicle, that the airbags in JM's vehicle did not deploy, and that JM's vehicle was drivable following the accident. The police report further indicated that JM was not injured in the accident. In keeping with the fact that JM was not seriously injured in the accident, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as the result of the accident, they were of low severity. On December 12, 2016, Feijoo purported to conduct an initial examination of JM at Feijoo P.A.. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided JM with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JM's presenting problems, nor the treatment plan provided to JM by Feijoo and Feijoo P.A., presented any risk of significant complications, morbidity, or mortality. To the contrary, JM did not need any significant treatment at all as a result of the accident. Even so, Feijoo and Feijoo P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Feijoo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)    On April 29, 2018, an Insured named BS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in BS's vehicle did not deploy, and that BS's vehicle was drivable following the accident.  The police

report further indicated that BS was not injured in the accident. In keeping with the fact that BS was not seriously injured in the accident BS did not visit any hospital emergency room following the accident. To the extent that BS experienced any health problems at all as the result of the accident, they were of low severity. On August 2, 2018, Feijoo purported to conduct an initial examination of BS at Feijoo P.A.. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided BS with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured.  Furthermore, neither BS's presenting problems, nor the treatment plan provided to BS by Feijoo and Feijoo P.A., presented any risk of significant complications, morbidity, or mortality. To the contrary BS did not need any significant treatment at all as a result of the accident. Even so, Feijoo and Feijoo P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Feijoo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)  On June 10, 2018, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LM's vehicle did not deploy, and that LM's vehicle was drivable following the accident.  The police report further indicated that LM was not injured in the accident. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as the result of the accident, they were of low severity. On June 19, 2018, Feijoo purported to conduct an initial examination of LM at Feijoo P.A.. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided LM with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured.  Furthermore, neither LM's presenting problems, nor the treatment plan provided to LM by Feijoo and Feijoo P.A., presented any risk of significant complications, morbidity, or mortality. To the contrary, LM did not need any significant treatment at all as a result of the accident. Even so, Feijoo and Feijoo P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Feijoo engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

430.  There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

431.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

432.    As set forth herein, in the claims identified in Exhibit "1", virtually all of the Insureds whom the Feijoo P.A. Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

433.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

434.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on the exact same date after their underlying automobile accident.

435.    Even so, in keeping with the fact that these putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Feijoo P.A. and Feijoo–issued substantially identical, phony "diagnoses", on or about the same date, to more than one Insured involved in a single accident.

436.    For example:

(i)     On May 30, 2013, two Insureds – ME and EF – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, July 2, 2013. ME and EF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that ME and EF suffered any injuries at all in their accident,

the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided ME and EF with substantially identical, phony "diagnoses".

(ii)     On July 28, 2013, two Insureds – AF and MM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, August 5, 2013. AF and MM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AF and MM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided AF and MM with substantially identical, phony "diagnoses".

(iii)    On November 8, 2013, two Insureds – EC and MC– were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, April 7, 2014. EC and MC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EC and MC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided EC and MC with substantially identical, phony "diagnoses".

(iv)    On November 22, 2013, two Insureds – JM and PM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, December 5, 2013. JM and PM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JM and PM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided JM and PM with substantially identical, phony "diagnoses".

(v)     On March 11, 2014, two Insureds – LQ and ZS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, March 17, 2014. LQ and ZS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LQ and ZS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided LQ and ZS with substantially identical, phony "diagnoses".

(vi)    On June 25, 2014, two Insureds – RP and YP– were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo

P.A. for initial examinations by Feijoo on the <u>exact same date</u>, June 26, 2014. RP and YP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RP and YP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided RP and YP with substantially identical, phony "diagnoses".

(vii)     On July 29, 2014, two Insureds – RL and OD – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, August 7, 2014. RL and OD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RL and OD suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided RL and OD with substantially identical, phony "diagnoses".

(viii)    On December 16, 2014, two Insureds – JA and AC– were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, January 15, 2015. JA and AC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JA and AC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided JA and AC with substantially identical, phony "diagnoses".

(ix)     On September 25, 2015, two Insureds – RI and JL – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, November 3, 2015. RI and JL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RI and JL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided RI and JL with substantially identical, phony "diagnoses".

(x)      On November 26, 2015, two Insureds – AM and BM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, March 1, 2016. AM and BM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AM and BM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided AM and BM with substantially

identical, phony "diagnoses".

(xi)    On December 2, 2015, two Insureds – MH and BV – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, December 7, 2015. MH and BV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MH and BV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided MH and BV with substantially identical, phony "diagnoses".

(xii)   On January 26, 2016, two Insureds – MR and SS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, June 6, 2016. MR and SS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MR and SS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided MR and SS with substantially identical, phony "diagnoses".

(xiii)  On February 9, 2017, two Insureds – AP and GZ – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, February 13, 2017. AP and GZ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AP and GZ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided AP and GZ with substantially identical, phony "diagnoses".

(xiv)   On April 21, 2017, two Insureds – CA and NA– were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, May 11, 2017. CA and NA were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CA and NA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided CA and NA with substantially identical, phony "diagnoses".

(xv)    On June 6, 2017, two Insureds – SM and LO– were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, June 8, 2017. SM and LO were different ages, in different physical conditions, located in different positions in the

vehicle, and experienced the impact from different positions in the vehicle. To the extent that SM and LO suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided SM and LO with substantially identical, phony "diagnoses".

(xvi)  On April 1, 2018, three Insureds – IB, JM, and MM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, April 3, 2018. IB, JM, and MM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that IB, JM, and MM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided IB, JM, and MM with substantially identical, phony "diagnoses".

(xvii)  On May 25, 2018, two Insureds – NA and SL – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, May 30, 2018. NA and SL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that NA and SL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided NA and SL with substantially identical, phony "diagnoses".

(xviii) On June 7, 2018, two Insureds – MC and DL – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, June 12, 2018. MC and DL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MC and DL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided MC and DL with substantially identical, phony "diagnoses".

(xix)  On November 11, 2018, three Insureds – MB, AH, and LH – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, November 16, 2018. MB, AH, and LH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MB, AH, and LH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided MB, AH, and LH with substantially identical, phony "diagnoses".

(xx)     On December 11, 2018, two Insureds – HE and IF– were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, December 13, 2018. HE and IF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that HE and IF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided HE and IF with substantially identical, phony "diagnoses".

(xxi)    On December 28, 2018, two Insureds – NA and YG – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, April 4, 2019. NA and YG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that NA and YG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided NA and YG with substantially identical, phony "diagnoses".

(xxii)   On March 21, 2019, two Insureds – SH and SM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, April 4, 2019. SH and SM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that SH and SM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided SH and SM with substantially identical, phony "diagnoses".

(xxiii)  On April 18, 2019, two Insureds – RA and SB – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, April 23, 2019. RA and SB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RA and SB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided RA and SB with substantially identical, phony "diagnoses".

(xxiv)   On May 7, 2019, two Insureds – DH and EP – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, May 16, 2019. DH and EP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DH and EP suffered any injuries at all in their accident, the injuries were

different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided DH and EP with substantially identical, phony "diagnoses".

(xxv)   On November 12, 2019, two Insureds – CC and AC – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Feijoo P.A. for initial examinations by Feijoo on the <u>exact same date</u>, November 14, 2019. CC and AC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CC and AC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Feijoo P.A. and Feijoo provided CC and AC with substantially identical, phony "diagnoses".

437.   Feijoo P.A. and Feijoo inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Feijoo P.A. Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations, range of motion, and other diagnostic testing.

438.   In keeping with the fact that Feijoo P.A. and Feijoo routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, for many of the Insureds in the claims identified in Exhibit "1", Feijoo P.A. and Feijoo diagnosed the Insureds with substantially identical sprain/strain "diagnoses", and concluded in a significant amount of the initial examination reports that the Insureds had suffered from an  "emergency medical condition", and stated that the Insureds had sustained "acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention <u>could</u> reasonably be expected to result in any of the following: a) serious jeopardy to patient health; b) serious impairment to bodily functions; or c) serious dysfunction of a bodily organ or parts."

439.   What is more, in many of the claims identified in Exhibit "1", Feijoo P.A. and

Feijoo recommended that "the patient should start medical treatment and care as soon as possible, as an emergency".

440.     It is extremely improbable that the Insureds in the claims identified in Exhibit "1" would have symptoms so serious that their injuries could be considered a medical emergency, especially considering that, in many instances, the initial examinations occurred weeks after the demonstrably minor automobile accidents.

441.     It is even more improbable – to the point of impossibility – that this would occur over and over again, in the context of minor automobile accidents that could not possibly have caused such severe levels of pain and/or injury.

442.     Feijoo P.A. and Feijoo inserted this false information in their initial examination reports despite the fact that the minor underlying accidents did not and could not possibly have caused such serious symptoms in the Insureds.

443.     For example:

(i)      On May 5, 2014, an Insured named CC was involved in an automobile accident. In keeping with the fact that CC was not seriously injured in the accident, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of CC on May 8, 2014, Feijoo P.A. and Feijoo falsely reported that CC's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(ii)     On September 9, 2014, an Insured named IG was involved in an automobile accident. In keeping with the fact that IG was not seriously injured in the accident, IG did not visit any hospital emergency room following the accident. To the extent that IG experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of IG on September 23, 2014, Feijoo P.A. and Feijoo falsely reported that IG's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(iii)    On September 25, 2014, an Insured named LS was involved in an automobile

accident. In keeping with the fact that LS was not seriously injured in the accident, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of LS on October 23, 2014, Feijoo P.A. and Feijoo falsely reported that LS's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(iv)     On February 5, 2015, an Insured named MC was involved in an automobile accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of MC on February 9, 2015, Feijoo P.A. and Feijoo falsely reported that MC's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(v)     On February 7, 2015, an Insured named LF was involved in an automobile accident. In keeping with the fact that LF was not seriously injured in the accident, LF did not visit any hospital emergency room following the accident. To the extent that LF experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of LF on March 19, 2015, more than one month after the accident, Feijoo P.A. and Feijoo falsely reported that LF's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(vi)     On October 1, 2015, an Insured named MC was involved in an automobile accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of MC on October 13, 2015, Feijoo P.A. and Feijoo falsely reported that MC's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(vii)     On April 23, 2016, an Insured named ER was involved in an automobile accident. In keeping with the fact that ER was not seriously injured in the accident, ER did not visit any hospital emergency room following the accident. To the extent that ER experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of ER on May 5, 2016, more than three weeks after the automobile accident, Feijoo P.A. and Feijoo falsely reported that ER's injuries constituted an "emergency medical

condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(viii)   On October 5, 2016, an Insured named LE was involved in an automobile accident. In keeping with the fact that LE was not seriously injured in the accident, LE did not visit any hospital emergency room following the accident. To the extent that LE experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of LE on October 27, 2016, more than three weeks after the automobile accident, Feijoo P.A. and Feijoo falsely reported that LE's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(ix)   On October 18, 2016, an Insured named AS was involved in an automobile accident. In keeping with the fact that AS was not seriously injured in the accident, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of AS on November 15, 2016, four weeks after the automobile accident, Feijoo P.A. and Feijoo falsely reported that AS's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(x)   On November 30, 2016, an Insured named JM was involved in an automobile accident. In keeping with the fact that JM was not seriously injured in the accident, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of JM on December 12, 2016, Feijoo P.A. and Feijoo falsely reported that JM's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(xi)   On February 18, 2017, an Insured named DP was involved in an automobile accident. In keeping with the fact that DP was not seriously injured in the accident, DP did not visit any hospital emergency room following the accident. To the extent that DP experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of DP on March 2, 2017, Feijoo P.A. and Feijoo falsely reported that DP's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(xii)   On June 1, 2017, an Insured named YE was involved in an automobile accident. In keeping with the fact that YE was not seriously injured in the accident, YE did not visit any hospital emergency room following the accident. To the extent that YE

experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of YE on June 6, 2017, Feijoo P.A. and Feijoo falsely reported that YE's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(xiii)  On July 1, 2017, an Insured named LE was involved in an automobile accident. In keeping with the fact that LE was not seriously injured in the accident, LE did not visit any hospital emergency room following the accident. To the extent that LE experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of LE on July 10, 2017, Feijoo P.A. and Feijoo falsely reported that LE's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(xiv)  On April 29, 2018, an Insured named BS was involved in an automobile accident. In keeping with the fact that BS was not seriously injured in the accident, BS did not visit any hospital emergency room following the accident. To the extent that BS experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of BS on August 2, 2018, more than three months after the minor automobile accident, Feijoo P.A. and Feijoo falsely reported that BS's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(xv)  On May 17, 2018, an Insured named JF was involved in an automobile accident. In keeping with the fact that JF was not seriously injured in the accident, JF did not visit any hospital emergency room following the accident. To the extent that JF experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of JF on June 15, 2018, more than four weeks after the minor automobile accident, Feijoo P.A. and Feijoo falsely reported that JF's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(xvi)  On June 10, 2018, an Insured named LM was involved in an automobile accident. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of LM on June 19, 2018, Feijoo P.A. and Feijoo falsely reported that LM's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(xvii)  On October 31, 2018, an Insured named FP was involved in an automobile accident. In keeping with the fact that FP was not seriously injured in the accident, FP did

not visit any hospital emergency room following the accident. To the extent that FP experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of FP on November 1, 2018, Feijoo P.A. and Feijoo falsely reported that FP's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(xviii)   On April 11, 2019, an Insured named KB was involved in an automobile accident. In keeping with the fact that KB was not seriously injured in the accident, KB did not visit any hospital emergency room following the accident. To the extent that KB experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of KB on April 16, 2019, Feijoo P.A. and Feijoo falsely reported that KB's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(xix)   On May 2, 2019, an Insured named IP was involved in an automobile accident. In keeping with the fact that IP was not seriously injured in the accident, IP did not visit any hospital emergency room following the accident. To the extent that IP experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of IP on May 7, 2019, Feijoo P.A. and Feijoo falsely reported that IP's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

(xx)   On June 22, 2019, an Insured named YM was involved in an automobile accident. In keeping with the fact that YM was not seriously injured in the accident, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of YM on June 25, 2019, Feijoo P.A. and Feijoo falsely reported that YM's injuries constituted an "emergency medical condition" and recommended that the "the patient should start medical treatment and care as soon as possible, as an emergency".

444.   These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Feijoo P.A. and Feijoo routinely falsely reported that the Insureds suffered from "severe pain" and were experiencing a "emergency medical condition" as the result of their minor accidents.

445.   Feijoo P.A. and Feijoo routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required

some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Feijoo P.A. Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations, range of motion testing, and other diagnostic services.

446.    To the extent that the Insureds in the claims identified in Exhibit "1" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

447.    The diagnosis and treatment of these ordinary sprains and strains did not require any "moderate complexity" medical decision-making on the part of Feijoo or anyone else.

448.    To the contrary, and as set forth herein, Feijoo did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "1", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the other Fraudulent Services that the Feijoo P.A. Defendants purported to provide.

449.    In the claims for initial examinations identified in Exhibit "1", Feijoo P.A. and Feijoo routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because CPT code 99204 is reimbursable at a higher rate than examinations that do not require moderate complexity medical decision-making.

450.    In the claims for initial examinations identified in Exhibit "1" Feijoo P.A. and Feijoo routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment

recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    Feijoo P.A. never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act.

451.    In this context, Feijoo – who at all relevant times purported to own Feijoo P.A. – did not, and could not have, legitimately supervised the business activities of Feijoo P.A.

452.    Had Feijoo actually supervised the business activities of Feijoo P.A., Feijoo would have noted – among other things – that Feijoo P.A. routinely fraudulently represented in Feijoo P.A.'s billing that the putative initial examinations were legitimately and lawfully performed.

**(ii)     The Fraudulent Charges for Follow-Up Examinations at Feijoo P.A.**

453.    In addition to their fraudulent initial examinations, Feijoo P.A. and Feijoo routinely purported to subject the Insureds in the claims identified in Exhibit "1" to fraudulent follow-up examinations during the course of their fraudulent treatment and billing protocol.

454.    Feijoo purported to personally perform virtually all of the follow-up examinations in the claims identified in Exhibit "1".

455.    As set forth in Exhibit "1", Feijoo P.A. and Feijoo then billed the follow-up examinations to GEICO under: (i) CPT code 99214, typically  resulting in charges of $275.00 for each follow-up examination they purported to provide; or (ii) CPT code 99215, typically resulting in charges of $425.00 for each follow-up examination they purported to provide.

456.    In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented Feijoo P.A.'s eligibility to collect PIP Benefits in the first instance.

457.    In fact, and as set forth herein, Feijoo P.A. never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

458.    As set forth herein, Feijoo P.A. and Feijoo's charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the follow-up examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

459.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

460.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination. For example:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)  Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

461.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

462.    Pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

463.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99215 to bill for a follow-up patient examination. For example:

(i)     Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly. (Family Medicine)

(ii)    Office evaluation and discussion of treatment options for a 68-year-old male with a biopsy-proven rectal carcinoma. (General Surgery)

(iii)   Office visit for restaging of an established patient with new lymphadenopathy one year post therapy for lymphoma. (Hematology/Oncology)

(iv)    Follow-up office visit for a 65-year-old male with a fever of recent onset while on outpatient antibiotic therapy for endocarditis. (Infectious Disease)

(v)     Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient (Internal Medicine)

(vi)    Follow-up office visit for a 75-year-old patient with ALS (amyotropfuc lateral sclerosis), who is no longer able to swallow. (Neurology)

(vii)    Follow-up visit, 40-year-old mother of 3, with acute rheumatoid arthritis, anatomical Stage 3, ARA function Class 3 rheumatoid arthritis, and deteriorating function. (Rheumatology)

464.    Thus, the sort of presenting problems that justify a charge under CPT code 99215 likewise typically are problems that pose a serious threat to the patient's health, or even the patient's life.

465.    By contrast, and as set forth herein, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

466.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

467.    By the time the Insureds in the claims identified in Exhibit "1" presented at Feijoo P.A. for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

468.    Even so, in the claims for follow-up examinations identified in Exhibit "1", Feijoo P.A. and Feijoo routinely billed for their putative follow-up examinations under CPT codes 99214 and 99215, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity.

469.    For example:

(i)    On May 5, 2014, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in CC's vehicle did not deploy, and that CC's vehicle was drivable following the accident.  The police report further indicated that CC was not injured in the accident. In keeping with the fact that CC was not seriously injured in the accident, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within a few weeks of the accident. Even so,

following a purported follow-up examination of CC by Feijoo on July 3, 2014 – almost two months after the accident – Feijoo P.A. and Feijoo billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that CC presented with problems of moderate to high severity.

(ii)     On September 9, 2014, an Insured named IG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to IG's vehicle, that there was minor damage to the other vehicle, that the airbags in IG's vehicle did not deploy, and that IG's vehicle was drivable following the accident. The police report further indicated that IG was not injured in the accident. In keeping with the fact that IG was not seriously injured in the accident, IG did not visit any hospital emergency room following the accident. To the extent that IG experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within a few weeks of the accident. Even so, following a purported follow-up examination of IG by Feijoo on October 17, 2014 – more than one month after the accident – Feijoo P.A. and Feijoo billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that IG presented with problems of moderate to high severity. What is more, following a purported follow-up examination of IG by Feijoo on November 6, 2014 – almost two months after the accident – Feijoo P.A. and Feijoo billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that IG presented with problems of moderate to high severity. In keeping with the fact that IG had no presenting problems of moderate to high severity, Feijoo P.A. and Feijoo actually stopped treating IG after November 6, 2014.

(iii)    On February 5, 2015, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MC's vehicle did not deploy, and that MC's vehicle was not towed.  The police report further indicated that MC was not injured in the accident. In keeping with the fact that MC was not seriously injured in the accident, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within a few weeks of the accident. Even so, following a purported follow-up examination of MC by Feijoo on March 16, 2015 – more than one month after the accident – Feijoo P.A. and Feijoo billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that MC presented with problems of moderate to high severity. What is more, following a purported follow-up examination of MC by Feijoo on April 6, 2015 – more than two months after the accident – Feijoo P.A. and Feijoo billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that MC presented with problems of moderate to high severity. In keeping with the fact that MC had no presenting problems of moderate to high severity, Feijoo P.A. and Feijoo actually stopped treating MC after April 6, 2015.

(iv)     On October 21, 2015, an Insured named FA was involved in an automobile

132

accident. The contemporaneous police report indicated that the airbags in FA's vehicle did not deploy, and that FA's vehicle was drivable following the accident. The police report further indicated that FA was not injured in the accident. In keeping with the fact that FA was not seriously injured in the accident, FA did not visit any hospital emergency room following the accident. To the extent that FA experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within a few weeks of the accident. Even so, following a purported follow-up examination of FA by Feijoo on February 29, 2016 – over four months after the accident – Feijoo P.A. and Feijoo billed GEICO for the follow-up examinations using CPT code 99215, and thereby falsely represented that FA presented with problems of moderate to high severity. In keeping with the fact that FA had no presenting problems of moderate to high severity, Feijoo P.A. and Feijoo actually stopped treating FA after February 29, 2016.

(v)     On February 2, 2016, an Insured named GT was involved in an automobile accident. The contemporaneous police report indicated that the airbags in GT's vehicle did not deploy, and that GT's vehicle was drivable following the accident. The police report further indicated that GT was not injured in the accident. In keeping with the fact that GT was not seriously injured in the accident, GT did not visit any hospital emergency room following the accident. To the extent that GT experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within a few weeks of the accident. Even so, following a purported follow-up examination of GT by Feijoo on March 28, 2016 – more than six weeks after the accident – Feijoo P.A. and Feijoo billed GEICO for the follow-up examinations using CPT code 99215, and thereby falsely represented that GT presented with problems of moderate to high severity. In keeping with the fact that GT had no presenting problems of moderate to high severity, Feijoo P.A. and Feijoo actually stopped treating GT after March 28, 2016.

(vi)    On November 30, 2016, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JM's vehicle, that the airbags in JM's vehicle did not deploy, and that JM's vehicle was drivable following the accident. The police report further indicated that JM was not injured in the accident. In keeping with the fact that JM was not seriously injured in the accident, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within a few weeks of the accident. Even so, following a purported follow-up examination of JM by Feijoo on January 23, 2017 – over seven weeks after the accident – Feijoo P.A. and Feijoo billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that JM presented with problems of moderate to high severity. In keeping with the fact that JM had no presenting problems of moderate to high severity, Feijoo P.A. and Feijoo actually stopped treating JM after January 23, 2017.

(vii)  On April 29, 2018, an Insured named BS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in BS's vehicle did not deploy, and that BS's vehicle was drivable following the accident.  The police report further indicated that BS was not injured in the accident. In keeping with the fact that BS was not seriously injured in the accident, BS did not visit any hospital emergency room following the accident. To the extent that BS experienced any health problems at all as the result of the accident, they were of low severity, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of BS on November 16, 2018 – more than six months after the minor accident – Feijoo P.A. and Feijoo billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that JB presented with problems of moderate to high severity. In keeping with the fact that BS had no presenting problems of moderate to high severity, Feijoo P.A. and Feijoo actually stopped treating BS after November 16, 2018.

(viii)  On June 10, 2018, an Insured named LM was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LM's vehicle did not deploy, and that LM's vehicle was drivable following the accident.  The police report further indicated that LM was not injured in the accident. In keeping with the fact that LM was not seriously injured in the accident, LM did not visit any hospital emergency room following the accident. To the extent that LM experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within a few weeks of the accident. Even so, following a purported follow-up examination of LM by Feijoo on August 1, 2018 – more than six weeks after the accident – Feijoo P.A. and Feijoo billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that LM presented with problems of moderate to high severity. What is more, following a purported follow-up examination of LM by Feijoo on September 27, 2018 – more than three months after the accident – Feijoo P.A. and Feijoo billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that LM presented with problems of moderate to high severity at the follow-up examination. In keeping with the fact that LM had no presenting problems of moderate to high severity, Feijoo P.A. and Feijoo actually stopped treating LM after September 27, 2018.

(ix)  On March 2, 2019, an Insured named YP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in YP's vehicle did not deploy, and that YP's vehicle was drivable following the accident.  The police report further indicated that YP was not injured in the accident. In keeping with the fact that YP was not seriously injured in the accident, YP did not visit any hospital emergency room following the accident. To the extent that YP experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within a few weeks of the accident. Even so, following a purported follow-up examination of YP by Feijoo on April 4, 2019, – more than one month after the accident – Feijoo P.A. and Feijoo billed GEICO for

the follow-up examinations using CPT code 99214, and thereby falsely represented that YP presented with problems of moderate to high severity.

470.     These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", Feijoo P.A. and Feijoo routinely falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

471.     In the claims for follow-up examinations identified in Exhibit "1", Feijoo P.A. and Feijoo routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99214 and 99215, because follow-up examinations billable under CPT codes 99214 and 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

472.     In the claims for follow-up examinations identified in Exhibit "1", Feijoo P.A. and Feijoo also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional, medically unnecessary follow-up examinations and range of motion testing.

**b.     Misrepresentations Regarding the Results of the Follow-Up Examinations**

473.     What is more, pursuant to the CPT Assistant, when Feijoo P.A. and Feijoo billed for their putative follow-up examinations under CPT code 99214, they represented that Feijoo performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

474. Additionally, pursuant to the CPT Assistant, when Feijoo P.A. and Feijoo billed for their putative follow-up examinations under CPT code 99215, they represented that Feijoo performed at least two of the following three components: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

475. In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", Feijoo did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

476. Rather, following their purported follow-up examinations, Feijoo P.A. and Feijoo simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for additional follow up-examinations, range of motion testing, or other diagnostic testing: or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

477. In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentment, Feijoo P.A. and Feijoo directed the Insureds to return to Feijoo P.A. for follow up examinations, range of motion testing and other diagnostic testing irrespective of the Insureds' actual presenting problems, to the extent the Insureds suffered any legitimate injuries at all.

478. The phony "follow-up examinations" that Feijoo P.A. and Feijoo purported to provide the Insureds in the claims identified in Exhibit "1" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Feijoo P.A.'s offices.

479.     In further keeping with the fact that the purported "results" of the follow-up examinations were pre-determined and involved no actual medical decision-making at all, in many of the claims identified in Exhibit "1", Feijoo and Feijoo P.A. purported to provide a "final evaluation" during the final follow-up examination that they purported to provide to Insureds, which they would then bill to GEICO under CPT code 99215.

480.     In virtually every "final evaluation" that Feijoo and Feijoo P.A. provided to the Insureds, they reported that the Insured had been left with a "partial impairment of the body as a whole" in order to create the appearance of genuine injuries, where none actually existed.

481.     What is more this "impairment" was virtually always measured to be anywhere from 5% to 17%, with a significant number of the Insureds purportedly suffering from an identical 5% impairment.

482.     It is simply impossible that virtually all of the Insureds purported to have been examined by Feijoo and Feijoo P.A. who received a final evaluation would suffer from a "partial impairment of the body as a whole", with substantially similar levels of partial impairment.

483.     These phony determinations were reported in a statistically impossible number of final examination reports created by Feijoo and Feijoo P.A., including but not limited to reports for the following Insureds on the following dates:

(i)      On July 8, 2013, JR was falsely reported to have suffered a 7% impairment of the body as a whole;

(ii)     On January 6, 2014, EG was falsely reported to have suffered a 8% impairment of the body as a whole;

(iii)    On January 6, 2014, MP was falsely reported to have suffered a 6% impairment of the body as a whole;

(iv)     On July 3, 2014, AG was falsely reported to have suffered a 7% impairment of the body as a whole;

(v)     On February 5, 2015, MC was falsely reported to have suffered a 9% impairment of the body as a whole;

(vi)    On November 3, 2015, JB was falsely reported to have suffered a 5% impairment of the body as a whole;

(vii)   On December 18, 2015, JA was falsely reported to have suffered a 5% impairment of the body as a whole;

(viii)  On March 28, 2016, GT was falsely reported to have suffered a 8% impairment of the body as a whole;

(ix)    On June 2, 2015, FP was falsely reported to have suffered a 11% impairment of the body as a whole;

(x)     On April 29, 2016, TL was falsely reported to have suffered a 9% impairment of the body as a whole;

(xi)    On June 23, 2016, CR was falsely reported to have suffered a 10% impairment of the body as a whole;

(xii)   On September 19, 2016, RR was falsely reported to have suffered a 8% impairment of the body as a whole;

(xiii)  On May 15, 2017, MR was falsely reported to have suffered a 5% impairment of the body as a whole;

(xiv)   On December 7, 2017, RG was falsely reported to have suffered a 5% impairment of the body as a whole;

(xv)    On December 15, 2017, YM was falsely reported to have suffered a 5% impairment of the body as a whole;

(xvi)   On October 5, 2017, LE was falsely reported to have suffered a 13% impairment of the body as a whole; ;

(xvii)  On June 26, 2018, JO was falsely reported to have suffered a 5% impairment of the body as a whole;

(xviii) On August 12, 2018, EA was falsely reported to have suffered a 5% impairment of the body as a whole;

(xix)   On December 5, 2018, KE was falsely reported to have suffered a 8% impairment of the body as a whole; and

(xx)   On April 14, 2019, FN was falsely reported to have suffered a 7% impairment of the body as a whole.

484.   These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", Feijoo P.A. and Feijoo routinely falsely purported to identify some level of "partial impairment of the body as a whole", despite the fact that – to the extent that the Insureds in the claims identified in Exhibit "1" suffered any health care problems at all as the result of their relatively minor automobile accidents – the problems virtually always were limited to minor soft tissue injuries such as sprains and strains.

485.   In the claims for follow-up examinations identified in Exhibit "1", Feijoo P.A. and Feijoo routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)   the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentment;

(ii)   the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   As set forth herein, Feijoo P.A. never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it operated in violation of the Clinic Act.

486.   In this context, Feijoo – who at all relevant times purported to own Feijoo P.A. – did not, and could not have, legitimately supervised the business activities of Feijoo P.A.

487.   Had Feijoo actually supervised the business activities of Feijoo P.A., Feijoo would have noted – among other things – that Feijoo P.A. routinely fraudulently represented in Feijoo P.A.'s billing that the putative follow-up examinations were legitimately and lawfully performed.

488.   Feijoo failed to do so, inasmuch as he Feijoo was the medical provider who purported to provide these fraudulent services in the first instance.

**(iii)**     **The Fraudulently Unbundled Charges for Range of Motion Testing at Feijoo P.A.**

489.     In an attempt to maximize the fraudulent billing for examinations that they could submit for each Insured, Feijoo P.A. and Feijoo fraudulently unbundled separate charges for purported range of motion testing from their charges for the putative initial examinations.

490.     What is more, in an additional attempt to maximize their fraudulent billing, Feijoo P.A. and Feijoo directed many Insureds to return for follow-up examinations where they again fraudulently unbundled separate charges for purported range of motion testing from their charges for the putative follow-up examinations.

491.     Specifically, and as set forth in Exhibit "1", when they submitted their already-inflated charges of $475.00 for purported initial examinations under CPT code 99204, and $275.00 or $425.00 for the purported follow-up examinations under CPT codes 92214 and 99215, Feijoo P.A. and Feijoo virtually always submitted an additional charge of $100.00, under CPT code 95851, for purported range of motion testing. As a result, following virtually every initial examination they purported to conduct, Feijoo P.A. and Feijoo submitted total charges to GEICO of $575.00, and following virtually every follow-up examination they purported to conduct, Feijoo P.A. and Feijoo submitted total charges to GEICO of $375.00 or $525.00.

**a.**     **Traditional Tests to Evaluate the Human Body's Range of Motion**

492.     The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

493. The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

494. A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

495. Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with Feijoo P.A. – necessarily require range of motion tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion is an essential component of the "hands-on" examination of a trauma patient.

496. Since range of motion tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the CPT Assistant requires that range of motion tests are to be reimbursed as an element of the initial examinations and follow-up examinations. In other words, subject to certain limited exceptions that are not applicable in this case, health care providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided range of motion tests.

**b.     Feijoo P.A. and Feijoo's Duplicate and Unbundled Billing for Range of Motion Tests**

497.    To the extent that Feijoo P.A. and Feijoo actually provided initial examinations in the first instance, Feijoo P.A. and Feijoo purported to provide range of motion tests on the Insureds during the initial examination.

498.    The charges for these range of motion tests were part and parcel of the already-inflated charges that Feijoo P.A. and Feijoo routinely submitted for the initial examinations under CPT code 99204.

499.    Additionally, to the extent that Feijoo P.A. and Feijoo actually provided follow-up examinations in the first instance, Feijoo P.A. and Feijoo purported to provide range of motion tests on the Insureds during the follow-up examination as well.

500.    The charges for these range of motion tests were part and parcel of the already-inflated charges that Feijoo P.A. and Feijoo routinely submitted for the follow-up examinations under CPT codes 99214 and 92215.

501.    Even so, and as set forth herein and in Exhibit "1", Feijoo P.A. and Feijoo routinely unbundled a separate charge of $100.00 under CPT code 95851 for range of motion testing from the underlying initial examination charge under CPT code 99204, and from the underlying follow-up examination charge under CPT codes 99214 and 99215.

502.    For example:

(i)     On April 4, 2013, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named LB. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(ii)    On July 16, 2013, Feijoo P.A. and Feijoo purported to provide a follow-up medical examination to an Insured named RA. Thereafter, in addition to their already-

inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(iii)   On October 14, 2013, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named JB. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(iv)   On November 18, 2013, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named GC. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(v)   On June 2, 2014, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named OS. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(vi)   On April 28, 2014, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named IA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(vii)   On June 23, 2014, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named SS. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(viii)    On September 25, 2014, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named LS. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(ix)    On May 12, 2015, Feijoo P.A. and Feijoo purported to provide a follow-up medical examination to an Insured named AP. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99214, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(x)    On May 21, 2015, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named RP. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xi)    On June 8, 2015, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named YS. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xii)    On October 13, 2015, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named MC. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xiii)    On May 6, 2016, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named MH. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xiv)   On May 12, 2016, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named ML. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xv)   On August 1, 2016, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named DS. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xvi)   On December 12, 2016, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named JM. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xvii)   On February 2, 2017, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named AA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99214, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xviii)   On March 2, 2017, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named DP. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xix)   On April 11, 2017, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named OR. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total

procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xx)     On July 11, 2017, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named EG. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99214, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxi)    On February 8, 2018, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named TA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxii)   On March 5, 2018, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named ST. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxiii)  On July 10, 2018, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named MJ. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99214, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxiv)   On August 23, 2018, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named SR. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99214, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxv)    On September 13, 2018, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named SA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99214, Feijoo P.A. and Feijoo

billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxvi) On March 28, 2019, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named JZ. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99214, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxvii) On May 7, 2019, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named MV. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99214, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxviii) On May 24, 2019, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named RI. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxix) On June 12, 2019, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named RA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxx) On January 6, 2020, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named EU. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99214, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 95851 for range of motion testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

503.    These are only representative examples. In the claims for purported initial and follow-up examinations that are identified in Exhibit "1", Feijoo P.A. and Feijoo routinely fraudulently and unlawfully unbundled separate charges for range of motion testing under CPT code 95851.

### c.    The Fraudulent Misrepresentations Regarding the Existence of Written, Interpretive Reports for the Range of Motion Tests at Feijoo P.A.

504.    Not only were Feijoo P.A. and Feijoo's charges for the range of motion tests fraudulent because the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that Feijoo P.A. and Feijoo prepared written reports interpreting the test data.

505.    Pursuant to the CPT Assistant, when a health care provider submits a charge for range of motion testing using CPT code 95851, the provider represents that it has prepared a written report interpreting the data obtained from the test.

506.    The CPT Assistant states that "Interpretation of the results with preparation of a separate, distinctly, identifiable, signed written report is required when reporting codes 95851".

507.    Though Feijoo P.A. and Feijoo routinely submitted billing for range of motion tests using CPT code 95851, Feijoo P.A. and Feijoo did not prepare written reports interpreting the data obtained from the tests.

508.    Feijoo P.A. and Feijoo did not prepare written reports interpreting the data obtained from the tests because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the tests were performed as part of the Defendants' predetermined fraudulent billing and treatment protocol, and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

**(iv)      The Fraudulently Unbundled Charges for X-Ray Consultations at Feijoo P.A.**

509.      In an attempt to maximize the fraudulent billing for initial examinations that they could submit for each Insured, Feijoo P.A. and Feijoo fraudulently unbundled separate charges for a physician's consultation regarding an x-ray made elsewhere ("x-ray consultations") from their charges for the putative initial examinations.

510.      What is more, in an additional attempt to maximize their fraudulent billing, Feijoo P.A. and Feijoo directed many Insureds to return for multiple follow-up examinations where they again fraudulently unbundled separate charges for x-ray consultations from their charges for the putative follow-up examinations.

511.      Specifically, and as set forth in Exhibit "1", when they submitted their already-inflated charges of $475.00 for purported initial examinations under CPT code 99204, and $275.00 or $425.00 for the purported follow-up examinations under CPT codes 92214 and 99215, Feijoo P.A. and Feijoo routinely: (i) submitted an additional charge of $100.00, under CPT code 76140, for purported x-ray consultations. As a result, following a significant amount of the initial examinations they purported to conduct, Feijoo P.A. and Feijoo submitted total charges to GEICO of $575.00, and following a significant amount of the follow-up examinations they purported to conduct, Feijoo P.A. and Feijoo submitted total charges to GEICO of $375.00 or $525.00.

512.      In the claims for x-ray consultations identified in Exhibit "1", the charges for the x-ray consultations also were fraudulent in that they misrepresented Feijoo P.A.'s eligibility to collect PIP Benefits in the first instance.

513.      In fact, and as set forth herein, Feijoo P.A. never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act.

514.    What is more, Feijoo P.A. and Feijoo never were eligible to collect PIP Benefits in connection with the x-ray consultations claims identified in Exhibit "1" because the tests were unlawfully unbundled from the underlying examination charges.

1.    **Fraudulent Billing for X-Ray Consultations**

515.    CPT code 76140 is used to report a physician's consultation regarding an x-ray made elsewhere. In order to report this code, the reporting physician must have been asked by another physician to read the x-ray and issue an interpretation of it and must also write a formal report on his interpretation and send a copy of it to the requesting physician. Furthermore, medical providers cannot properly bill the 76140 code for their review of x-ray films or reports prepared somewhere else when the review is performed as a component of their initial and follow-up examinations.

2.    **Feijoo P.A. and Feijoo's Unbundled Billing for X-Ray Consultations**

516.    In virtually all instances where Feijoo P.A. and Feijoo submitted a charge under CPT code 76140, Feijoo was not asked to provide a consultation on an x-ray by another physician, and instead reviewed x-ray reports prepared somewhere else as a component of an initial or follow-up examination.

517.    The charges for the x-ray consultations were part and parcel of the already-inflated charges that Feijoo P.A. and Feijoo routinely submitted for the initial and follow up-examinations under CPT codes 99204, 99214, and 99215.

518.    Even so, and as set forth herein and in Exhibit "1", Feijoo P.A. and Feijoo routinely unbundled a separate charge of $100.00 under CPT code 76140 for x-ray consultations from each underlying initial examination charge under CPT code 99204, and from each underlying follow-up examination charge under CPT codes 99214 and 99215.

519.    For example:

(i)     On August 4, 2014, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named MA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(ii)    On June 2, 2015, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named MA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99214, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees. What is more, on July 30, 2015, Feijoo P.A. and Feijoo purported to provide an additional follow-up examination to MA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 76140 for an x-ray consultation in order to again separate what was one examination into subparts for the purpose of increasing medical fees.

(iii)   On May 23, 2016, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named DA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(iv)    On April 27, 2017, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named AA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(v)     On October 16, 2017, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named BA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99214, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(vi)    On October 16, 2017, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named MB. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 76140 for an x-ray

consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(vii)  On May 30, 2018, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named XA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(viii)  On October 24, 2018, Feijoo P.A. and Feijoo purported to provide a follow-up examination to an Insured named YA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(ix)  On May 30, 2019, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named VC. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(x)  On July 2, 2019, Feijoo P.A. and Feijoo purported to provide an initial examination to an Insured named ME. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Feijoo P.A. and Feijoo billed GEICO for a separate charge of $100.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

520.  These are only representative examples. In the claims for purported initial and follow up medical examinations that are identified in Exhibit "1", Feijoo P.A. and Feijoo routinely fraudulently and unlawfully unbundled separate charges for x-ray consultations under CPT code 76140.

## 2.  The We Care Defendants' Fraudulent Treatment and Billing Protocol

521.  The We Care Defendants purported to subject the Insureds in the claims identified in Exhibit "2" to medically unnecessary physical therapy services.

522.     As set forth herein, though Feijoo falsely purported to personally perform or directly supervise the majority of the physical therapy services in the claims identified in Exhibit "2", the physical therapy services actually were performed without supervision by massage therapists associated with We Care, to the extent that they were even provided at all.

523.     As set forth in Exhibit "2", the We Care Defendants then billed the purported physical therapy services to GEICO under:

(i)      CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $90.24 for each round of mechanical traction therapy they purported to provide;

(ii)     CPT code 97018, for putative paraffin bath therapy, typically resulting in a charge of $20.00 for each round of paraffin bath therapy they purported to provide;

(iii)    CPT code 97032, for putative electrical stimulation, typically resulting in a charge of $40.44 for each round of electrical stimulation they purported to provide;

(iv)     CPT code 97034, for putative contrast baths, typically resulting in a charge of $35.06 for each round of contrast bath treatments they purported to provide;

(v)      CPT code 97035, for putative ultrasound, typically resulting in a charge of $25.92 for each round of ultrasound they purported to provide;

(vi)     CPT code 97039, for unlisted modality treatments, resulting in a charge of $15.00 for each round of unlisted modality treatments they purported to provide;

(vii)    CPT code 97110, for putative therapeutic exercises, resulting in a charge of $55.00 for each round of therapeutic exercises they purported to provide; and

(viii)   CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $196.14.00 for each round of neuromuscular reeducation they purported to provide;

524.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

525.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

526. As set forth herein, in the claims identified in Exhibit "2", virtually all of the Insureds who purportedly received treatment at We Care were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

527. It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

528. It is even more improbable – to the point of impossibility – that this would occur over and over again.

529. It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in the same minor automobile accident would routinely present for their purported physical therapy treatment on the exact same dates.

530. It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "2" would suddenly be cured of their purported ailments on the exact same date, months after their motor vehicle accident.

531. For example:

(i) On September 14, 2017, two Insureds – BR and DA – were involved in the same automobile accident. Thereafter – incredibly – both BR and DA presented at We Care for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, September 19, 2017. BR and DA were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BR and DA suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that the We Care Defendants provided were pre-determined and phony, BR and DA both presented at We Care on at least 20 of the exact same dates over a two and a half month period where they received substantially similar physical therapy treatment on virtually all of those dates.

(ii)   On December 16, 2017, two Insureds – FP and LM – were involved in the same automobile accident. Thereafter – incredibly – both FP and LM presented at We Care for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, December 28, 2017. FP and LM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FP and LM suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that the We Care Defendants provided were pre-determined and phony, FP and LM both presented at We Care on at least 25 of the <u>exact</u> same dates over a two month period where they received substantially similar physical therapy treatment on virtually all of those dates. Moreover, We Care, Martinez, Nguyen, and Feijoo stopped purporting to provide physical therapy services to FP and LM on the exact same day, February 27, 2018. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the two months when they purportedly were treating at We Care.

(iii)   On December 22, 2017, two Insureds – VL and YC – were involved in the same automobile accident. Thereafter – incredibly – both VL and YC presented at We Care for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, December 26, 2017. VL and YC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that VL and YC suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that the We Care Defendants provided were pre-determined and phony, VL and YC both presented at We Care on at least 25 of the <u>exact</u> same dates over a three month period where they received substantially similar physical therapy treatment on virtually all of those dates. Moreover, We Care, Martinez, Nguyen, and Feijoo stopped purporting to provide physical therapy services to VL and YC on the exact same day, February 23, 2018. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the three months when they purportedly were treating at We Care.

(iv)   On January 25, 2018, two Insureds – GV and MA – were involved in the same automobile accident. Thereafter – incredibly – both GV and MA presented at We Care for their first day of physical therapy services by Feijoo purportedly provided by Feijoo on the exact same date, January 30, 2018. GV and MA were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GV and MA suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that the We Care Defendants provided were pre-determined and phony, GV and MA both presented at We Care on at least 20 of the <u>exact</u> same dates over a three month period where they received substantially similar physical

therapy treatment on virtually all of those dates. Moreover, We Care, Martinez, Nguyen, and Feijoo stopped purporting to provide physical therapy services to GV and MA on the exact same day, April 11, 2018. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the three months when they purportedly were treating at We Care.

(v)     On March 28, 2018, two Insureds – AG and GP – were involved in the same automobile accident. Thereafter – incredibly – both AG and GP presented at We Care for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, April 2, 2018. AG and GP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AG and GP suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that the We Care Defendants provided were pre-determined and phony, AG and GP both presented at We Care on at least 25 of the exact same dates over a two and a half month period where they received substantially similar physical therapy treatment on virtually all of those dates.

532.     These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "2", We Care, Martinez, Nguyen, and Feijoo routinely inserted false "diagnoses" in their physical therapy reports in order to create a false justification for additional unnecessary physical therapy services.

533.     In the claims for physical therapy services identified in Exhibit "2", the charges for the physical therapy services were fraudulent in that they misrepresented We Care's eligibility to collect PIP Benefits in the first instance.

534.     In fact, and as set forth herein, We Care never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

535.     What is more, and as set forth herein, in the claims for physical therapy services identified in Exhibit "2", the We Care Defendants falsely represented that the physical therapy services lawfully had been performed or directly supervised by Feijoo when in fact they were

unlawfully performed by unsupervised massage therapists associated with We Care, who are not and never have been licensed as physical therapists.

536.   As set forth herein, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

537.   Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

538.   In each of the claims for physical therapy services identified in Exhibit "2", the We Care Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

539.   In fact, in the claims for physical therapy services identified in Exhibit "2", the services were not lawfully provided, and were not eligible for PIP reimbursement, inasmuch as: (i) the putative physical therapy services were performed – to the extent that they were performed at all –by unsupervised massage therapists associated with We Care, who were not licensed to practice physical therapy; and (ii) the We Care Defendants deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the non-reimbursable charges.

3.     The New Life Defendants' Fraudulent Treatment and Billing Protocol

540.   The New Life Defendants purported to subject the Insureds in the claims identified in Exhibit "3" to medically unnecessary physical therapy.

541.   As set forth herein, though Feijoo falsely purported to personally perform or directly supervise a significant amount of the physical therapy services in the claims identified in

Exhibit "3", the physical therapy services actually were performed without supervision by Rodriguez, Estevez, and other massage therapists associated with New Life to the extent that they were even provided at all.

542.    As set forth in Exhibit "3", the New Life Defendants then billed the purported physical therapy services to GEICO under:

(i)     CPT code 97010 for putative hot/cold pack therapy, typically resulting in a charge of $10.00 for each round of hot/cold pack therapy they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $64.00 for each round of mechanical traction therapy they purported to provide;

(iii)   CPT code 97018, for putative paraffin bath therapy, in a charge of $50.00 for each round of paraffin bath therapy they purported to provide;

(iv)    CPT code 97034, for putative contrast baths, resulting in a charge of $39.00 for each round of contrast bath treatments they purported to provide;

(v)     CPT code 97035, for putative ultrasound, resulting in a charge of $26.00 for each round of ultrasound they purported to provide;

(vi)    CPT code 97110, for putative therapeutic exercises, resulting in a charge of $69.00 for each round of therapeutic exercises they purported to provide; and

(viii)  CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $65.00 for each round of neuromuscular reeducation they purported to provide;

(ix)    CPT code 97140, for putative manual therapy, resulting in a charge of $63.00 for each round of manual therapy they purported to provide;

(x)     CPT code 97530, for putative therapeutic activity therapy, resulting in a charge of $80.00 for each round of therapeutic activity they purported to provide; and

(xi)    HCPCS code G0283 for putative electrical stimulation, resulting in a charge of $30.00 for each round of electrical stimulation they purported to provide.

543.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

544.     As set forth herein, in the claims identified in Exhibit "3", virtually all of the Insureds who purportedly received treatment at New Life were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

545.     It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "3" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

546.     It is even more improbable – to the point of impossibility – that this would occur over and over again.

547.     It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in the same minor automobile accident would routinely present for their purported physical therapy treatment on the exact same dates.

548.     It is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "3" would suddenly be cured of their ailments on the exact same date, months after their motor vehicle accident.

549.     For example:

(i)      On September 15, 2017, two Insureds – YG and JB – were involved in the same automobile accident. Thereafter – incredibly – both YG and JB presented at New Life for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, September 19, 2017. YG and JB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YG and JB suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that New Life, Machado, Almonte, and Feijoo provided were pre-determined and phony, YG and JB both presented at New Life on at least 20 of the exact same dates over a two month period where they received substantially similar physical therapy treatment on virtually all of those dates.

(ii)     On April 30, 2018, two Insureds – KB and AS – were involved in the same automobile accident. Thereafter – incredibly – both KB and AS presented at New Life for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, May 8, 2018. KB and AS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that KB and AS suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that New Life, Machado, Almonte, and Feijoo provided were pre-determined and phony, KB and AS both presented at New Life on at least 25 of the exact same dates over a two month period where they received substantially similar physical therapy treatment on virtually all of those dates.

(iii)    On May 8, 2018, two Insureds – YR and GN – were involved in the same automobile accident. Thereafter – incredibly – both YR and GN presented at New Life for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, May 10, 2018. YR and GN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YR and GN suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that New Life, Machado, Almonte, and Feijoo provided were pre-determined and phony, YR and GN both presented at New Life on at least 30 of the exact same dates over a two month period where they received substantially similar physical therapy treatment on virtually all of those dates. Moreover, New Life, Machado, Almonte, and Feijoo stopped purporting to provide physical therapy services to YR and GN on the exact same day, July 11, 2018. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the two months when they purportedly were treating at New Life.

550.    In a significant amount of the claims for physical therapy services that are identified in Exhibit "3", New Life, Machado, Almonte, and Feijoo inserted false "diagnoses" in their physical therapy reports in order to create a false justification for additional unnecessary physical therapy services.

551.    In the claims for physical therapy services identified in Exhibit "3", the charges for the physical therapy services were fraudulent in that they misrepresented New Life's eligibility to collect PIP Benefits in the first instance.

552.    In fact, and as set forth herein, New Life never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the Patient Brokering Act, and the Self-Referral Act.

553.    What is more, and as set forth herein, in the claims for physical therapy services identified in Exhibit "3", the New Life Defendants falsely represented that the physical therapy services lawfully had been performed or directly supervised by Feijoo when in fact they were unlawfully performed without supervision by Rodriguez and other massage therapists associated with New Life, who are not and never have been licensed as physical therapists.

554.    As set forth herein, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

555.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

556.    In each of the claims for physical therapy services identified in Exhibit "3" , the New Life Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

557.    In fact, in the claims for physical therapy services identified in Exhibit "3" , the services were not lawfully provided, and were not eligible for PIP reimbursement, inasmuch as: (i) the putative physical therapy services were performed – to the extent that they were performed at all – by unsupervised massage therapists associated with New Life, who were not licensed to practice physical therapy; and (ii) the New Life Defendants deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing

for the physical therapy services, in a calculated attempt to induce GEICO to pay the non-reimbursable charges.

**4.      The Accident Rehab Defendants' Fraudulent Treatment and Billing Protocol**

**(i)      The Fraudulent Charges for Initial Examinations at Accident Rehab**

558.      As an initial step in the Accident Rehab Defendants' fraudulent treatment and billing protocol, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo purported to provide the Insureds in the claims identified in Exhibit "4" with putative initial examinations.

559.      Feijoo purported to personally perform or directly supervise a significant amount of the initial examinations at Accident Rehab in the claims identified in Exhibit "4".

560.      As set forth in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99204, routinely resulting in charges of $400.00 for each initial examination that they purported to provide.

561.      In the claims for initial examinations identified in Exhibit "4", the charges for the initial examinations were fraudulent in that they misrepresented Accident Rehab's eligibility to collect PIP Benefits in the first instance.

562.      In fact, and as set forth herein, Accident Rehab never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act.

563.      As set forth herein, the charges for the initial examinations identified in Exhibit "4" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

564.      The No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

565.    The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

566.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the Insured presented with problems of moderate to high severity.

567.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

568.    Specifically, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

569.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient

examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

570.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "4" had any presenting problems at all as the result of their minor automobile accidents, the problems were low severity soft tissue injuries such as sprains and strains.

571.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "4" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "4" the Insureds did not seek treatment at any hospital as the result of their accidents.

572.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

573.    Furthermore, to the extent that police reports existed with respect to the claims identified in Exhibit "4", the contemporaneous police reports virtually always indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

574.    Even so, in the claims for initial examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely billed for their putative initial examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

575.    For example:

(i)    On May 2, 2017, an Insured named WD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to WD's vehicle, that the airbags in WD's vehicle did not deploy, and that WD's vehicle was drivable following the accident. The police report further indicated that WD was

not injured in the accident. In keeping with the fact that WD was not seriously injured in the accident, WD did not visit any hospital emergency room following the accident. To the extent that WD experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of WD by Feijoo on May 10, 2017, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that WD presented with moderately to highly severe health problems as the result of the accident.

(ii)   On July 6, 2018, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that JO was not injured in the accident. In keeping with the fact that JO was not seriously injured in the accident, JO did not visit any hospital emergency room following the accident. To the extent that JO experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JO by Feijoo on July 17, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JO presented with moderately to highly severe health problems as the result of the accident.

(iii)  On February 26, 2019, an Insured named LH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LH's vehicle, that the airbags in LH's vehicle did not deploy, and that LH's vehicle was drivable following the accident. The police report further indicated that LH was not injured in the accident. In keeping with the fact that LH was not seriously injured in the accident, LH did not visit any hospital emergency room following the accident. To the extent that LH experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of LH by Feijoo on March 6, 2019, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that LH presented with moderately to highly severe health problems as the result of the accident.

576.   These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

577.    In the claims for initial examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

578.    In the claims for initial examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Accident Rehab Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

**b.**    **Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

579.    What is more, in the claims identified in Exhibit "4" for initial examinations under CPT code 99204, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo misrepresented and exaggerated the amount of face-to-face time that the examining physician – namely Feijoo – spent with the Insureds or the Insureds' families during the putative initial examination.

580.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination typically represents that the physician who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

581.    As set forth in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo virtually always billed for their putative initial examinations using CPT code 99204, and thereby represented that the physician who purported to conduct the examinations – namely Feijoo

– spent at least 45 minutes of face-to-face time with the Insureds or their families during the examinations.

582.     In fact, in the initial examinations identified in Exhibit "4", Feijoo never spent even 15 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 45 minutes, to the extent that the examinations actually were conducted at all.

583.     Rather, in the purported initial examinations identified in Exhibit "4", the examinations rarely entailed more than 10 minutes of face-to-face time between Feijoo and the Insureds, or the Insureds' families, to the extent that they were provided at all.

584.     In keeping with the fact that the initial examinations in the claims identified in Exhibit "4" did not involve more than 10 minutes of face-to-face time between Feijoo, the Insureds, or the Insureds' families – to the extent that they were provided at all – Feijoo used pre-printed template forms in purporting to conduct the examinations at Accident Rehab.

585.     All that was required to complete the pre-printed template forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion testing.

586.     These interviews and examinations did not require Feijoo to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

587.     Indeed, Feijoo could not legitimately have personally spent at least 45 minutes of face-to-face time with the Insureds or their families during the initial examinations at Accident Rehab, or even directly supervised anyone else who was purporting to perform the examinations, considering the massive amount of health care services he simultaneously was purporting to

personally perform or directly supervise at numerous health care clinics and medical practices throughout south Florida.

588.  For example:

(i)  On November 1, 2017, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO under CPT code 99204 for two initial examination that Feijoo falsely purported to perform on Insureds named GK and PK and falsely represented that Feijoo spent at least 45 minutes of face-to-face time with the Insured or the Insured's family during the examination. On that same day, Feijoo also purported to personally provide or directly supervise at least 10 hours of physical therapy services to 13 individual Insureds, at six different facilities located throughout south Florida, all of which were billed to GEICO.

(ii)  On April 11, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO under CPT code 99204 for three initial examination that Feijoo falsely purported to perform on Insureds named AR, AR, and RR, and falsely represented that Feijoo spent at least 45 minutes of face-to-face time with the Insured or the Insured's family during the examination. On that same day, Feijoo also purported to personally provide or directly supervise at least 20 hours of physical therapy services to 15 individual Insureds, at five different facilities located throughout the south Florida Area, all of which were billed to GEICO.

(iii)  On May 29, 2019, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo falsely purported to perform on an Insured named LA, and falsely represented that Feijoo spent at least 45 minutes of face-to-face time with the Insured or the Insured's family during the examination. On that same day, Feijoo also purported to personally provide or directly supervise at least 13.5 hours of physical therapy services to 9 individual Insureds, at three different facilities located throughout the south Florida Area, all of which were billed to GEICO.

589.  These are only representative examples. In the claims for initial examinations that are identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely falsely represented that Salado had spent at least 45 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that – on those same dates – Salado also purported to personally perform a massive amount of physical therapy and other services to large numbers of Insureds at multiple locations throughout south Florida.

590.     Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99204 are reimbursable at higher rates than examinations that take less time to perform.

### c.     Misrepresentations Regarding "Comprehensive" Physical Examinations

591.     Moreover, the claims identified in Exhibit "4" for initial examinations under CPT code 99204, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely falsely represented the extent of the underlying physical examinations.

592.     Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination

593.     As set forth in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo virtually always billed for their putative initial examinations using CPT code 99204, and thereby represented that the physician who purported to conduct the examinations – namely Salado – conducted comprehensive physical examinations of the Insureds who purportedly received the examinations.

594.     Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

595.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

596.    The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

(xii)   endocrine;

(xiii)  hematologic/lymphatic; and

(xiv)   allergic/immunologic.

597.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)   examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

598.   In the claims for initial examinations identified in Exhibit "4", when Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed for the initial examinations under CPT code 99204, they falsely represented that Feijoo performed a "comprehensive" patient examination on the Insureds he purported to treat during the initial examinations.

599.   In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibit "4", Feijoo virtually never conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

600.   For instance, in the claims under CPT code 99204 identified in Exhibit "4", Feijoo did not conduct any general examination of multiple patient organ systems, inasmuch as he did not document findings with respect to at least eight organ systems.

601.   Furthermore, although Feijoo often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during the initial examinations in the claims

for initial examinations identified in Exhibit "4", the musculoskeletal examinations did not qualify

as "complete", because they failed to document:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and/or

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

602.    For example:

(i)      On May 10, 2017, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named WD, and thereby represented that they had provided a "comprehensive" physical examination to WD.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)     On July 17, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named JO, and thereby represented that they had provided a "comprehensive" physical examination to JO.  However,

Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii) On March 6, 2019, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO under CPT code 99204 for an initial examination that Feijoo purported to perform or supervise on an Insured named LH, and thereby represented that they had provided a "comprehensive" physical examination to LH.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

603.    In the claims for initial examinations under CPT code 99204 that are identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo falsely represented that they had provided "comprehensive" physical examinations.  In fact, they had not provided comprehensive physical examinations because neither Feijoo nor anyone working under his direct supervision had documented findings with respect to at least eight of the Insureds' organ systems, nor had they documented "complete" examinations of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

604.    In the claims for initial examinations under CPT code 99204 that are identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo falsely represented that they had provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations that do not require the examining physician to provide "comprehensive" physical examinations.

d.    **Misrepresentations Regarding the Extent of Medical Decision-Making**

605.    Furthermore, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in "moderate complexity" medical decision-making.

606.    In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co–morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

607.    Though Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely billed for their putative initial examinations using CPT codes 99204 and thereby falsely represented that the initial examinations involved medical decision-making of "moderate" complexity, in actuality the initial examinations did not involve any medical decision-making at all.

608.    First, in the claims for initial examinations identified in Exhibit "4", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

609.    When the Insureds in the claims identified in Exhibit "4" presented to Accident Rehab for "treatment", they did not arrive with any significant amount medical records.

610.    Furthermore, prior to the initial examinations, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo did not request any significant amount of medical records from other providers.

611.    Second, in the claims for initial examinations identified in Exhibit "4", there was no risk of significant complications or morbidity– much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

612.     Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at Accident Rehab, to the extent that Accident Rehab provided any such diagnostic procedures or treatment options in the first instance.

613.     In virtually every one of the claims identified in Exhibit "4", any diagnostic procedures and "treatments" that the Accident Rehab Defendants actually provided were limited to a series of medically unnecessary follow-up examinations and physical therapy treatments, none of which was health-or life-threatening if properly administered.

614.     Third, in the claims for initial examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

615.     Rather, to the extent that the initial examinations were conducted in the first instance, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

616.     Specifically, in most of the claims identified in Exhibit "4", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

617.     Even so, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every Insured.

618.     Then, based upon these phony "diagnoses", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo directed virtually every Insured to receive significant and medically

unnecessary physical therapy treatment.

619.   For example:

(i)     On May 2, 2017, an Insured named WD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to WD's vehicle, that there was minor damage to the other vehicle, that the airbags in WD's vehicle did not deploy, and that WD's vehicle was drivable following the accident. The police report further indicated that WD was not injured in the accident. In keeping with the fact that WD was not seriously injured in the accident, WD did not visit any hospital emergency room following the accident. To the extent that WD experienced any health problems at all as the result of the accident, they were of low severity. On May 10, 2017, Feijoo purported to conduct an initial examination of WD at Accident Rehab. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided WD with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither WD's presenting problems, nor the treatment plan provided to WD by Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo presented any risk of significant complications, morbidity, or mortality. To the contrary, WD did not need any significant treatment at all as a result of the accident. Even so, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Feijoo engaged in some legitimate, high complexity medical decision-making during the purported examination.

(ii)    On July 6, 2018, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that JO was not injured in the accident. In keeping with the fact that JO was not seriously injured in the accident, JO did not visit any hospital emergency room following the accident. To the extent that JO experienced any health problems at all as the result of the accident, they were of low severity. On July 17, 2018, Feijoo purported to conduct an initial examination of JO at Accident Rehab. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided JO with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JO's presenting problems, nor the treatment plan provided to JO by Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo presented any risk of significant complications, morbidity, or mortality. To the contrary, JO did not need any significant treatment at all as a result of the accident. Even so, Accident Rehab, A. Vazquez, M. Vazquez,

Salado, and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Feijoo engaged in some legitimate, high complexity medical decision-making during the purported examination.

(iii) On February 26, 2019, an Insured named LH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LH's vehicle, that there was minor damage to the other vehicle, that the airbags in LH's vehicle did not deploy, and that LH's vehicle was drivable following the accident.  The police report further indicated that LH was not injured in the accident. In keeping with the fact that LH was not seriously injured in the accident, LH did not visit any hospital emergency room following the accident. To the extent that LH experienced any health problems at all as the result of the accident, they were of low severity. On March 6, 2019, Feijoo purported to conduct an initial examination of LH at Accident Rehab. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided LH with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LH's presenting problems, nor the treatment plan provided to LH by Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo presented any risk of significant complications, morbidity, or mortality. To the contrary, LH did not need any significant treatment at all as a result of the accident. Even so, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Feijoo engaged in some legitimate, high complexity medical decision-making during the purported examination.

620.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

621.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

622.     As set forth herein, in the claims identified in Exhibit "4", virtually all of the Insureds whom the Accident Rehab Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

623.   It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "4" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

624.   It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "4" would present for an initial examination, often over a week later, with substantially identical symptoms, and receive substantially identical diagnoses, requiring a substantially identical course of treatment, on the exact same date after their underlying automobile accident.

625.   Even so, in keeping with the fact that these putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo issued substantially identical, phony "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

626.   For example:

(i)     On July 13, 2017, two Insureds – JA and FN – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Accident Rehab for initial examinations by Feijoo on the <u>exact same date</u>, July 19, 2017. JA and FN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JA and FN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo provided JA and FN with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ii)    On November 12, 2017, two Insureds – AW and KW – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Accident

Rehab for initial examinations by Feijoo on the exact same date, November 22, 2017. AW and KW were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AW and KW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo provided AW and KW with substantially identical, phony "diagnoses".

(iii)   On March 26, 2018, three Insureds – AR, AR, and RR – were involved in the same automobile accident. Thereafter – incredibly – all the Insureds presented at Accident Rehab for initial examinations by Feijoo on the exact same date, April 11, 2018. AR, AR, and RR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AR, AR, and RR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo provided AR, AR, and RR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all of them.

(iv)   On February 15, 2019, two Insureds – EN and SN– were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Accident Rehab for initial examinations by Feijoo on the exact same date, February 27, 2019. EN and SN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EN and SN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo provided EN and SN with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(v)   On October 2, 2019, two Insureds – TS and DE – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Accident Rehab for initial examinations by Feijoo on the exact same date, December 18, 2019. TS and DE were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that TS and DE suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo provided TS and DE with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

627.     Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Accident Rehab Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

628.     In keeping with the fact that Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making,  for virtually every one of the Insureds in the claims identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo diagnosed the Insureds with substantially identical sprain/strain "diagnoses", and concluded in a significant amount of the initial examination reports that the patient had suffered from an  "emergency medical condition", and stated that the patient "has developed acute symptoms of sufficient severity, which may include among other severe pain, such as that of the absence of immediate medical attention could reasonably be expected to result in serious dysfunction of an organ or bodily part".

629.     It is extremely improbable that virtually every one of the Insureds in the claims identified in Exhibit "4" would have symptoms so acute that their injuries could be considered a medical emergency.

630.     It is even more improbable – to the point of impossibility – that this would occur over and over again, in the context of minor automobile accidents that could not possibly have caused such severe levels of pain and/or injury.

631.    Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo inserted this false information in their initial examination reports despite the fact that the minor underlying accidents did not and could not possibly have caused such serious symptoms in the Insureds.

632.    For example:

(i)    On May 2, 2017, an Insured named WD was involved in an automobile accident. In keeping with the fact that WD was not seriously injured in the accident, WD did not visit any hospital emergency room following the accident. To the extent that WD experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of WD on May 10, 2017, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo falsely reported that WD's injuries constituted an "emergency medical condition".

(ii)   On July 6, 2018, an Insured named JO was involved in an automobile accident. In keeping with the fact that JO was not seriously injured in the accident, JO did not visit any hospital emergency room following the accident. To the extent that JO experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of JO on July 17, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo falsely reported that JO's injuries constituted an "emergency medical condition".

(iii)  On February 26, 2019, an Insured named LH was involved in an automobile accident. In keeping with the fact that LH was not seriously injured in the accident, LH did not visit any hospital emergency room following the accident. To the extent that LH experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of LH on March 6, 2019, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo falsely reported that LH's injuries constituted an "emergency medical condition".

633.    In a significant amount of the initial examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo falsely reported that the Insureds suffered from such pain that it was a "emergency medical condition", which could "reasonably be expected to result in serious dysfunction of an organ or bodily part."

634.    Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely inserted this false information in their initial examination reports in order to create the false impression that

the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Accident Rehab Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

635.    To the extent that the Insureds in the claims identified in Exhibit "4" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

636.    The diagnosis and treatment of these ordinary sprains and strains did not require any "moderate complexity" medical decision-making on the part of Feijoo or anyone else.

637.    To the contrary, and as set forth herein, Feijoo did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "4", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the laundry-list of other Fraudulent Services that the Accident Rehab Defendants purported to provide.

638.    In the claims for initial examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because CPT code 99204 is reimbursable at a higher rate than examinations that do not require moderate complexity medical decision-making.

639.    In the claims for initial examinations identified in Exhibit "4" Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely fraudulently misrepresented that the

examinations were lawfully provided and reimbursable, when in fact they were neither lawfully

provided nor reimbursable, because:

(i)   the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)  the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii) Accident Rehab never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

640.   In this context, Salado – who at all relevant times purported to serve as the "medical

director" at Accident Rehab – did not, and could not have, "[c]onduct[ed] systematic reviews of

clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. §

400.9935(1).

641.   Had Salado actually fulfilled his statutory role as medical director at Accident

Rehab, he would have noted – among other things – that the Accident Rehab Defendants routinely

fraudulently represented in Accident Rehab's billing that the putative initial examinations were

legitimately and lawfully performed.

642.   Salado failed to do so, because he never actually served as a legitimate medical

director at Accident Rehab in the first instance.

**(ii)   The Fraudulent Charges for Follow-Up Examinations at Accident Rehab**

643.   In addition to their fraudulent initial examinations, Accident Rehab, A. Vazquez,

M. Vazquez, Salado, and Feijoo often purported to subject each of the Insureds in the claims

identified in Exhibit "4" to fraudulent follow-up examination(s) during the course of their

fraudulent treatment and billing protocol.

644.     Feijoo purported to personally perform or directly supervise the majority of the follow-up examinations in the claims identified in Exhibit "4".

645.     As set forth in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo then billed the follow-up examinations to GEICO under: (i) CPT code 99214, typically resulting in charges of $200.00 for each follow-up examination they purported to provide; or (ii) CPT code 99215, typically resulting in charges of $400.00 for each follow-up examination they purported to provide.

646.     In the claims for follow-up examinations identified in Exhibit "4", the charges for the follow-up examinations were fraudulent in that they misrepresented Accident Rehab's eligibility to collect PIP Benefits in the first instance.

647.     In fact, and as set forth herein, Accident Rehab never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

648.     As set forth herein, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo's charges for the follow-up examinations identified in Exhibit "4" also were fraudulent in that they misrepresented the nature and extent of the examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

649.     Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

650.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

651.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)  Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

652.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

653.    Pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

654.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99215 to bill for a follow-up patient examination. For example:

(i)     Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly. (Family Medicine)

(ii)    Office evaluation and discussion of treatment options for a 68-year-old male with a biopsy-proven rectal carcinoma. (General Surgery)

(iii)   Office visit for restaging of an established patient with new lymphadenopathy one year post therapy for lymphoma. (Hematology/Oncology)

(iv)    Follow-up office visit for a 65-year-old male with a fever of recent onset while on outpatient antibiotic therapy for endocarditis. (Infectious Disease)

(v)     Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient (Internal Medicine)

(vi)    Follow-up office visit for a 75-year-old patient with ALS (amyotropfuc lateral sclerosis), who is no longer able to swallow. (Neurology)

(vii)   Follow-up visit, 40-year-old mother of 3, with acute rheumatoid arthritis, anatomical Stage 3, ARA function Class 3 rheumatoid arthritis, and deteriorating function. (Rheumatology)

655.    Thus, the sort of presenting problems that justify a charge under CPT code 99215 typically are problems that pose a serious threat to the patient's health, or even the patient's life.

656.    By contrast, and as set forth herein, to the limited extent that the Insureds in the claims identified in Exhibit "4" experienced any injuries at all in their minor automobile accidents, the injuries were – at the outset – garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

657.    What is more, by the time the Insureds in the claims identified in Exhibit "4" presented at Accident Rehab for the putative follow-up examinations, the Insureds either did not

have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

658.    Even so, in the claims for follow-up examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely billed for their putative follow-up examinations under CPT codes 99214 and 99215, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity.

659.    For example:

(i)     On May 2, 2017, an Insured named WD was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to WD's vehicle, that the airbags in WD's vehicle did not deploy, and that WD's vehicle was drivable following the accident. The police report further indicated that WD was not injured in the accident. In keeping with the fact that WD was not seriously injured in the accident, WD did not visit any hospital emergency room following the accident. To the extent that WD experienced any health problems at all as the result of the accident, they were of low severity, and had resolved within a few weeks. Even so, following a purported follow-up examination of WD on May 31, 2017, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that WD presented with problems of moderate to high severity. What is more, following a purported follow-up examination of WD on June 28, 2017 – approximately six weeks after the accident – Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that WD presented with problems of moderate to high severity at the follow-up examination.

(ii)    On July 6, 2018, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that JO was not injured in the accident. In keeping with the fact that JO was not seriously injured in the accident, JO did not visit any hospital emergency room following the accident. To the extent that JO experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of JO on August 8, 2018, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that JO presented with problems of moderate to high severity. Subsequently, on September 5, 2018, – approximately two months after the accident – Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo purported to provide JO an additional follow-up examination using CPT code 99214 and again falsely represented that JO presented with problems of moderate to high severity. What is more, following

a third purported follow-up examination of JO on October 17, 2018 – more than three months after the accident – Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that JO presented with problems of moderate to high severity at the third follow-up examination. In keeping with the fact that JO had no presenting problems of moderate to high severity, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo actually stopped treating JO after October 17, 2018.

(iii)   On February 26, 2019, an Insured named LH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LH's vehicle, that the airbags in LH's vehicle did not deploy, and that LH's vehicle was drivable following the accident. The police report further indicated that LH was not injured in the accident. In keeping with the fact that LH was not seriously injured in the accident, LH did not visit any hospital emergency room following the accident. To the extent that LH experienced any health problems at all as the result of the accident, they were of low severity, and had resolved within a few weeks. Even so, following a purported follow-up examination of LH on April 3, 2019 – approximately five weeks after the accident – Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that LH presented with problems of moderate to high severity.

660.    In the claims for follow-up examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

661.    These are only representative examples. In the claims for follow-up examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99214 and 99215, because follow-up examinations billable under CPT codes 99214 and 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

662.    In the claims for follow-up examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the other Fraudulent Services that the Accident Rehab Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

663.    What is more, pursuant to the CPT Assistant, when Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed for their putative follow-up examinations under CPT code 99214, they represented that Feijoo or someone working under his direct supervision performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

664.    Pursuant to the CPT Assistant, when Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo billed for their putative follow-up examinations under CPT code 99215, they represented that they performed at least two of the following three components: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

665.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "4", Feijoo did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

666.    Rather, following their purported follow-up examinations, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo simply: (i) reiterated the false, boilerplate "diagnoses" they previously had provided to the Insureds; and either  (ii) referred the Insureds back to Accident Rehab for even more medically unnecessary physical therapy services, despite the fact that the

Insureds purportedly already had received extensive physical therapy services from Accident Rehab that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

667.    In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo recommended a substantially identical course of medically unnecessary "treatment" to virtually every one of the Insureds identified in Exhibit "4", irrespective of the Insureds' actual presenting problems, to the extent the Insureds experienced any legitimate injuries at all.

668.    Specifically, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo directed the Insureds to receive substantially identical types of physical therapy services, including: (i) hot/cold packs; (ii) mechanical traction; (iii) paraffin bath; (iv) electrical stimulation; (vi) ultrasound therapy; (vii) therapeutic exercises; and (viii) neuromuscular reeducation. See Exhibit "4".

669.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

670.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

671.    By contrast, at Accident Rehab, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the

Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol.

672.     The phony "follow-up examinations" that Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo purported to provide the Insureds in the claims identified in Exhibit "4" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Accident Rehab's offices.

673.     In further keeping with the fact that the purported "results" of the follow-up examinations were pre-determined and involved no actual medical decision-making at all, in the claims identified in Exhibit "4", Feijoo and Accident Rehab purported to provide a "final evaluation" during the final follow-up examination that they purported to provide to Insureds.

674.     As set forth herein, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

675.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

676.     Even so, in many of the "final evaluations" that Feijoo and Accident Rehab provided to the Insureds, they advised the Insured that they had been left with a "partial permanent impairment" in order to create the appearance of genuine injuries, where none actually existed.

677.     What is more this "permanent impairment" was routinely measured to be anywhere from 5% to 15%.

678.    It is simply impossible that such a significant amount of the Insureds purported to have been examined by Feijoo, and Accident Rehab who received a final evaluation would suffer from a "partial permanent impairment" with substantially similar levels of partial impairment.

679.    These phony determinations were reported in a statistically impossible number of final examination reports created by Feijoo and Accident Rehab, including but not limited to reports for the following Insureds on the following dates:

(i)      On January 17, 2017, AD was falsely reported to have suffered a 9% permanent partial impairment of the body as a whole;

(ii)     On August 10, 2017, JF was falsely reported to have suffered a 7% permanent partial impairment of the body as a whole;

(iii)    On October 25, 2017, KB was falsely reported to have suffered a partial permanent impairment of the body as a whole of no less than 6%;

(iv)     On May 23, 2018, MM was falsely reported to have suffered a partial permanent impairment of the body as a whole of no less than 7%;

(v)      On December 12, 2018, MH was falsely reported to have suffered a 12% partial permanent impairment of the body as a whole;

(vi)     On December 12, 2018, TH was falsely reported to have suffered a 5% partial permanent impairment of the body as a whole;

(vii)    On December 12, 2018, TH was falsely reported to have suffered a 5% partial permanent impairment of the body as a whole;

(viii)   On May 1, 2019, MM was falsely reported to have suffered a partial permanent impairment of the body as a whole of no less than 5%;

(ix)     On June 4, 2019, EN was falsely reported to have suffered a 8% partial permanent impairment of the body as a whole; and

(x)      On October 8, 2019, LH was falsely reported to have suffered a 9% partial permanent impairment of the body as a whole;

680.    These are only representative examples. In the claims for follow-up examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely

falsely purported to identify some level of "partial permanent impairment of the body as a whole", despite the fact that – to the extent that the Insureds in the claims identified in Exhibit "4" suffered any health care problems at all as the result of their relatively minor automobile accidents – the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

681.    In the claims for follow-up examinations identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    Accident Rehab never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

682.    In this context, Salado – who at all relevant times purported to serve as the "medical director" at Accident Rehab – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

683.    Had Salado actually fulfilled his statutory role as medical director at Accident Rehab, he would have noted – among other things – that the Accident Rehab Defendants routinely fraudulently represented in Accident Rehab's billing that the putative follow-up examinations were legitimately and lawfully performed and billed.

684.     Salado failed to do so, because he never actually served as a legitimate medical director at Accident Rehab in the first instance.

**(iii)     The Fraudulent Charges for Physical Therapy at Accident Rehab**

685.     In addition to the fraudulent initial examinations and follow-up examinations, in the majority of cases, the Accident Rehab Defendants purported to subject the Insureds in the claims identified in Exhibit "4" to medically unnecessary physical therapy.

686.     As set forth herein, though Feijoo falsely purported to personally perform or directly supervise the majority of the physical therapy services in the claims identified in Exhibit "4", the physical therapy services actually were unlawfully performed without supervision by chiropractic assistants associated with Accident Rehab, to the extent that they were even provided at all.

687.     As set forth in Exhibit "4", the Accident Rehab Defendants then billed the purported physical therapy services to GEICO under:

(i)      CPT code 97010 for putative hot/cold pack therapy, typically resulting in a charge of $45.00 for each round of hot/cold pack therapy they purported to provide;

(ii)     CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $60.00 for each round of mechanical traction therapy they purported to provide;

(iii)    CPT code 97018, for putative paraffin bath therapy, in a charge of $40.00 for each round of paraffin bath therapy they purported to provide;

(iv)    CPT code 97035, for putative ultrasound, resulting in a charge of  $60.00 for each round of ultrasound they purported to provide;

(v)     CPT code 97039, for unlisted modality treatments, resulting in a charge of $50.00 for each round of unlisted modality treatments they purported to provide;

(vi)    CPT code 97110, for putative therapeutic exercises, resulting in a charge of $75.00 for each round of therapeutic exercises they purported to provide; and

(vii)   CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of

$75.00 for each round of neuromuscular reeducation they purported to provide;

688.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "4" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

689.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

690.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in the same minor automobile accident would routinely present for their purported physical therapy treatment on the exact same dates, or would begin and complete their physical therapy treatment on the exact same date.

691.    It is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "4" would suddenly be cured of their ailments on the exact same date, months after their motor vehicle accident.

692.    Even so:

(i)     On December 19, 2016, two Insureds – ML and EC– were involved in the same automobile accident. Thereafter – incredibly – both ML and EC presented at Accident Rehab for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, January 5, 2017. ML and EC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that ML and EC suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo provided were pre-determined and phony, ML and EC both presented at Accident Rehab on at least 30 of the exact same dates over a three month period where they received substantially similar physical therapy treatment on virtually all of those dates. Moreover, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo stopped purporting to provide physical therapy services to ML and EC on

the exact same day, April 12, 2017. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the four months when they purportedly were treating at Accident Rehab.

(ii)     On November 16, 2017, two Insureds – GC and AC – were involved in the same automobile accident. Thereafter – incredibly – both GC and AC presented at Accident Rehab for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, November 29, 2017. GC and AC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GC and AC suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo provided were pre-determined and phony, GC and AC both presented at Accident Rehab on at least 5 of the <u>exact</u> same dates over a three month period where they received substantially similar physical therapy treatment on virtually all of those dates. Moreover, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo stopped purporting to provide physical therapy services to GC and AC on the exact same day, December 30, 2017. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the six weeks when they purportedly were treating at Accident Rehab.

(iii)    On May 14, 2018, two Insureds – EG and TG– were involved in the same automobile accident. Thereafter – incredibly – both EG and TG presented at Accident Rehab for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, May 23, 2018. EG and TG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EG and TG suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo provided were pre-determined and phony, EG and TG both presented at Accident Rehab on at least 10 of the <u>exact</u> same dates over a three month period where they received substantially similar physical therapy treatment on virtually all of those dates. Moreover, Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo stopped purporting to provide physical therapy services to EG and TG on the exact same day, April 12, 2017. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the four months when they purportedly were treating at Accident Rehab.

(iv)    On October 2, 2019, two Insureds – DG and TS – were involved in the same automobile accident. Thereafter – incredibly – both DG and TS presented at Accident Rehab for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, December 12, 2019 – more than two months after the accident. DG and TS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from

different positions in the vehicle. To the extent that DG and TS suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo provided were pre-determined and phony, DG and TS both presented at Accident Rehab on at least 20 of the <u>exact</u> same dates over a three month period where they received substantially similar physical therapy treatment on virtually all of those dates.

(v)     On October 10, 2019, two Insureds – RR and MR – were involved in the same automobile accident. Thereafter – incredibly – both RR and MR presented at Accident Rehab for their first day of physical therapy services purportedly provided by Feijoo on the exact same date, October 16, 2019. RR and MR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RR and MR suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo provided were pre-determined and phony, RR and MR both presented at Accident Rehab on at least 15 of the <u>exact</u> same dates over a three month period where they received substantially similar physical therapy treatment on virtually all of those dates.

693.     In a significant amount of the claims for physical therapy services that are identified in Exhibit "4", Accident Rehab, A. Vazquez, M. Vazquez, Salado, and Feijoo inserted false "diagnoses" in their physical therapy reports in order to create a false justification for additional unnecessary physical therapy services.

694.     In the claims for physical therapy services identified in Exhibit "4", the charges for the physical therapy services were fraudulent in that they misrepresented Accident Rehab's eligibility to collect PIP Benefits in the first instance.

695.     In fact, and as set forth herein, Accident Rehab never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

696.     What is more, and as set forth herein, in the claims for physical therapy services identified in Exhibit "4", the Accident Rehab Defendants falsely represented that the physical

therapy services lawfully had been performed or directly supervised by Feijoo when in fact they were unlawfully performed by unsupervised chiropractic assistants associated with Accident Rehab, who are not and never have been licensed as physical therapists.

697.    As set forth herein, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

698.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

699.    In each of the claims for physical therapy services identified in Exhibit "4" , the Accident Rehab Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

700.    In fact, in the claims for physical therapy services identified in Exhibit "4" , the services were not lawfully provided, and were not eligible for PIP reimbursement, inasmuch as: (i) the putative physical therapy services were performed – to the extent that they were performed at all –by unsupervised chiropractic assistants associated with Accident Rehab, who were not licensed to practice physical therapy; and (ii) the Accident Rehab Defendants deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the non-reimbursable charges.

**5.      The Miami Medical Defendants' Fraudulent Treatment and Billing Protocol**

**(i).    The Fraudulent Charges for Initial Examinations at Miami Medical**

701.    As an initial step in the Miami Medical Defendants' fraudulent scheme, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo purported to provide the Insureds in the claims identified in Exhibit "5" with a putative initial examination.

702.    Feijoo and Nodarse purported to perform virtually all of the putative initial examinations in the claims identified in Exhibit "5".

703.    As set forth in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo then billed the putative initial examinations through Miami Medical to GEICO under CPT code 99203, typically resulting in charges of $375.00 for each purported initial examination, or under CPT code 99205, typically resulting in charges of $475.00 per initial examination.

704.    In the claims for initial examinations identified in Exhibit "5", the charges for the initial examinations were fraudulent in that they misrepresented Miami Medical's eligibility to collect PIP Benefits in the first instance.

705.    In fact, and as set forth herein, Miami Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

706.    As set forth herein, the charges for the initial examinations identified in Exhibit "5" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems at Miami Medical**

707.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

708.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

709.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

710.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

711.    Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99205 to bill for an initial patient examination typically requires that the Insured present with problems of moderate to high severity.

712.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99205 to bill for an initial patient examination.

713.     Specifically, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99205 to bill for an initial patient examination:

(i)      Initial office evaluation of a 65-year-old female with exertional chest pain, Intermittent claudication, syncope and a murmur of aortic stenosis. (Cardiology)

(ii)     Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, anti-hypertension. (Family Medicine)

(iii)    Initial office visit for a 73-year-old male with an unexplained 20-pound weight loss. (Hematology/Oncology)

(iv)     Initial office visit for a 24-year-old homosexual male who has a fever, a cough, and shortness of breath. (Infectious Disease)

(v)      Initial office evaluation, patient with systemic lupus erythematosus, fever, seizures and profound thrombocytopenia. (Rheumatology)

(vi)     Initial office evaluation and management of patient with systemic vasculitis and compromised circulation to the limbs. (Rheumatology)

714.     Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99205 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

715.     By contrast, to the extent that the Insureds in the claims identified in Exhibit "5" had any presenting problems at all as the result of their minor automobile accidents, the problems were low severity soft tissue injuries such as sprains and strains.

716.     For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "5" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "5" the Insureds did not seek treatment at any hospital as the result of their accidents.

717. To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

718. Furthermore, to the extent that police reports existed with respect to the claims identified in Exhibit "5", the contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was injured in the accidents. 718.

Even so, in the vast majority of claims for initial examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo billed for their putative initial examinations using CPT codes 99203 and 99205, and thereby falsely represented that the Insureds presented with problems of moderate or moderate to high severity.

719. For example:

(i) On July 31, 2013, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AG's vehicle, that there was minor damage to the other vehicle, that the airbags in AG's vehicle did not deploy, and that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured in the accident. In keeping with the fact that AG was not seriously injured in the accident, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of AG by Feijoo on August 13, 2013, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that AG presented with moderately to highly severe health problems as the result of the accident.

(ii) On March 8, 2015, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LS's vehicle did not deploy, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured in the accident. In keeping with the fact that LS was not seriously injured in the accident, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of LS by Feijoo on May 12, 2015, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that LS

presented with moderately to highly severe health problems as the result of the accident.

(iii)    On February 19, 2016, an Insured named DB was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to DB's vehicle, that there was minor damage to the other vehicle, that the airbags in DB's vehicle did not deploy, and that DB's vehicle was drivable following the accident. The police report further indicated that DB was not injured in the accident. In keeping with the fact that DB was not seriously injured in the accident, DB did not visit any hospital emergency room following the accident. To the extent that DB experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of DB by Nodarse on February 24, 2016, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that DB presented with moderately severe health problems as the result of the accident.

(iv)    On May 17, 2016, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to SG's vehicle, that there was minor damage to the other vehicle, that the airbags in SG's vehicle did not deploy, and that SG's vehicle was drivable following the accident. The police report further indicated that SG was not injured in the accident. In keeping with the fact that SG was not seriously injured in the accident, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of SG by Feijoo on September 20, 2016, Miami Medical, J. Jimenez, Marquez, and Feijoo billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that SG presented with moderately to highly severe health problems as the result of the accident.

(v)     On January 19, 2017, an Insured named DB was involved in an automobile accident. The contemporaneous police report indicated that DB was not injured in the accident. In keeping with the fact that DB was not seriously injured in the accident, DB did not visit any hospital emergency room following the accident. To the extent that DB experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of DB by Nodarse on January 25, 2017, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that DB presented with moderately severe health problems as the result of the accident.

(vi)    On June 18, 2017, an Insured named IR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in IR's vehicle did not deploy, and that IR's vehicle was drivable following the accident. The police report further indicated that IR was not injured in the accident. In keeping with the

fact that IR was not seriously injured in the accident, IR did not visit any hospital emergency room following the accident. To the extent that IR experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of IR by Nodarse on June 21, 2017, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that IR presented with moderately severe health problems as the result of the accident.

(vii)    On August 23, 2017, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JR's vehicle did not deploy, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not seriously injured in the accident. In keeping with the fact that JR was not seriously injured in the accident, JR did not visit any hospital emergency room immediately following the accident. To the extent that JR experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JR by Feijoo on September 26, 2017, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that JR presented with moderately to highly severe health problems as the result of the accident.

(viii)   On May 15, 2018, an Insured named RH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RH's vehicle did not deploy. The police report further indicated that RH was not injured in the accident. In keeping with the fact that RH was not seriously injured in the accident, RH did not visit any hospital emergency room following the accident. To the extent that RH experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of RH by Nodarse on May 18, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that RH presented with moderately severe health problems as the result of the accident.

(ix)     On February 6, 2019, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to CH's vehicle, that there was minor damage to the other vehicle, that the airbags in CH's vehicle did not deploy, and that CH's vehicle was drivable following the accident. The police report further indicated that CH was not injured in the accident. In keeping with the fact that CH was not seriously injured in the accident, CH did not visit any hospital emergency room following the accident. To the extent that CH experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of CH by Feijoo on April 4, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that CH presented with moderately to highly severe health problems as the result of the accident.

(x)     On May 20, 2019, an Insured named AT was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AT's vehicle did not deploy. The police report further indicated that AT was not injured in the accident. In keeping with the fact that AT was not seriously injured in the accident, AT did not visit any hospital emergency room following the accident. To the extent that AT experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of AT by Nodarse on May 22, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that AT presented with moderately severe health problems as the result of the accident.

720.    These are only representative examples. In the claims for initial examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo routinely falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all.

721.    In the claims for initial examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo routinely falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99203 and 99205, because examinations billable under CPT codes 99203 and 99205 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

722.    In the claims for initial examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo also routinely falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to create a false basis for the other medically unnecessary Fraudulent Services that the Miami Medical Defendants purported to provide to the Insureds, including follow-up examinations, physical therapy services, and range of motion tests.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial examinations at Miami Medical**

723.    What is more, in the claims identified in Exhibit "5" for initial examinations under CPT code 99203 or 99205, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo misrepresented and exaggerated the amount of face-to-face time that Feijoo spent with the Insureds or the Insureds' families.

724.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination typically represents that the physician who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

725.    Pursuant to the Fee Schedule, the use of CPT code 99205 to bill for a patient examination represents that the physician who conducted the examination spent at least 60 minutes of face-to-face time with the patient or the patient's family.

726.    As set forth in Exhibit "5", in the vast majority of instances, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo billed for their putative initial examinations using CPT code 99203 or 99205, and thereby represented that the physician who purported to conduct the examinations – namely Nodarse and Feijoo – spent at least 30 minutes or 60 minutes, respectively, of face-to-face time with the Insureds or their families during the examinations.

727.    In fact, in the initial examinations identified in Exhibit "5", Feijoo and Nodarse virtually never spent at least 30 or 60 minutes of face-to-face time with the Insureds or their families when conducting the examinations.

728.    Rather, in the initial examinations identified in Exhibit "5", the examinations rarely lasted more than 10-15 minutes, to the extent that they were provided at all.

729.    In keeping with the fact that the initial examinations in the claims identified in Exhibit "5" rarely lasted more than 10-15 minutes, to the extent that they were provided at all,

Nodarse and Feijoo used template forms in conducting the examinations.

730. The template that Nodarse and Feijoo used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

731. The only face-to-face time between Feijoo or Nodarse and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

732. These interviews and examinations did not require Feijoo or Nodarse to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

733. In keeping with the fact that Feijoo and Nodarse could not legitimately have spent 30 or 60 minutes of face-to-face time with the Insureds or their families during the purported initial examinations, they often simultaneously purported to provide an improbable or impossible number of other services to Insureds on the same dates of service as the purported examinations.

734. For example:

(i) On November 10, 2016, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and, Nodarse billed GEICO under CPT code 99203 for an initial examination that Nodarse falsely purported to perform on an Insured named UL and falsely represented that Nodarse spent at least 30 minutes of face-to-face time with the Insured or the Insured's family during the examinations. On that same day, Nodarse also purported to personally provide or directly supervise at least <u>18 hours</u> of physical therapy services to 10 individual Insureds, at two different facilities in south Florida, all of which were billed to GEICO.

(ii) On July 11, 2017, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo falsely purported to perform on an Insured named AR and falsely represented that Feijoo spent at least 60 minutes of face-to-face time with the Insured or the Insured's family during the examinations. On that same day, Feijoo also purported to personally provide or directly supervise at least <u>11.5 hours</u> of physical therapy services to 7 individual Insureds, at four different facilities throughout south Florida, all of which were billed to GEICO.

(iii) On June 12, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo falsely

purported to perform on two Insureds named NO and FR and falsely represented that Feijoo spent at least 60 minutes of face-to-face time with the Insured or the Insured's family during the examinations. On that same day, Feijoo also purported to personally provide or directly supervise at least <u>11.75 hours</u> of physical therapy services to 10 individual Insureds, at four different facilities throughout south Florida, all of which were billed to GEICO.

(iv)  On May 22, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and, Nodarse billed GEICO under CPT code 99203 for an initial examination that Nodarse falsely purported to perform on an Insured named LT and falsely represented that Nodarse spent at least 30 minutes of face-to-face time with the Insured or the Insured's family during the examinations. On that same day, Nodarse also purported to personally provide or directly supervise at least <u>11.5 hours</u> of physical therapy services to 6 individual Insureds, at two different facilities in south Florida, all of which were billed to GEICO.

(v)  On July 18, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo falsely purported to perform on an Insured named EM and falsely represented that Feijoo spent at least 60 minutes of face-to-face time with the Insured or the Insured's family during the examinations. On that same day, Feijoo also purported to personally provide or directly supervise at least <u>11.25 hours</u> of physical therapy services to 7 individual Insureds, at four different facilities throughout south Florida, all of which were billed to GEICO.

735.  These are only representative examples. In the claims for initial examinations that are identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo routinely falsely represented that Nodarse and Feijoo had spent at least 30 or 60 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that – on those same dates – Nodarse and Feijoo also purported to personally perform a massive amount of physical therapy and other services to large numbers of Insureds at multiple locations throughout south Florida.

736.  Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99203 or 99205 are reimbursable at higher rates than examinations that take less time to perform.

c.    **Misrepresentations Regarding "Comprehensive" Patient Examinations at Miami Medical**

737.    In the claims identified in Exhibit "5" for initial examinations under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo falsely represented the extent of the underlying physical examinations.

738.    Pursuant to the CPT Assistant, the use of CPT code 99205 to bill for a patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination.

739.    As set forth in Exhibit "5", when Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed their putative initial examinations using CPT code 99205 they thereby represented that the physician who purported to conduct the examinations – namely Feijoo – conducted comprehensive physical examinations of the Insureds who purportedly received the examinations.

740.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

741.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

742.    The CPT Assistant recognizes the following organ systems:

(i)    constitutional symptoms (e.g., fever, weight loss);

(ii)    eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)      neurological;

(xi)     psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)    allergic/immunologic.

743.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

744.   In the claims for initial examinations identified in Exhibit "5", when Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed for the initial examinations under CPT code 99205, they falsely represented that Feijoo performed "comprehensive" patient examinations on the Insureds he purported to treat during the initial examinations.

745.   In fact, with respect to the claims for initial examinations under CPT code 99205 that are identified in Exhibit "5", Feijoo never conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

746.   For instance, in each of the claims under CPT code 99205 identified in Exhibit "5", Feijoo did not conduct any general examination of multiple patient organ systems, inasmuch as he did not document findings with respect to at least eight organ systems.

747.   Furthermore, although Feijoo often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibit "5", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)   the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(ii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iii)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(iv)     inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(v)      coordination, deep tendon reflexes, and sensation; and/or

(vi)     mental status, including orientation to time, place and person, as well as mood and affect.

748.    For example:

(i)      On August 13, 2013, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo purported to perform or supervise on an Insured named AG, and thereby represented that they had provided a "comprehensive" physical examination to AG. However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)     On October 29, 2013, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo purported to perform or supervise on an Insured named MP, and thereby represented that they had provided a "comprehensive" physical examination to MP. However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii)    On March 17, 2015, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo purported to perform or supervise on an Insured named CM, and thereby represented that they had provided a "comprehensive" physical examination to CM. However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv)     On May 12, 2015, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo purported to perform or supervise on an Insured named LS, and thereby represented that they had provided a "comprehensive" physical examination to LS.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)      On May 18, 2016 Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo

purported to perform or supervise on an Insured named AM, and thereby represented that they had provided a "comprehensive" physical examination to AM.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vi)    On September 20, 2016, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo purported to perform or supervise on an Insured named SG, and thereby represented that they had provided a "comprehensive" physical examination to SG.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vii)    On September 26, 2017, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo purported to perform or supervise on an Insured named JR, and thereby represented that they had provided a "comprehensive" physical examination to JR.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(viii)    On August 2, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo purported to perform or supervise on an Insured named OS, and thereby represented that they had provided a "comprehensive" physical examination to OS.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ix)    On April 4, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo purported to perform or supervise on an Insured named CH, and thereby represented that they had provided a "comprehensive" physical examination to CH. However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(x)    On June 13, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO under CPT code 99205 for an initial examination that Feijoo purported to perform or supervise on an Insured named RR, and thereby represented that they had provided a "comprehensive" physical examination to RR.  However, Feijoo did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

749.     These are only representative examples. In the claims for initial examinations under CPT code 99205 that are identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo routinely falsely represented that they had provided "comprehensive" physical examinations. In fact, they had not provided comprehensive physical examinations because Feijoo did not document his findings with respect to at least eight of the Insureds' organ systems, nor had they documented "complete" examinations of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

750.     In the claims for initial examinations under CPT code 99205 that are identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo falsely represented that they had provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99205, because examinations billable under CPT code 99205 are reimbursable at higher rates than examinations that do not require the examining physician to provide "comprehensive" physical examinations.

d.     **Misrepresentations Regarding the Extent of Medical Decision-Making at Miami Medical**

751.     Furthermore, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination engaged in "low complexity" medical decision-making.

752.     Pursuant to the CPT Assistant, the use of CPT code 99205 to bill for a patient examination represents that the physician who performed the examination engaged in medical decision-making of "high complexity".

753.     In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to

be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

754.    As set forth herein, and in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed for putative initial patient examinations using CPT code 99203, and thereby represented that Nodarse engaged in some genuine, low-complexity medical decision-making during the initial examinations.

755.    As set forth herein, and in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed for putative initial patient examinations using CPT code 99205, and thereby represented that Feijoo engaged in some genuine, high-complexity medical decision-making during the initial examinations.

756.    In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

757.    First, in the claims for initial examinations identified in Exhibit "5", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

758.    When the Insureds in the claims identified in Exhibit "5" presented to Miami Medical for "treatment", they did not arrive with any significant amount of medical records.

759.    Furthermore, prior to the initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo did not request any significant amount of medical records from other providers.

760.    Second, in the claims for initial examinations identified in Exhibit "5", there was

no risk of significant complications or morbidity– much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

761.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided at Miami Medical, to the extent that Miami Medical provided any such diagnostic procedures or treatment options in the first instance.

762.    In virtually every one of the claims identified in Exhibit "5", any diagnostic procedures and "treatments" that the Miami Medical Defendants actually provided were limited to a series of medically unnecessary follow-up examinations, physical therapy treatments, and range of motion tests, none of which was health-or life-threatening if properly administered.

763.    Third, in the claims for initial examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

764.    Rather, to the extent that the initial examinations were conducted in the first instance, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo provided a phony list of soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

765.    Specifically, in most of the claims identified in Exhibit "5", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

766.    Even so, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo prepared initial examination reports in which they provided a phony list of soft tissue injury

"diagnoses" to the Insureds.

767.    Then, based upon these phony "diagnoses", Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo directed many Insureds to receive significant and medically unnecessary physical therapy treatment.

768.    For example:

(i)    On July 31, 2013, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to Aleida Gray's vehicle, that there was minor damage to the other vehicle, that the airbags in AG's vehicle did not deploy, and that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured in the accident. In keeping with the fact that AG was not seriously injured in the accident, AG did not visit any hospital emergency room following the accident. To the extent that AG experienced any health problems at all as the result of the accident, they were of low severity. On August 13, 2013, Feijoo purported to conduct an initial examination of AG at Miami Medical. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided AG with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AG's presenting problems, nor the treatment plan provided to AG by Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo presented any risk of significant complications, morbidity, or mortality. To the contrary, AG did not need any significant treatment at all as a result of the accident. Even so, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Feijoo engaged in some legitimate, high complexity medical decision-making during the purported examination.

(ii)    On March 8, 2015, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LS's vehicle did not deploy, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured in the accident. In keeping with the fact that LS was not seriously injured in the accident, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as the result of the accident, they were of low severity. On May 12, 2015, Feijoo purported to conduct an initial examination of LS at Miami Medical. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination.

Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided LS with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LS's presenting problems, nor the treatment plan provided to LS by Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo presented any risk of significant complications, morbidity, or mortality. To the contrary, LS did not need any significant treatment at all as a result of the accident. Even so, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Feijoo engaged in some legitimate, high complexity medical decision-making during the purported examination.

(iii)      On February 19, 2016, an Insured named DB was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to DB's vehicle, that there was minor damage to the other vehicle, that the airbags in DB's vehicle did not deploy, and that DB's vehicle was drivable following the accident. The police report further indicated that DB was not injured in the accident. In keeping with the fact that DB was not seriously injured in the accident, DB did not visit any hospital emergency room following the accident. To the extent that DB experienced any health problems at all as the result of the accident, they were of low severity. On February 24, 2016, Nodarse purported to conduct an initial examination of DB at Miami Medical. To the extent that Nodarse performed the examination in the first instance, Nodarse did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Nodarse did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Nodarse provided DB with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DB's presenting problems, nor the treatment plan provided to DB by Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse presented any risk of significant complications, morbidity, or mortality. To the contrary, DB did not need any significant treatment at all as a result of the accident. Even so, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Nodarse engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)      On May 17, 2016, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to SG's vehicle, that there was minor damage to the other vehicle, that the airbags in SG's vehicle did not deploy, and that SG's vehicle was drivable following the accident. The police report further indicated that SG was not injured in the accident. In keeping with the fact that SG was not seriously injured in the accident, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low severity. On September 20, 2016, Feijoo purported to conduct an initial

examination of SG at Miami Medical. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided SG with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SG's presenting problems, nor the treatment plan provided to SG by Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo presented any risk of significant complications, morbidity, or mortality. To the contrary, SG did not need any significant treatment at all as a result of the accident. Even so, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Feijoo engaged in some legitimate, high complexity medical decision-making during the purported examination.

(v)     On January 19, 2017, an Insured named DB was involved in an automobile accident. The contemporaneous police report indicated that DB was not injured in the accident. In keeping with the fact that DB was not seriously injured in the accident, DB did not visit any hospital emergency room following the accident. To the extent that DB experienced any health problems at all as the result of the accident, they were of low severity. On January 25, 2017, Nodarse purported to conduct an initial examination of DB at Miami Medical. To the extent that Nodarse performed the examination in the first instance, Nodarse did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Nodarse did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Nodarse provided DB with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DB's presenting problems, nor the treatment plan provided to DB by Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse presented any risk of significant complications, morbidity, or mortality. To the contrary, DB did not need any significant treatment at all as a result of the accident. Even so, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Nodarse engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)    On June 18, 2017, an Insured named IR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in IR's vehicle did not deploy, and that IR's vehicle was drivable following the accident. The police report further indicated that IR was not injured in the accident. In keeping with the fact that IR was not seriously injured in the accident, IR did not visit any hospital emergency room following the accident. To the extent that IR experienced any health problems at all as the result of the accident, they were of low severity. On June 21, 2017, Nodarse purported to conduct an initial examination of IR at Miami Medical. To the extent that Nodarse performed the examination in the first instance,

Nodarse did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Nodarse did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Nodarse provided IR with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither IR's presenting problems, nor the treatment plan provided to IR by Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse presented any risk of significant complications, morbidity, or mortality. To the contrary, IR did not need any significant treatment at all as a result of the accident. Even so, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Nodarse engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)   On August 23, 2017, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JR's vehicle did not deploy, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not seriously injured in the accident. In keeping with the fact that JR was not seriously injured in the accident, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the accident, they were of low severity. On September 26, 2017, Feijoo purported to conduct an initial examination of JR at Miami Medical. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided JR with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR by Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any significant treatment at all as a result of the accident. Even so, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Feijoo engaged in some legitimate, high complexity medical decision-making during the purported examination.

(viii)  On May 15, 2018, an Insured named RH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RH's vehicle did not deploy. The police report further indicated that RH was not injured in the accident. In keeping with the fact that RH was not seriously injured in the accident, RH did not visit any hospital emergency room following the accident. To the extent that RH experienced any health problems at all as the result of the accident, they were of low severity. On May 18, 2018, Nodarse purported to conduct an initial examination of RH at Miami Medical. To the extent that Nodarse performed the examination in the first instance, Nodarse did not retrieve, review, or analyze any

significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Nodarse did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Nodarse provided RH with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RH's presenting problems, nor the treatment plan provided to RH by Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse presented any risk of significant complications, morbidity, or mortality. To the contrary, RH did not need any significant treatment at all as a result of the accident. Even so, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Nodarse engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)   On February 6, 2019, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to CH's vehicle, that there was minor damage to the other vehicle, that the airbags in CH's vehicle did not deploy, and that CH's vehicle was drivable following the accident. The police report further indicated that CH was not injured in the accident. In keeping with the fact that CH was not seriously injured in the accident, CH did not visit any hospital emergency room following the accident. To the extent that CH experienced any health problems at all as the result of the accident, they were of low severity. On April 4, 2019, Feijoo purported to conduct an initial examination of CH at Miami Medical. To the extent that Feijoo performed the examination in the first instance, Feijoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Feijoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Feijoo provided CH with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CH's presenting problems, nor the treatment plan provided to CH by Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo presented any risk of significant complications, morbidity, or mortality. To the contrary, CH did not need any significant treatment at all as a result of the accident. Even so, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo billed GEICO for the initial examination using CPT code 99205, and thereby falsely represented that Feijoo engaged in some legitimate, high complexity medical decision-making during the purported examination.

(x)   On May 20, 2019, an Insured named AT was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AT's vehicle did not deploy. The police report further indicated that AT was not injured in the accident. In keeping with the fact that AT was not seriously injured in the accident, AT did not visit any hospital emergency room following the accident. To the extent that AT experienced any health problems at all as the result of the accident, they were of low severity. On May 22, 2019, Nodarse purported to conduct an initial

examination of AT at Miami Medical. To the extent that Nodarse performed the examination in the first instance, Nodarse did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Nodarse did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Nodarse provided AT with the same phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AT's presenting problems, nor the treatment plan provided to AT by Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse presented any risk of significant complications, morbidity, or mortality. To the contrary, AT did not need any significant treatment at all as a result of the accident. Even so, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Nodarse engaged in some legitimate, low complexity medical decision-making during the purported examination.

769.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

770.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

771.    As set forth herein, in the claims identified in Exhibit "5", virtually all of the Insureds whom Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

772.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "5" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

773.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at Miami Medical with substantially identical

injuries <u>on the exact same dates</u> after their accidents.

774. Even so, in keeping with the fact that Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo frequently issued substantially identical "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

775. For example:

(i) On July 31, 2013, two Insureds – EE and AG – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Feijoo on the <u>exact same date</u>, August 5, 2013. EE and AG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EE and AG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo provided EE and AG with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ii) On August 7, 2015, two Insureds – PR and RR – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Nodarse on the <u>exact same date</u>, August 14, 2015. PR and RR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that PR and RR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse provided PR and RR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(iii) On October 5, 2015, two Insureds – FR and JV – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Feijoo on the <u>exact same date</u>, October 8, 2015. FR and JV were different ages, in different physical conditions, located in different

positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that FR and JV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo provided FR and JV with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(iv)    On February 3, 2016, two Insureds – JR and JR – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Feijoo and on the <u>exact same date</u>, February 10, 2016. JR and JR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JR and JR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo provided JR and JR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(v)     On February 29, 2016, two Insureds – CC and RM – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Nodarse on the <u>exact same date</u>, March 2, 2016. CC and RM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CC and RM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse provided CC and RM with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(vi)    On May 2, 2016, two Insureds – TA and MO – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Nodarse on the <u>exact same date</u>, May 4, 2016. TA and MO were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that TA and MO suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Nodarse, and Feijoo provided TA and MO with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(vii)   On May 15, 2016, two Insureds – KA and RR – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami

Medical for initial examinations by Feijoo on the <u>exact same date</u>, May 21, 2016. KA and RR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that KA and RR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo provided KA and RR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(viii)   On October 26, 2016, two Insureds – AP and JF – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Feijoo on the <u>exact same date</u>, October 29, 2016. AP and JF were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AP and JF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo provided AP and JF with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ix)   On January 19, 2017, two Insureds – BB and JN – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Nodarse on the <u>exact same date</u>, January 25, 2017. BB and JN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BB and JN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse provided BB and JN with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(x)   On December 25, 2017, two Insureds – DM and CL – were involved in the same minor automobile accident. Ten days later, DM and CL presented – incredibly – <u>on the exact same date</u>, January 5, 2018, to Miami Medical for initial examinations by Feijoo. DM and CL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DM and CL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo provided DM and CL with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xi)     On March 11, 2018, two Insureds – DI and GI – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Nodarse on the <u>exact same date</u>, March 24, 2018. DI and GI were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DI and GI suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse, provided DI and GI with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xii)    On April 6, 2018, two Insureds – LD and NO – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Feijoo on the <u>exact same date</u>, April 7, 2018. LD and NO were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LD and NO suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo provided LD and NO with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xiii)   On April 22, 2018, two Insureds – LP and LG – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Feijoo on the <u>exact same date</u>, April 25, 2018. LP and LG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LP and LG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo provided LP and LG with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xiv)    On May 21, 2018, two Insureds – JM and MM – were involved in the same minor automobile accident. Sixteen days later, JM and MM presented – incredibly – <u>on the exact same date</u>, June 6, 2018, to Miami Medical for initial examinations by Feijoo. JM and MM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JM and MM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo provided JM and MM with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary

treatment to both of them.

(xv)  On January 22, 2019, two Insureds – JF and DC – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Miami Medical for initial examinations by Feijoo on the <u>exact same date</u>, March 21, 2019. JF and DC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JF and DC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo provided JF and DC with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

776.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo frequently issued substantially identical "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

777.    In keeping with the fact that Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, for a substantial amount of the claims identified in Exhibit "5", Feijoo diagnosed the Insureds with substantially identical sprain/strain "diagnoses", concluded in the initial examination report that the patient had suffered from an  "Emergency Medical Condition", and stated that the patient had sustained "acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention <u>could</u> reasonably be expected to result in any of the following: a) serious jeopardy to patient health; b) serious impairment to bodily functions; or c) serious dysfunction of a bodily organ or part."

778.    It is extremely improbable that such a substantial amount of the Insureds in the claims identified in Exhibit "5" would have symptoms so acute that their injuries could be considered a medical emergency, especially considering that in many instances, the initial examination occurred weeks after the minor automobile accident.

779.    It is even more improbable – to the point of impossibility – that this would occur over and over again, in the context of minor automobile accidents that could not possibly have caused such severe levels of pain and/or injury.

780.    Even so, to create the false appearance of severe injuries, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo inserted this false information in their initial examination reports despite the fact that the minor underlying accidents did not and could not possibly have caused such serious symptoms in the Insureds.

781.    For example:

(i)     On March 8, 2015, an Insured named LS was involved in an automobile accident. In keeping with the fact that LS was not seriously injured in the accident, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of LS on May 12, 2015, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo falsely reported that LS's injuries constituted an "emergency medical condition".

(ii)    On May 17, 2016, an Insured named SG was involved in an automobile accident. In keeping with the fact that SG was not seriously injured in the accident, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of SG on September 20, 2016, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo falsely reported that SG's injuries constituted an "emergency medical condition".

(iii)   On August 23, 2017, an Insured named JR was involved in an automobile accident. In keeping with the fact that JR was not seriously injured in the accident, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of JR on September 26, 2017, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo

falsely reported that JR's injuries constituted an "emergency medical condition".

(iv)     On December 9, 2017, an Insured named ER was involved in an automobile accident. In keeping with the fact that ER was not seriously injured in the accident, ER did not visit any hospital emergency room following the accident. To the extent that ER experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of ER on May 22, 2018, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo falsely reported that ER's injuries constituted an "emergency medical condition".

(v)      On February 6, 2019, an Insured named CH was involved in an automobile accident. In keeping with the fact that CH was not seriously injured in the accident, CH did not visit any hospital emergency room following the accident. To the extent that CH experienced any health problems at all as the result of her accident, they were of low severity. Even so, following a purported initial examination of CH on April 4, 2019, Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo falsely reported that CH's injuries constituted an "emergency medical condition".

782.    These are only representative examples. In a substantial amount of the claims for initial examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo falsely reported that the Insureds suffered from "severe pain" and were experiencing an "Emergency Medical Condition" as the result of their minor accidents.

783.    Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo purported to provide to the Insureds, including medically unnecessary follow-up examinations, range of motion testing, and other diagnostic services.

784.    To the extent that the Insureds in the claims identified in Exhibit "5" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

785.     The diagnosis and treatment of these ordinary sprains and strains did not require any "low complexity" or  "moderate complexity" medical decision-making on the part of Feijoo, Nodarse, or anyone else.

786.     To the contrary, and as set forth herein, Feijoo and Nodarse did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "5", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the other Fraudulent Services that the Miami Medical Defendants purported to provide.

787.     In the claims for initial examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203 or 99205, because CPT codes 99203 and 99205 are reimbursable at  higher rated than examinations that do not require low complexity or moderate complexity medical decision-making.

788.     In the claims for initial examinations identified in Exhibit "5" Miami Medical, J. Jimenez, G. Jimenez, Marquez, Nodarse, and Feijoo routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-similar, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    Miami Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act.

789.    In this context, Marquez – who at all relevant times purported to serve as the "medical director" at Miami Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

790.    Had Marquez actually fulfilled his statutory role as medical director at Miami Medical, he would have noted – among other things – that the Miami Medical Defendants routinely fraudulently represented in Miami Medical's billing that the putative initial examinations were legitimately and lawfully performed.

791.    Marquez failed to do so, because he never actually served as a legitimate medical director at Miami Medical in the first instance.

**(ii)    The Fraudulent Charges for Follow-Up Examinations at Miami Medical**

792.    In addition to their fraudulent initial examinations, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely purported to subject the Insureds in the claims identified in Exhibit "5" to fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

793.    Feijoo and Nodarse purported to personally perform or directly supervise virtually all of the follow-up examinations in the claims identified in Exhibit "5".

794.    As set forth in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse then routinely billed the follow-up examinations to GEICO under: (i) CPT code 99213, typically resulting in charges of $127.00 for each follow-up examination they purported to

provide; or (ii) CPT code 99215, typically resulting in charges of $286.00 for each follow-up examination they purported to provide.

795.     In the claims for follow-up examinations identified in Exhibit "5", the charges for the follow-up examinations were fraudulent in that they misrepresented Miami Medical's eligibility to collect PIP Benefits in the first instance.

796.     In fact, and as set forth herein, Miami Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

797.     As set forth herein, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo's charges for the follow-up examinations identified in Exhibit "5" also were fraudulent in that they misrepresented the nature and extent of the examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

798.     Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

799.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination. For example:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)     Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)     Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

800.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

801.    Pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

802.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99215 to bill for a follow-up patient examination. For example:

(i)     Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly. (Family Medicine)

(ii)    Office evaluation and discussion of treatment options for a 68-year-old male with a biopsy-proven rectal carcinoma. (General Surgery)

(iii)   Office visit for restaging of an established patient with new lymphadenopathy one year post therapy for lymphoma. (Hematology/Oncology)

(iv)    Follow-up office visit for a 65-year-old male with a fever of recent onset while on outpatient antibiotic therapy for endocarditis. (Infectious Disease)

(v)     Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient (Internal Medicine)

(vi)    Follow-up office visit for a 75-year-old patient with ALS (amyotropfuc lateral sclerosis), who is no longer able to swallow. (Neurology)

(vii)   follow-up visit, 40-year-old mother of 3, with acute rheumatoid arthritis, anatomical Stage 3, ARA function Class 3 rheumatoid arthritis, and deteriorating function. (Rheumatology)

803.    Thus, the sort of presenting problems that justify a charge under CPT code 99215 typically are problems that pose a serious threat to the patient's health, or even the patient's life.

804.    By contrast, by the time the Insureds in the claims identified in Exhibit "5" presented at Miami Medical for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

805.    Even so, in the claims for follow-up examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely billed for their putative follow-up examinations under CPT codes 99213 and 99215, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity or moderate to high severity.

806.    For example:

(i)    On March 8, 2015, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in LS's vehicle did not deploy, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured in the accident. In keeping with the fact that LS was not seriously injured in the accident, LS did not visit any hospital emergency room following the accident. To the extent that LS experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of LS on May 26, 2015, – more than two months after the accident – Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that LS presented with problems of moderate to high severity.

(ii)    On February 19, 2016, an Insured named DB was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to DB's vehicle, that there was minor damage to the other vehicle, that the airbags in DB's vehicle did not deploy, and that DB's vehicle was drivable following the accident. The police report further indicated that DB was not injured

234

in the accident. In keeping with the fact that DB was not seriously injured in the accident, DB did not visit any hospital emergency room following the accident. To the extent that DB experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of DB on May 10, 2016 – more than two months after the accident – Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that DB presented with problems of moderate to high severity. Subsequently, on July 12, 2016 – more than four months after the accident – Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Nodarse purported to provide DB an additional follow-up examination using CPT code 99215 and again falsely represented that DB presented with problems of moderate to high severity.

(iii)    On March 16, 2016, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in MP's vehicle did not deploy, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured in the accident. In keeping with the fact that MP was not seriously injured in the accident, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as the result of the accident, they were of low severity at the outset at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of MP on October 4, 2016 – more than six months after the accident – Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that MP presented with problems of moderate to high severity.

(iv)    On June 18, 2017, an Insured named IR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in IR's vehicle did not deploy, and that IR's vehicle was drivable following the accident. The police report further indicated that IR was not injured in the accident. In keeping with the fact that IR was not seriously injured in the accident, IR did not visit any hospital emergency room following the accident. To the extent that IR experienced any health problems at all as the result of the accident, they were of low severity at the outset at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of IR on October 3, 2017 – more than three months after the accident – Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that IR presented with problems of moderate to high severity.

(v)    On June 18, 2017, an Insured named IR was involved in an automobile accident. The contemporaneous police report indicated that the airbags in IR's vehicle did not deploy, and that IR's vehicle was drivable following the accident. The police report further indicated that IR was not injured in the accident. In keeping with the fact that IR was not seriously injured in the accident, IR did not visit any hospital

emergency room following the accident. To the extent that IR experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of IR on August 9, 2017 – more than six weeks after the accident – Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that IR presented with problems of low to moderate severity.

(vi)     On May 15, 2018, an Insured named RH was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RH's vehicle did not deploy. The police report further indicated that RH was not injured in the accident. In keeping with the fact that RH was not seriously injured in the accident, RH did not visit any hospital emergency room following the accident. To the extent that RH experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had resolved within a few weeks. Even so, following a purported follow-up examination of RH on June 8, 2018, – more than three weeks after the accident – Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that RH presented with problems of low to moderate severity.

807.     In the claims for follow-up examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

808.     These are only representative examples. In the claims for follow-up examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99215, because follow-up examinations billable under CPT codes 99213 and 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

809.     In the claims for follow-up examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo also routinely falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Miami Medical Defendants purported to provide to the Insureds.

**b.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

810.     What is more, pursuant to the CPT Assistant, when Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo billed for their putative follow-up examinations under CPT code 99213, they represented that Nodarse and Feijoo performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

811.     Pursuant to the CPT Assistant, when Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo billed for their putative follow-up examinations under CPT code 99215, they represented that they performed at least two of the following three components: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

812.     In actuality, however, in the claims for follow-up examinations identified in Exhibit "5", Nodarse and Feijoo did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

813.     Rather, following their purported follow-up examinations, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo simply: (i) reiterated the false, boilerplate "diagnoses" they previously had provided to the Insureds; and either  (ii) referred the Insureds

back to Miami Medical for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services from Miami Medical that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

814.    In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo recommended a substantially identical course of medically unnecessary "treatment" to virtually every one of the Insureds identified in Exhibit "5", irrespective of the Insureds' actual presenting problems, to the extent the Insureds experienced any legitimate injuries at all.

815.    Specifically, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo directed the Insureds to receive substantially identical types of physical therapy services, including: (i) paraffin (ii) ultrasound therapy; (iii) neuromuscular reeducation; and (iv) manual therapy. See Exhibit "5".

816.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

817.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

818.    By contrast, at Miami Medical, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocol.

819.    The phony "follow-up examinations" that Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo purported to provide the Insureds in the claims identified in Exhibit "5" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Miami Medical's offices.

820.    In further keeping with the fact that the purported "results" of the follow-up examinations were pre-determined and involved no actual medical decision-making at all, in the claims identified in Exhibit "5", Feijoo and Miami Medical purported to provide a "final orthopedic consultation" during the final follow-up examination that they purported to provide to Insureds.

821.    As set forth herein, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

822.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

823.    Even so, in a significant amount of the "final orthopedic consultations" that Feijoo and Miami Medical provided to the Insureds, they advised the Insured that they had been left with

a "partial permanent impairment of the body as a whole" in order to create the appearance of genuine injuries, where none actually existed.

824.    What is more this "partial permanent impairment" was routinely measured to be anywhere from 5% to 15%.

825.    It is simply impossible that such a significant number of the Insureds purported to have been examined by Feijoo, and Miami Medical who received a final orthopedic consultation would suffer from a "partial permanent impairment of the body as a whole" with substantially similar levels of "partial permanent impairments".

826.    These phony determinations were reported in a statistically impossible number of final examination reports created by Feijoo and Miami Medical, including but not limited to reports for the following Insureds on the following dates:

(i)      On April 5, 2014, TK was falsely reported to have suffered a partial permanent impairment of 8% of the body as a whole;

(ii)     On May 6, 2014, MP was falsely reported to have suffered a partial permanent impairment of 12% of the body as a whole;

(iii)    On November 3, 2015, AY was falsely reported to have suffered a partial permanent impairment of 8% of the body as a whole;

(iv)     On September 20, 2016, AM was advised  that she had been left with a partial permanent impairment of 6% of the body as a whole;

(v)      On October 4, 2016, MP was falsely reported to have suffered a partial permanent impairment of 7% of the body as a whole;

(vi)     On September 26, 2017, IR was falsely reported to have suffered a partial permanent impairment of 4% of the body as a whole;

(vii)    On August 30, 2018, NM was falsely reported to have suffered a partial permanent impairment of 6% of the body as a whole;

(viii)   On October 11, 2018, GL was falsely reported to have suffered a partial permanent impairment of 6%-7% of the body as a whole;

(ix)     On January 31, 2019, WP was falsely reported to have suffered a partial permanent impairment of 8% of the body as a whole;

827.    These are only representative examples. In the claims for follow-up examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, Marquez, and Feijoo routinely falsely purported to identify some level of "partial impairment of the body as a whole", despite the fact that to the extent that the Insureds in the claims identified in Exhibit "5" suffered any health care problems at all as the result of their relatively minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

828.    In the claims for follow-up examinations identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   Miami Medical never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

829.    In this context, Marquez – who at all relevant times purported to serve as the "medical director" at Miami Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

830.    Had Marquez actually fulfilled his statutory role as medical director at Miami Medical, he would have noted – among other things – that the Miami Medical Defendants routinely

fraudulently represented in Miami Medical's billing that the putative follow-up examinations were legitimately and lawfully performed and billed.

831.    Marquez failed to do so, because he never actually served as a legitimate medical director at Miami Medical in the first instance.

**(iii)    The Fraudulent Charges for Physical Therapy at Miami Medical**

832.    In addition to the fraudulent initial examinations and follow-up examinations, in a significant number of cases, the Miami Medical Defendants purported to subject the Insureds in the claims identified in Exhibit "5" to medically unnecessary physical therapy.

833.    As set forth herein, though Feijoo and Nodarse falsely purported to personally perform or directly supervise a substantial amount of the physical therapy services in the claims identified in Exhibit "5", the physical therapy services actually were performed without supervision by G. Jimenez, Vazquez, Uzan, and other unsupervised massage therapists associated with Miami Medical, to the extent that they were even provided at all.

834.    As set forth in Exhibit "5", the Miami Medical Defendants then billed the purported physical therapy services to GEICO under:

(i)    CPT code 97018, for putative paraffin bath therapy, in a charge of $50.00 for each round of paraffin bath therapy they purported to provide;

(ii)    CPT code 97035, for putative ultrasound, resulting in a charge of $60.00 for each round of ultrasound they purported to provide;

(iii)    CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $78.00 for each round of neuromuscular reeducation they purported to provide; and

(iv)    CPT code 97140, for putative manual therapy, resulting in a charge of $84.00 for each round of neuromuscular reeducation they purported to provide.

835.    In the claims for physical therapy services identified in Exhibit "5", the charges for the physical therapy services were fraudulent in that they misrepresented Miami Medical's eligibility to collect PIP Benefits in the first instance.

836.    In fact, and as set forth herein, Miami Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

837.    What is more, and as set forth herein, in the claims for physical therapy services identified in Exhibit "5", the Miami Medical Defendants falsely represented that the physical therapy services lawfully had been performed or directly supervised by Feijoo and Nodarse when in fact they were unlawfully performed by G. Jimenez, Vazquez, and Uzan and other unsupervised massage therapists, who are not and never have been licensed as physical therapists.

838.    As set forth herein, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

839.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

840.    In each of the claims for physical therapy services identified in Exhibit "5" , the Miami Medical Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

841.    In fact, in the claims for physical therapy services identified in Exhibit "5" , the services were not lawfully provided, and were not eligible for PIP reimbursement, inasmuch as: (i) the putative physical therapy services were performed – to the extent that they were performed at all – by unsupervised massage therapists associated with Miami Medical, who were not licensed

to practice physical therapy; and (ii) the Miami Medical Defendants deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the non-reimbursable charges.

**(iv)    The Fraudulently Unbundled Charges for Range of Motion and Muscle Strength Testing at Miami Medical**

842.    In an attempt to maximize the fraudulent billing for initial examinations that they could submit for each Insured, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo fraudulently unbundled separate charges for purported range of motion testing and muscle strength testing from their charges for the putative initial examinations.

843.    What is more, in an additional attempt to maximize their fraudulent billing, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo directed Insureds to return for follow-up examinations where they again fraudulently unbundled separate charges for purported range of motion and muscle strength testing from their charges for the multiple putative follow-up examinations.

844.    Specifically, and as set forth in Exhibit "5", when Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo submitted their already-inflated charges of $475.00 for purported initial examinations under CPT code 99205, and $286.00 for the purported follow-up examinations under CPT code 99215, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely: (i) submitted an additional charge of $60.00 or $120.00, under CPT code 95851, for purported range of motion testing; and (ii) submitted an additional charge of $65.00 or $86.00 under CPT code 95831, for purported muscle strength testing. As a result, following a significant amount of the initial examinations they purported to conduct, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo submitted total charges to

GEICO of over $600.00. Additionally, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo submitted total charges of over $400 for the purported follow-up examinations billed under CPT code 99215.

845.    In the claims for range of motion and muscle strength tests identified in Exhibit "5", the charges for the range of motion and muscle strength tests also were fraudulent in that they misrepresented Miami Medical's eligibility to collect PIP Benefits in the first instance.

846.    In fact, and as set forth herein, Miami Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act.

847.    What is more, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo never were eligible to collect PIP Benefits in connection with the range of motion and muscle strength testing claims identified in Exhibit "5" because the tests were routinely unlawfully unbundled from the underlying examination charges.

1.    **Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

848.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

849.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

850.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the physician asks the patient to move his or her joints at various

angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

851.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he or she would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

852.    Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with Miami Medical – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion is an essential component of the "hands-on" examination of a trauma patient.

853.    Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the CPT Assistant requires that range of motion and muscle strength tests are to be reimbursed as an element of the initial examinations and follow-up examinations. In other words, health care providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided range of motion and muscle strength tests.

2.      **Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo's Duplicate and Unbundled Billing for Range of motion and Muscle Strength Tests**

854.    To the extent that Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo actually provided initial examinations in the first instance, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely purported to provide range of motion and muscle strength tests on the Insured during each initial examination

855.    The charges for the range of motion and muscle strength tests were part and parcel of the already-inflated charges that Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo submitted for the initial examinations under CPT code 99205.

856.    To the extent that Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo actually provided follow-up examinations in the first instance, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely purported to provide range of motion and muscle strength tests on each Insured during each follow-up examination as well.

857.    The charges for the range of motion and muscle strength tests were part and parcel of the already-inflated charges that Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely submitted for the follow-up examinations under CPT codes 99214 and 92215.

858.    Even so, and as set forth herein and in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely unbundled a separate charge of $60.00 under CPT code 95851 for range of motion testing and $65.00 for muscle strength testing from each underlying initial examination charge under CPT code 99205, and from each underlying follow-up examination charge under CPT code 99215.

859.    For example:

(i)      On April 9, 2013, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named JB. Thereafter, in addition to their already-inflated charge for the examination under CPT code

99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(ii)     On October 29, 2013, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named MJ. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(iii)    On February 11, 2014, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named JC. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(iv)     On April 8, 2014, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named BG. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(v)      On August 12, 2014, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named BB. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(vi)     On September 30, 2014, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named IM. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(vii)    On March 24, 2015, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide a follow-up examination to an Insured named CD. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(viii)   On March 31, 2015, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named PB. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(ix)     On December 29, 2015, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named LG. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(x)      On February 9, 2016, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named JA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range

of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xi)     On April 26, 2016, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named HA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xii)    On May 10, 2016, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named DB. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xiii)   On August 16, 2016, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named AM. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xiv)    On November 15, 2016, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named FC. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xv)     On February 21, 2017, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named OA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xvi)    On March 28, 2017, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named CG. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xvii)   On July 11, 2017, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named AR. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xviii)  On September 26, 2017, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named AR. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for: (a) a separate charge of $60.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $65.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xix)    On March 20, 2018, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named JS. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $120.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $86.00 under CPT code 95831 for

muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xx)    On May 8, 2018, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named GI. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $120.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $86.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxi)   On May 15, 2018, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named MV. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for: (a) a separate charge of $120.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $86.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxii)  On September 13, 2018, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide a follow-up examination to an Insured named JM. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $120.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $86.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxiii) On January 31, 2019, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide a follow-up examination to an Insured named KT. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $120.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $86.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxiv)  On July 18, 2019, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named LT. Thereafter, in

addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $120.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $86.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(xxv)  On January 23, 2020, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named JM. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99204, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for: (a) a separate charge of $120.00 under CPT code 95851 for range of motion testing; and (b) a separate charge of $86.00 under CPT code 95831 for muscle strength testing in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

**(v)      The Fraudulently Unbundled Charges for X-Ray Consultations at Miami Medical**

860.      In an attempt to maximize the fraudulent billing for initial examinations that they could submit for each Insured, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo fraudulently unbundled separate charges for a physician's consultation regarding an x-ray made elsewhere ("x-ray consultations") from their charges for the putative initial examinations.

861.      What is more, in an additional attempt to maximize their fraudulent billing, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo directed many Insureds to return for follow-up examinations where they again fraudulently unbundled separate charges for x-ray consultations from their charges for the multiple putative follow-up examinations.

862.      Specifically, and as set forth in Exhibit "5", when they submitted their already-inflated charges of $325.00 or $475.00 for purported initial examinations under CPT codes 99203 and 99205, and $127.00 or $286.00 for the purported follow-up examinations under CPT codes 92213 and 99215, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely submitted an additional charge of $40.00, under CPT code 76140, for purported x-ray

consultations. As a result, following a significant number of initial examinations they purported to conduct, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo submitted total charges to GEICO of $365.00 or $515.00, and following a significant amount of the follow-up examinations they purported to conduct, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo submitted total charges to GEICO of $167.00 or $326.00.

863.    In the claims for x-ray consultations identified in Exhibit "5", the charges for the x-ray consultations also were fraudulent in that they misrepresented Miami Medical's eligibility to collect PIP Benefits in the first instance.

864.    In fact, and as set forth herein, Miami Medical never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act.

865.    What is more, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo never were eligible to collect PIP Benefits in connection with the x-ray consultations claims identified in Exhibit "5" because the tests were unlawfully unbundled from the underlying examination charges.

**1.      Fraudulent Billing for X-Ray Consultations**

866.    CPT code 76140 is used to report a physician's consultation regarding an x-ray made elsewhere. In order to report this code, the reporting physician must have been asked by another physician to read the x-ray and issue an interpretation of it and must also write a formal report on his interpretation and send a copy of it to the requesting physician. Furthermore, medical providers cannot properly bill the 76140 code for their review of x-ray films or reports prepared somewhere else when the review is performed as a component of their initial and follow-up examinations.

2. **Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo's Unbundled Billing for X-ray consultations**

867. To the extent that Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo actually provided initial and follow-up examinations in the first instance, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely purported to provide x-ray consultations on Insureds during these examinations where they would submit a separate charge under CPT code 76140.

868. In virtually all instances where Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo submitted a charge under CPT code 76140, Feijoo and Nodarse were not asked to provide a consultation on an x-ray by another physician, and instead reviewed x-ray reports prepared somewhere else as a component of an initial or follow-up examination.

869. The charges for the x-ray consultations were part and parcel of the already-inflated charges that Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely submitted for the initial and follow up-examinations under CPT codes 99203, 99205, 99213, and 99215.

870. Even so, and as set forth herein and in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely unbundled a separate charge of $40.00 under CPT code 76140 for the x-ray consultations from each underlying initial examination charge under CPT codes 99203 and 99205, and from each underlying follow-up examination charge under CPT codes 99213 and 99215.

871. For example:

(i) On August 13, 2013, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named EE. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for a separate charge of $40.00 under CPT code 76140 for an x-ray

consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(ii)     On June 2, 2014, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named FL. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for a separate charge of $40.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(iii)    On March 20, 2015, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named JG. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99203, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for a separate charge of $40.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(iv)     On March 16, 2015, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named GL. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99203, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for a separate charge of $40.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(v)      On April 26, 2016, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named HA. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for a separate charge of $40.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(vi)     On November 15, 2016, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse purported to provide an initial examination to an Insured named FC. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Nodarse billed GEICO for a separate charge of $40.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(vii)    On January 3, 2017, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide a follow-up examination to an Insured named FR. Thereafter, in addition to their already-inflated charge for the examination under

CPT code 99215, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for a separate charge of $40.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(viii)   On January 31, 2019, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide a follow-up examination to an Insured named KT. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99215, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for a separate charge of $40.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(ix)   On March 21, 2019, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named DC. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for a separate charge of $40.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

(x)   On May 16, 2019, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo purported to provide an initial examination to an Insured named JT. Thereafter, in addition to their already-inflated charge for the examination under CPT code 99205, Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, and Feijoo billed GEICO for a separate charge of $40.00 under CPT code 76140 for an x-ray consultation in order to separate what was one total examination into subparts for the purpose of increasing medical fees.

872.    These are only representative examples. In the claims for purported initial and follow up medical examinations that are identified in Exhibit "5", Miami Medical, J. Jimenez, G. Jimenez, J. Marquez, Nodarse, and Feijoo routinely fraudulently and unlawfully unbundled separate charges for x-ray consultations under CPT code 76140.

### III.   The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

873.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of bills and treatment reports through Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical to GEICO, containing thousands of individual

charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

874. The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i) The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical were in compliance with Florida law, and therefore were eligible to collect PIP Benefits in the first instance. In fact, Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical were never eligible for collect PIP Benefits in the first instance because: (a) Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical operated in violation of the Clinic Act; (b) Feijoo P.A., We Care, and New Life operated in violation of the Patient Brokering Act; and (c) Feijoo P.A. operated in violation of the Self-Referral Act.

(ii) The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (b) in the case of the physical therapy services, because they were provided by unsupervised massage therapists and/or chiropractic assistants in contravention of Florida law.

(iii) The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv) The bills and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

**IV.** **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

875.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

876.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

877.    For instance, We Care, New Life, Accident Rehab, and Miami Medical Defendants knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that they all lacked legitimate medical directors, and therefore were ineligible to collect PIP Benefits in the first instance.

878.    Additionally, Feijoo P.A. knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that it lacked a licensed health care practitioner-owner who legitimately supervised the business activities of Feijoo P.A.

879.    What is more, the We Care, New Life, Accident Rehab and Miami Medical Defendants knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that the Fraudulent Services were being provided – to the extent that they were provided at all – by unsupervised massage therapists and/or chiropractic assistants in contravention of Florida law.

880.    Furthermore, all the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a

fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

881.    Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

882.    The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

883.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,100,000.00.

884.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

885.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-884 above.

886.     There is an actual case in controversy between GEICO and Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

887.     Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical have no right to receive payment for any pending bills submitted to GEICO because of the fraudulent and unlawful activity described herein.

888.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical have no right to receive payment for any pending bills submitted to GEICO.

<u>SECOND CAUSE OF ACTION</u>
**Against Feijoo**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

889.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-88, 332-520, and 873-884, above.

890.     Feijoo P.A. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

891.     Feijoo knowingly has conducted and/or participated, directly or indirectly, in the conduct of Feijoo P.A.'s affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over seven years seeking payments that Feijoo P.A. was not eligible to receive under the No-Fault Law because: (i) Feijoo P.A. was unlawfully operated in violation of the Clinic Act, Patient Brokering Act, and Self-Referral Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically

necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Feijoo P.A. Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

892.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

893.   Feijoo P.A.'s business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Feijoo operated Feijoo P.A., inasmuch as Feijoo P.A. was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Feijoo P.A. to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Feijoo P.A. continues to attempt collection on the fraudulent billing submitted through Feijoo P.A. to the present day.

894.   Feijoo P.A. is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Feijoo P.A. in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

895.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $900,000.00 pursuant to the fraudulent bills submitted through the Feijoo P.A. enterprise.

896.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against the Feijoo P.A. Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

897.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-88, 332-520, and 873-884, above.

898.    The Feijoo P.A. Defendants are actively engaged in trade and commerce in the State of Florida.

899.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

900.    The Feijoo P.A. Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

901.    The bills and supporting documents submitted or caused to be submitted by the Feijoo P.A. Defendants to GEICO were fraudulent in that they misrepresented: (i) Feijoo P.A.'s eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

902.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Feijoo P.A. Defendants has been materially injurious to GEICO and its Insureds.

903.    The conduct of the Feijoo P.A. Defendants was the actual and proximate cause of the damages sustained by GEICO.

904.    The Feijoo P.A. Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $900,000.00.

905.    By reason of the Feijoo P.A. Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### FOURTH CAUSE OF ACTION
**Against Feijoo**
**(Under Fla. Stat. 772.103(3))**

906.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-88, 332-520, and 873-884, above.

907.    Feijoo P.A. is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

908.    Feijoo knowingly has conducted and/or participated, directly or indirectly, in the conduct of Feijoo P.A.'s affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Feijoo P.A. unlawfully was operated in violation of the Clinic Act, Patient Brokering Act, and Self-Referral Act, and therefore was not eligible to collect PIP Benefits in the first instance;

(ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Feijoo P.A. Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

909.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

910.    Feijoo P.A. is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Feijoo P.A. in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

911.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $900,000.00 pursuant to the fraudulent bills submitted through the Feijoo P.A. enterprise.

912.    By reason of Feijoo's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### FIFTH CAUSE OF ACTION
### Against the Feijoo P.A. Defendants
### (Common Law Fraud)

913.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-88, 332-520, and 873-884, above.

914.     The Feijoo P.A. Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Feijoo P.A. for the Fraudulent Services.

915.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Feijoo P.A. was in compliance with the Clinic Act, the Patient Brokering Act, and the Self-Referral Act and eligible to collect PIP Benefits in the first instance, when in fact Feijoo P.A. never was in compliance with the Clinic Act, Patient Brokering Act, and Self-Referral Act and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

916.     The Feijoo P.A. Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Feijoo P.A. that were not reimbursable.

917. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $900,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Feijoo P.A. Defendants through Feijoo P.A..

918. The Feijoo P.A. Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

919. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
**Against the Feijoo P.A. Defendants**
**(Unjust Enrichment)**

920. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-88, 332-520, and 873-884, above.

921. As set forth herein, the Feijoo P.A. Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

922. When GEICO paid the bills and charges submitted or caused to be submitted by the Feijoo P.A. Defendants through Feijoo P.A., it reasonably believed that it was legally obligated to make such payments based on the Feijoo P.A. Defendants' improper, unlawful, and/or unjust acts.

923. The Feijoo P.A. Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Feijoo P.A. Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

924.     The Feijoo P.A. Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

925.     By reason of the above, the Feijoo P.A. Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $900,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Martinez and Nguyen**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

926.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-105, 158-202, 332-338, 346-363, 521-539, and 873-884, above.

927.     We Care is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

928.     Martinez and Nguyen knowingly have conducted and/or participated, directly or indirectly, in the conduct of We Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over nine months seeking payments that We Care was not eligible to receive under the No-Fault Law because: (i) We Care unlawfully was operated in violation of the Clinic Act and Patient Brokering Act (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the We Care Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for

the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

929.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

930.    We Care's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Martinez and Nguyen operated We Care, inasmuch as We Care was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for We Care to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the We Care Defendants continue to attempt collection on the fraudulent billing submitted through We Care to the present day.

931.    We Care is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by We Care in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

932.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $170,000.00 pursuant to the fraudulent bills submitted through the We Care enterprise.

933.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Martinez, Nguyen, and Feijoo
### (Violation of RICO, 18 U.S.C. § 1962(d))

934.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-105, 158-202, 332-338, 346-363, 521-539, and 873-884, above.

935.    We Care is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

936.    Martinez, Nguyen, and Feijoo are employed by or associated with the We Care enterprise.

937.    Martinez, Nguyen, and Feijoo knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of We Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over nine months seeking payments that We Care was not eligible to receive under the No-Fault Law because: (i) We Care unlawfully was operated in violation of the Clinic Act and the Patient Brokering Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

938.    A representative sample of the fraudulent bills and corresponding mailings

submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

939.    Martinez, Nguyen, and Feijoo knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

940.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $170,000.00 pursuant to the fraudulent bills submitted through the We Care enterprise.

By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against the We Care Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

941.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-105, 158-202, 332-338, 346-363, 521-539, and 873-884, above.

942.    The We Care Defendants are actively engaged in trade and commerce in the State of Florida.

943.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

944.    The We Care Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

945.     The bills and supporting documents submitted or caused to be submitted by the We Care Defendants to GEICO were fraudulent in that they misrepresented: (i) We Care's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

946.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of the We Care Defendants has been materially injurious to GEICO and its Insureds.

947.     The conduct of the We Care Defendants was the actual and proximate cause of the damages sustained by GEICO.

948.     The We Care Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $170,000.00.

949.     By reason of the We Care Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## TENTH CAUSE OF ACTION
### Against Martinez and Nguyen
### (Under Fla. Stat. 772.103(3))

950.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-105, 158-202, 332-338, 346-363, 521-539, and 873-884, above.

951.     We Care is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

952.     Martinez and Nguyen knowingly have conducted and/or participated, directly or indirectly, in the conduct of We Care's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting

or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) We Care unlawfully was operated in violation of the Clinic Act and Patient Brokering Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

953.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

954.    We Care is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by We Care in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

955.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $170,000.00 pursuant to the fraudulent bills submitted through the We Care enterprise.

## ELEVENTH CAUSE OF ACTION
### Against Martinez, Nguyen, and Feijoo
### (Under Fla. Stat. 772.103(4))

956.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-105, 158-202, 332-338, 346-363, 521-539, and 873-884, above.

957.    We Care is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

958.    Martinez, Nguyen, and Feijoo are employed by or associated with the We Care enterprise.

959.    In furtherance of the fraudulent scheme, Martinez, Nguyen, and Feijoo submitted or caused to be submitted thousands of fraudulent bills through We Care to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

960.    When the billing was submitted, Martinez, Nguyen, and Feijoo knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) We Care unlawfully was operated in violation of the Clinic Act and the and Patient Brokering Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the We Care Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

961.     These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

962.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $170,000.00 pursuant to the fraudulent bills submitted through the We Care enterprise.

963.     By reason of Martinez, Nguyen, and Feijoo's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**TWELFTH CAUSE OF ACTION**
**Against the We Care Defendants**
**(Common Law Fraud)**

964.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-105, 158-202, 332-338, 346-363, 521-539, and 873-884, above.

965.     The We Care Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through We Care for the Fraudulent Services.

966.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that We Care was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact We Care never was in compliance with the Clinic Act and Patient Brokering Act, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP

reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

967.    The We Care Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through We Care that were not reimbursable.

968.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $170,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the We Care Defendants through We Care.

969.    The We Care Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

970.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
### Against the We Care Defendants
### (Unjust Enrichment)

971.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-105, 158-202, 332-338, 346-363, 521-539, and 873-884, above.

972.    As set forth herein, the We Care Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

973.     When GEICO paid the bills and charges submitted or caused to be submitted by the

We Care Defendants through We Care, it reasonably believed that it was legally obligated to make

such payments based on the We Care Defendants' improper, unlawful, and/or unjust acts.

974.     The We Care Defendants have been enriched at GEICO's expense by GEICO's

payments which constituted a benefit that the We Care Defendants voluntarily accepted

notwithstanding their improper, unlawful, and unjust billing scheme.

975.     The We Care Defendants' retention of GEICO's payments violates fundamental

principles of justice, equity and good conscience.

976.     By reason of the above, the We Care Defendants have been unjustly enriched in an

amount to be determined at trial, but in no event less than $170,000.00.

**FOURTEENTH CAUSE OF ACTION**
**Against Machado**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

977.     GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1-82, 106-122, 157, 203-246, 339-363, 540-557, and 873-884, above.

978.     New Life is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4),

that engages in activities that affected interstate commerce.

979.     Machado knowingly has conducted and/or participated, directly or indirectly, in the

conduct of New Life's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United

States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous

basis for over one year seeking payments that New Life was not eligible to receive under the No-

Fault Law because: (i) New Life unlawfully was operated in violation of the Clinic Act and Patient

Brokering Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to

277

GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the New Life Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

980.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

981.    New Life's business is a racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Machado operated New Life, inasmuch as New Life was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for New Life to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the New Life Defendants continue to attempt collection on the fraudulent billing submitted through New Life to the present day.

982.    New Life is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by New Life in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

983.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $130,000.00 pursuant to the fraudulent bills submitted through the New Life enterprise.

984.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against Machado, Rodriguez,  Estevez, and Feijoo**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

985.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 106-122, 157, 203-246, 339-363, 540-557, and 873-884, above.

986.     New Life is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

987.     Machado, Rodriguez, Estevez, and Feijoo are employed by or associated with the New Life enterprise.

988.     Machado, Rodriguez, Estevez, and Feijoo knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of New Life's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking payments that New Life was not eligible to receive under the No-Fault Law because: (i) New Life unlawfully was operated in violation of the Clinic Act and Patient Brokering Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were

provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the New Life Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

989.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

990.    Machado, Rodriguez, Estevez, and Feijoo knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

991.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $130,000.00 pursuant to the fraudulent bills submitted through the New Life enterprise.

992.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against the New Life Defendants
### (Under Fla. Stat. 501.201 et. seq.)

993.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 106-122, 157, 203-246, 339-363, 540-557, and 873-884, above.

994.    The New Life Defendants are actively engaged in trade and commerce in the State of Florida.

995.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

996.    The New Life Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

997.    The bills and supporting documents submitted or caused to be submitted by the New Life Defendants to GEICO were fraudulent in that they misrepresented: (i) New Life's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

998.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the New Life Defendants has been materially injurious to GEICO and its Insureds.

999.    The conduct of the New Life Defendants was the actual and proximate cause of the damages sustained by GEICO.

1000.   The New Life Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $130,000.00.

1001.   By reason of the New Life Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## SEVENTEENTH CAUSE OF ACTION
### Against Machado
### (Under Fla. Stat. 772.103(3))

1002.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 106-122, 157, 203-246, 339-363, 540-557, and 873-884, above.

1003.   New Life is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1004.   Machado knowingly has conducted and/or participated, directly or indirectly, in the conduct of New Life's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) New Life unlawfully was operated in violation of the Clinic Act and Patient Brokering Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1005.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1006.   New Life is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by New Life in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1007.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $130,000.00 pursuant to the fraudulent bills submitted through the New Life enterprise.

1008.   By reason of Machado's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## EIGHTEENTH CAUSE OF ACTION
### Against Machado, Rodriguez, Estevez, and Feijoo
### (Under Fla. Stat. 772.103(4))

1009.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 106-122, 157, 203-246, 339-363, 540-557, and 873-884, above.

1010.   New Life is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1011.   Machado, Rodriguez, Estevez, and Feijoo are employed by or associated with the New Life enterprise.

1012.   In furtherance of the fraudulent scheme, Machado, Rodriguez, Estevez, and Feijoo submitted or caused to be submitted thousands of fraudulent bills through New Life to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1013.  When the billing was submitted, Machado, Rodriguez, Estevez, and Feijoo knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) New Life unlawfully was operated in violation of the Clinic Act and the and Patient Brokering Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the New Life Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1014.  These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1015.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $130,000.00 pursuant to the fraudulent bills submitted through the New Life enterprise.

1016.  By reason of Machado, Rodriguez, Estevez, and Feijoo's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### NINETEENTH CAUSE OF ACTION
**Against the New Life Defendants**
**(Common Law Fraud)**

1017.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 106-122, 157, 203-246, 339-363, 540-557, and 873-884, above.

1018.   The New Life Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through New Life for the Fraudulent Services.

1019.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that New Life was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact New Life never was in compliance with the Clinic Act and Patient Brokering Act; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1020.   The New Life Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through New Life that were not reimbursable.

1021.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $130,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the New Life Defendants through New Life.

1022.   The New Life Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1023.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTIETH CAUSE OF ACTION**
**Against the New Life Defendants**
**(Unjust Enrichment)**

1024.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 106-122, 157, 203-246, 339-363, 540-557, and 873-884, above.

1025.   As set forth herein, the New Life Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1026.   When GEICO paid the bills and charges submitted or caused to be submitted by the New Life Defendants through New Life, it reasonably believed that it was legally obligated to make such payments based on the New Life Defendants' improper, unlawful, and/or unjust acts.

1027.   The New Life Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the New Life Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1028.   The New Life Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1029.   By reason of the above, the New Life Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $130,000.00.

**TWENTY-FIRST CAUSE OF ACTION**
**Against A. Vazquez, M. Vazquez, and Salado**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

1030.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 123-138, 247-284, 358-363, 558-700, and 873-884, above.

1031.   Accident Rehab is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1032.   A. Vazquez, M. Vazquez, and Salado knowingly have conducted and/or participated, directly or indirectly, in the conduct of Accident Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Accident Rehab was not eligible to receive under the No-Fault Law because: (i) Accident Rehab unlawfully was operated in violation of the Clinic Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Accident Rehab Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1033.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

1034.   Accident Rehab's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which A. Vazquez, M. Vazquez, and Salado operated Accident Rehab, inasmuch as Accident Rehab was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Accident Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Accident Rehab Defendants continue to attempt collection on the fraudulent billing submitted through Accident Rehab to the present day.

1035.   Accident Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Accident Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1036.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills submitted through the Accident Rehab enterprise.

1037.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## TWENTY-SECOND CAUSE OF ACTION
### Against A. Vazquez, M. Vazquez, Salado, and Feijoo
### (Violation of RICO, 18 U.S.C. § 1962(d))

1038.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 123-138, 247-284, 358-363, 558-700, and 873-884, above.

1039.   Accident Rehab is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1040.   A. Vazquez, M. Vazquez, Salado, and Feijoo are employed by or associated with the Accident Rehab enterprise.

1041.   A. Vazquez, M. Vazquez, Salado, and Feijoo knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Accident Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Accident Rehab was not eligible to receive under the No-Fault Law because: (i) Accident Rehab unlawfully was operated in violation of the Clinic Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Accident Rehab Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1042.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

1043.   A. Vazquez, M. Vazquez, Salado, and Feijoo knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1044.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills submitted through the Accident Rehab enterprise.

1045.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-THIRD CAUSE OF ACTION**
**Against the Accident Rehab Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

1046.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 123-138, 247-284, 358-363, 558-700, and 873-884, above.

1047.   The Accident Rehab Defendants are actively engaged in trade and commerce in the State of Florida.

1048.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1049.   The Accident Rehab Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

1050.   The bills and supporting documents submitted or caused to be submitted by the Accident Rehab Defendants to GEICO were fraudulent in that they misrepresented: (i) Accident Rehab's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

1051.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.   Additionally, the conduct of the Accident Rehab Defendants has been materially injurious to GEICO and its Insureds.

1052.   The conduct of the Accident Rehab Defendants was the actual and proximate cause of the damages sustained by GEICO.

1053.   The Accident Rehab Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $600,000.00.

1054.   By reason of the Accident Rehab Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## TWENTY-FOURTH CAUSE OF ACTION
### Against A. Vazquez, M. Vazquez, and Salado
### (Under Fla. Stat. 772.103(3))

1055.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 123-138, 247-284, 358-363, 558-700, and 873-884, above.

1056.   Accident Rehab is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1057. A. Vazquez, M. Vazquez, and Salado knowingly have conducted and/or participated, directly or indirectly, in the conduct of Accident Rehab's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Accident Rehab unlawfully was operated in violation of the Clinic Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1058. These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1059. Accident Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Accident Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1060.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills submitted through the Accident Rehab enterprise.

## TWENTY-FIFTH CAUSE OF ACTION
### Against A. Vazquez, M. Vazquez, Salado, and Feijoo
### (Under Fla. Stat. 772.103(4))

1061.  GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 123-138, 247-284, 358-363, 558-700, and 873-884, above.

1062.  Accident Rehab is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1063.  A. Vazquez, M. Vazquez, Salado, and Feijoo are employed by or associated with the Accident Rehab enterprise.

1064.  In furtherance of the fraudulent scheme, A. Vazquez, M. Vazquez, Salado, and Feijoo submitted or caused to be submitted thousands of fraudulent bills through Accident Rehab to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1065.  When the billing was submitted, A. Vazquez, M. Vazquez, Salado, and Feijoo knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Accident Rehab unlawfully was operated in violation of the Clinic Act (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Accident Rehab Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the

Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1066.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1067.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills submitted through the Accident Rehab enterprise.

1068.   By reason of A. Vazquez, M. Vazquez, Salado, and Feijoo's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against the Accident Rehab Defendants**
**(Common Law Fraud)**

1069.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 123-138, 247-284, 358-363, 558-700, and 873-884, above.

1070.   The Accident Rehab Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Accident Rehab for the Fraudulent Services.

1071.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Accident Rehab was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Accident Rehab never was in compliance with the Clinic Act, and never was eligible to collect

PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1072.   The Accident Rehab Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Accident Rehab that were not reimbursable.

1073.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Accident Rehab Defendants through Accident Rehab.

1074.   The Accident Rehab Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1075.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-SEVENTH CAUSE OF ACTION**
**Against the Accident Rehab Defendants**
**(Unjust Enrichment)**

1076.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 123-138, 247-284, 358-363, 558-700, and 873-884, above.

1077.   As set forth herein, the Accident Rehab Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1078.   When GEICO paid the bills and charges submitted or caused to be submitted by the Accident Rehab Defendants through Accident Rehab, it reasonably believed that it was legally obligated to make such payments based on the Accident Rehab Defendants' improper, unlawful, and/or unjust acts.

1079.   The Accident Rehab Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Accident Rehab Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1080.   The Accident Rehab Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1081.   By reason of the above, the Accident Rehab Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $600,000.00.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Against J. Jimenez, G. Jimenez, and Marquez**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

1082.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 139-157, 285-331, 358-363, and 701-884, above.

1083.   Miami Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1084. J. Jimenez, G. Jimenez, and Marquez knowingly have conducted and/or participated, directly or indirectly, in the conduct of Miami Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over seven years seeking payments that Miami Medical was not eligible to receive under the No-Fault Law because: (i) Miami Medical unlawfully was operated in violation of the Clinic Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Miami Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1085. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

1086. Miami Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which J. Jimenez, G. Jimenez, and Marquez operated Miami Medical, inasmuch as Miami Medical was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Miami Medical to function. Furthermore, the intricate

planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Miami Medical Defendants continue to attempt collection on the fraudulent billing submitted through Miami Medical to the present day.

1087.   Miami Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Miami Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1088.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,400,000.00 pursuant to the fraudulent bills submitted through the Miami Medical enterprise.

1089.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-NINTH CAUSE OF ACTION**
**Against J. Jimenez, G. Jimenez, Marquez, Nodarse, Vazquez, Uzan, and Feijoo**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

1090.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 139-157, 285-331, 358-363, and 701-884, above.

1091.   Miami Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

1092.   J. Jimenez, G. Jimenez, Marquez, Nodarse, Vazquez, Uzan, and Feijoo are employed by or associated with the Miami Medical enterprise.

1093.   J. Jimenez, G. Jimenez, Marquez, Nodarse, Vazquez, Uzan, and Feijoo knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the

conduct of Miami Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over seven years seeking payments that Miami Medical was not eligible to receive under the No-Fault Law because: (i) Miami Medical unlawfully was operated in violation of the Clinic Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Miami Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1094.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

1095.   J. Jimenez, G. Jimenez, Marquez, Nodarse, Vazquez, Uzan, and Feijoo knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

1096.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,400,000.00 pursuant to the fraudulent bills submitted through the Miami Medical enterprise.

1097.  By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTIETH CAUSE OF ACTION
**Against the Miami Medical Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

1098.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 139-157, 285-331, 358-363, and 701-884, above.

1099.  The Miami Medical Defendants are actively engaged in trade and commerce in the State of Florida.

1100.  GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

1101.  The Miami Medical Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

1102.  The bills and supporting documents submitted or caused to be submitted by the Miami Medical Defendants to GEICO were fraudulent in that they misrepresented: (i) Miami Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

1103.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Miami Medical Defendants has been materially injurious to GEICO and its Insureds.

1104.   The conduct of the Miami Medical Defendants was the actual and proximate cause of the damages sustained by GEICO.

1105.   The Miami Medical Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $370,000.00.

1106.   By reason of the Miami Medical Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**THIRTY-FIRST CAUSE OF ACTION**
**Against J. Jimenez, G. Jimenez, and Marquez**
**(Under Fla. Stat. 772.103(3))**

1107.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 139-157, 285-331, 358-363, and 701-884, above.

1108.   Miami Medical is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1109. J. Jimenez, G. Jimenez, and Marquez knowingly have conducted and/or participated, directly or indirectly, in the conduct of Miami Medical's affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted thousands of fraudulent bills to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Miami Medical unlawfully was operated in violation of the Clinic Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii)

the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1110.   These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1111.   Miami Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Miami Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

1112.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,400,000.00 pursuant to the fraudulent bills submitted through the Miami Medical enterprise.

### THIRTY-SECOND CAUSE OF ACTION
**Against J. Jimenez, G. Jimenez, Marquez, Nodarse, Vazquez, Uzan, and Feijoo**
**(Under Fla. Stat. 772.103(4))**

1113.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 139-157, 285-331, 358-363, and 701-884, above.

1114.   Miami Medical is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

1115.  J. Jimenez, G. Jimenez, Marquez, Nodarse, Vazquez, Uzan, and Feijoo are employed by or associated with the Miami Medical enterprise.

1116.  In furtherance of the fraudulent scheme, J. Jimenez, G. Jimenez, Marquez, Nodarse, Vazquez, Uzan, and Feijoo submitted or caused to be submitted thousands of fraudulent bills through Miami Medical to GEICO seeking payment under automobile insurance policies issued by GEICO to Florida Insureds.

1117.  When the billing was submitted, J. Jimenez, G. Jimenez, Marquez, Nodarse, Vazquez, Uzan, and Feijoo knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Miami Medical unlawfully was operated in violation of the Clinic Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Miami Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

1118.  These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

1119.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,400,000.00 pursuant to the fraudulent bills submitted through the Miami Medical enterprise.

1120.   By reason of J. Jimenez, G. Jimenez, Marquez, Nodarse, Vazquez, Uzan, and Feijoo's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### THIRTY-THIRD CAUSE OF ACTION
**Against the Miami Medical Defendants**
**(Common Law Fraud)**

1121.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-82, 139-157, 285-331, 358-363, and 701-884, above.

1122.   The Miami Medical Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Miami Medical for the Fraudulent Services.

1123.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Miami Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Miami Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

1124.   The Miami Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Miami Medical that were not reimbursable.

1125.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,400,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Miami Medical Defendants through Miami Medical.

1126.   The Miami Medical Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

1127.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTY-FOURTH CAUSE OF ACTION
### Against the Miami Medical Defendants
### (Unjust Enrichment)

1128.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-82, 139-157, 285-331, 358-363, and 701-884, above.

1129.   As set forth herein, the Miami Medical Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

1130.   When GEICO paid the bills and charges submitted or caused to be submitted by the Miami Medical Defendants through Miami Medical, it reasonably believed that it was legally obligated to make such payments based on the Miami Medical Defendants' improper, unlawful, and/or unjust acts.

1131.  The Miami Medical Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Miami Medical Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

1132.  The Miami Medical Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

1133.  By reason of the above, the Miami Medical Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,400,000.00.

## JURY DEMAND

1134.  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Feijoo P.A., We Care, New Life, Accident Rehab, and Miami Medical have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Feijoo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $900,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Feijoo P.A. and Feijoo, compensatory damages in an amount to be determined at trial but in excess of $900,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

D.      On the Fourth Cause of Action against Feijoo, compensatory damages in an amount to be determined at trial but in excess of $900,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

E.      On the Fifth Cause of Action against the Feijoo P.A. Defendants, compensatory damages in an amount to be determined at trial but in excess of $900,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against the Feijoo P.A. Defendants, more than $900,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Martinez and Nguyen, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $170,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Martinez, Nguyen, and Feijoo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $170,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against We Care, Martinez, Nguyen, and Feijoo, compensatory damages in an amount to be determined at trial but in excess of $170,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

J.      On the Tenth Cause of Action against Martinez and  Nguyen, compensatory damages in an amount to be determined at trial but in excess of $170,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

K.    On the Eleventh Cause of Action against Martinez, Nguyen, and Feijoo, compensatory damages in an amount to be determined at trial but in excess of $170,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

L.    On the Twelfth Cause of Action against the We Care Defendants, compensatory damages in an amount to be determined at trial but in excess of $170,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.    On the Thirteenth Cause of Action against the We Care Defendants, more than $170,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.    On the Fourteenth Cause of Action against Machado and Almonte, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $130,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.    On the Fifteenth Cause of Action against Machado, Almonte, Rodriguez, Estevez, and Feijoo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $130,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.    On the Sixteenth Cause of Action against the New Life Defendants, compensatory damages in an amount to be determined at trial but in excess of $130,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

Q.      On the Seventeenth Cause of Action against Machado and Almonte, compensatory damages in an amount to be determined at trial but in excess of $130,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

R.      On the Eighteenth Cause of Action against Machado, Almonte, Rodriguez, Estevez, and Feijoo, compensatory damages in an amount to be determined at trial but in excess of $130,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

S.      On the Nineteenth Cause of Action against the New Life Defendants, compensatory damages in an amount to be determined at trial but in excess of $130,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

T.      On the Twentieth Cause of Action against the New Life Defendants,  more than $130,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

U.      On the Twenty-First Cause of Action against A. Vazquez, M. Vazquez, and Salado, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $600,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against A. Vazquez, M. Vazquez, Salado, and Feijoo, compensatory damages in of GEICO in an amount to be determined at trial but in excess of $600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.     On the Twenty-Third Cause of Action against the Accident Rehab Defendants, compensatory damages in an amount to be determined at trial but in excess of $600,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

X.     On the Twenty-Fourth Cause of Action against A. Vazquez, M. Vazquez, and Salado, compensatory damages in an amount to be determined at trial but in excess of $600,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

Y.     On the Twenty-Fifth Cause of Action against A. Vazquez, M. Vazquez, Salado, and Feijoo, compensatory damages in an amount to be determined at trial but in excess of $600,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

Z.     On the Twenty-Sixth Cause of Action against the Accident Rehab Defendants, compensatory damages in an amount to be determined at trial but in excess of $600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

AA.    On the Twenty-Seventh Cause of Action against the Accident Rehab Defendants, more than $600,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

BB.    On the Twenty-Eighth Cause of Action against J. Jimenez, G. Jimenez, and Marquez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC.     On the Twenty-Ninth Cause of Action against J. Jimenez, G. Jimenez, Nodarse, Vazquez, Uzan, and Feijoo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

DD.     On the Thirtieth Cause of Action against the Miami Medical Defendants, compensatory damages in an amount to be determined at trial but in excess of $1,400,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

EE.     On the Thirty-First Cause of Action against J. Jimenez, G. Jimenez, compensatory damages in an amount to be determined at trial but in excess of $1,400,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

FF.     On the Thirty-Second Cause of Action against J. Jimenez, G. Jimenez, Nodarse, Vazquez, Uzan, and Feijoo, compensatory damages in an amount to be determined at trial but in excess of $1,400,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

GG.     On the Thirty-Third Cause of Action against the Miami Medical Defendants, compensatory damages in an amount to be determined at trial but in excess of $1,400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

HH.     On the Thirty-Fourth Cause of Action against the Miami Medical Defendants, more than $1,400,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Dated:   May 15, 2020

Respectfully submitted,

*/s/  John P. Marino*
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

Yonatan Bernstein (pro hac vice pending)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11550
Phone:  (516) 357-3000
Facsimile:  (516) 357-3333
max.gershenoff@rivkin.com
yonatan.bernstein@rivkin.com

*Attorneys for Plaintiffs*